Barcode:4187711-02 A-549-502 REV - Admin Review 3/1719 - 2/29/20

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-549-502
Administrative Review
POR:  03/01/2019-02/29/2020
**Public Document**
E&C/OI:  TES

December 2, 2021

| | |
|---|---|
| **MEMORANDUM TO:** | Ryan Majerus<br>Deputy Assistant Secretary<br>  for Policy and Negotiations,<br>   performing the non-exclusive functions and duties of the<br>   Assistant Secretary for Enforcement and Compliance |
| **FROM:** | James Maeder<br>Deputy Assistant Secretary<br>  for Antidumping and Countervailing Duty Operations |
| **SUBJECT:** | Circular Welded Carbon Steel Pipes and Tubes from Thailand:<br>Issues and Decision Memorandum for the Final Results of<br>Antidumping Duty Administrative Review and Final No Shipment<br>Determination, In Part; 2019-2020 |

## I.    SUMMARY

We analyzed comments filed in the administrative review of the antidumping duty (AD) order on circular welded carbon steel pipes and tubes (CWP) from Thailand for the period of review (POR) March 1, 2019, through February 29, 2020.  This review covers two mandatory respondents, Saha Thai Steel Pipe Public Co., Ltd., also known as Saha Thai Steel Pipe (Public) Co., Ltd. (collectively, Saha Thai) and Blue Pipe Steel Center (Blue Pipe), and 27 non-examined producers or exporters of subject merchandise.  In addition, we determined that Blue Pipe and one of the non-examined companies, K-Line Logistics (Thailand) Ltd. (K-Line), had no shipments during the POR.  As a result of our analysis of comments received from parties, we made changes to the *Preliminary Results*.[1]  We recommend that you approve the positions described in the "Discussion of Comments" section of this memorandum.

Below are the issues for which we received comments from interested parties:

Comment 1:    Whether Commerce Should Base the Weighted-Average Dumping Margins for
             Saha Thai and Blue Pipe on Adverse Facts Available
Comment 2:    Whether Saha Thai Created a Fictitious Market
Comment 3:    Whether Saha Thai Is Affiliated with Certain Companies

---

[1] *See Circular Welded Carbon Steel Pipes and Tubes from Thailand:  Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2019-2020*, 86 FR 30405 (June 8, 2021) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM).

Filed By: Thomas Schauer, Filed Date: 12/3/21 10:42 AM, Submission Status: Approved



Barcode:4187711-02 A-549-502 REV - Admin Review 3/1/19 - 2/29/20

Comment 4:    Whether Commerce Should Require Saha Thai and Blue Pipe to Resubmit Certain Submissions

Comment 5:    Whether Commerce Must Take Steps to Ensure the Government Can Collect the Duties Owed

Comment 6:    Whether Commerce Should Reconsider Prior Reviews to Account for Potential Fraud

Comment 7:    Whether Commerce Should Adjust Saha Thai's Costs to Account for a Particular Market Situation

Comment 8:    Whether Commerce's Preliminary Determination for Non-Examined Companies Is Contrary to Law

Comment 9:    Whether Commerce Should Calculate an Individual Weighted-Average Dumping Margin for Thai Premium Pipe Co., Ltd.

## II.    BACKGROUND

On June 8, 2021, the Department of Commerce (Commerce) published the *Preliminary Results*.[2]

On June 1, 2021, Wheatland Tube Company (Wheatland), a domestic interested party, placed rebuttal factual information on the record.[3]  On June 21, 2021, Saha Thai[4] and Blue Pipe[5] submitted rebuttal factual information on the record.

Wheatland,[6] Nucor Tubular Products Inc. (Nucor), a domestic interested party,[7] Saha Thai,[8] and Thai Premium Pipe Co., Ltd. (TPP),[9] timely submitted a case briefs; Wheatland,[10] Nucor,[11] Saha

---

[2] *Id.*

[3] *See* Wheatland's Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand:  Rebuttal Factual Information to Blue Pipe's Supplemental Questionnaire Response," dated June 1, 2021.

[4] *See* Saha Thai's Letter, "Saha Thai's new factual information to rebut, clarify, or correct the information in Wheatland's June 1, 2021, submission; Circular Welded Carbon Steel Pipe and Tubes from Thailand (AR 19-20)," dated June 21, 2021.

[5] *See* Blue Pipe's Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand:  Rebuttal Factual Information," dated June 21, 2021.

[6] *See* Wheatland's Letter, "Circular Welded Steel Pipes and Tubes from Thailand:  Resubmitted Case Brief," dated July 27, 2021 (Wheatland's Case Brief).

[7] *See* Nucor's Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand:  Case Brief," dated July 21, 2021.  In its case brief, Nucor stated that it "concurs with and adopt by reference the arguments set forth in the case brief submitted by Wheatland" and that it "does not wish to address any issues or arguments that are substantively different from those addressed by Wheatland in its case brief."

[8] *See* Saha Thai's Letter, "Saha Thai's Case Brief; Circular Welded Carbon Steel Pipe and Tubes from Thailand (AR 19-20)," dated July 21, 2021 (Saha Thai's Case Brief).

[9] *See* TPP's Letters, "Circular Welded Carbon Steel Pipes and Tubes from Thailand:  Case Brief," dated July 21, 2021 (TPP Case Brief); and "Circular Welded Carbon Steel Pipes and Tubes from Thailand:  Case Brief Supplemental," dated July 27, 2021 (TPP Case Brief Supplement).

[10] *See* Wheatland's Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Rebuttal Brief," dated August 10, 2021 (Wheatland's Rebuttal Brief).

[11] *See* Nucor's Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Rebuttal Brief," dated August 10, 2021.  In its rebuttal brief, Nucor stated that it "concurs with and adopts by reference the arguments set forth in the rebuttal brief submitted by Wheatland" and that it "does not wish to address any issues or arguments that are substantively different from those addressed by Wheatland in its rebuttal brief."

Filed By: Thomas Schauer, Filed Date: 12/3/21 10:42 AM, Submission Status: Approved

Barcode:4187711-02 A-549-502 REV - Admin Review 3/1/19 - 2/29/20

Thai,[12] and Blue Pipe[13] timely submitted rebuttal briefs.  On July 8, 2021, Wheatland requested a hearing.[14]  We held a public hearing on September 28, 2021.[15]

On September 8, 2021, Commerce extended the deadline for the final results of review to December 3, 2021.[16]

## III.    SCOPE OF THE *ORDER*[17]

The products covered by this *Order* are certain circular welded carbon steel pipes and tubes from Thailand.  The subject merchandise has an outside diameter of 0.375 inches or more, but not exceeding 16 inches.  These products, which are commonly referred to in the industry as "standard pipe" or "structural tubing" are hereinafter designated as "pipes and tubes."  The merchandise is classifiable under the Harmonized Tariff Schedule of the United States (HTSUS) subheadings 7306.30.1000, 7306.30.5025, 7306.30.5032, 7306.30.5040, 7306.30.5055, 7306.30.5085 and 7306.30.5090.  Although the HTSUS subheadings are provided for convenience and purposes of CBP, the written description of the merchandise subject to the *Order* is dispositive.

## IV.    CHANGES TO THE PRELIMINARY RESULTS

As described in Comment 1, below, we relied on partial adverse facts available with respect to our calculation of home market net prices for certain affiliated home-market customers of Saha Thai.

In addition, for the *Preliminary Results*, Commerce found that 53.54 percent of Saha Thai's U.S. sales passed the Cohen's *d* test, and confirmed the existence of a pattern of prices for comparable merchandise that differ significantly among purchasers, regions, or time periods and that the average-to-average method could not account for such differences because there was a 25 percent relative change between the weighted-average dumping margin calculated using the average-to-average method and the weighted-average dumping calculated using an alternative comparison method based on applying the average-to-transaction method to those U.S. sales which passed the Cohen's *d* test and the average-to-average method to those sales which did not pass the Cohen's *d* test.[18]  Accordingly, for the *Preliminary Results*, Commerce applied the average-to-transaction method to those U.S. sales which passed the Cohen's *d* test and the average-to-average method to those U.S. sales which did not pass the Cohen's *d* test to calculate the weighted-average dumping margin for Saha Thai.[19]

---

[12] *See* Saha Thai's Letter, "Saha Thai's Rebuttal Brief - Circular Welded Carbon Steel Pipe and Tubes from Thailand (AR 19-20)," dated August 16, 2021 (Saha Thai's Rebuttal Brief).

[13] *See* Blue Pipe's Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand:  Rebuttal Brief," dated August 10, 2021 (Blue Pipe's Rebuttal Brief).

[14] *See* Wheatland's Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand:  Hearing Request," dated July 8, 2021.

[15] *See* Public Hearing Transcript, "In the Matter of the Antidumping Administrative the Antidumping Administrative Carbon Steel Pipes and Tubes from Thailand," dated October 5, 2021.

[16] *See* Memorandum, "Circular Welded Carbon Steel Pipes and Tubes from Thailand:  Extension of Deadline for Final Results of Antidumping Duty Administrative Review; 2019-2020," dated September 8, 2021.

[17] *See Circular Welded Carbon Pipes and Tubes from Thailand*, 51 FR 8341 (March 11, 1986) (*Order*).

[18] *See Preliminary Results* PDM at 15.

[19] *Id.*

3

After applying the partial adverse facts available as described further in Comment 1 below, we now find that the average-to-average method can account for such differences because the difference between the weighted-average dumping margin calculated using the average-to-average method and the weighted-average dumping calculated using an alternative comparison method based on applying the average-to-transaction method to those U.S. sales which passed the Cohen's *d* test and the average-to-average method to those sales which did not pass the Cohen's *d* test is no longer meaningful (*i.e.*, the difference in the calculated rates do not cross the *de minimis* threshold or is less than 25 percent when both rates are above the *de minimis* threshold).[20]  Thus, for the final results of review, Commerce is applying the average-to-average method to all U.S. sales to calculate the weighted-average dumping margin for Saha Thai.

## V.    DISCUSSION OF COMMENTS

### Comment 1:  Whether Commerce Should Base the Weighted-Average Dumping Margins for Saha Thai and Blue Pipe on Adverse Facts Available

*Wheatland's Case Brief*
- Commerce should apply total adverse facts available (AFA) to Saha Thai and Blue Pipe.[21]
  - Blue Pipe did not accurately report its affiliates.[22]
    - Blue Pipe's claim that certain family members had no role in other companies involved in the development, production, sale and/or distribution of CWP is contradicted by information on the record.[23]
    - Blue Pipe failed to disclose the connections it had with Company A in its responses.[24]
  - Saha Thai did not accurately report its affiliates.[25]
    - Saha Thai's claim that certain department heads and employees had no role in other companies involved in the development, production, sale and/or distribution of CWP is contradicted by information on the record.[26]
    - Saha Thai failed to disclose the connections it had with Company A in its responses.[27]
  - Commerce has the legal authority to apply AFA to address misconduct and fraud.[28]
    - The omissions and false statements made by Saha Thai and Blue Pipe justify the use of AFA.[29]

---

[20] *See* Memorandum, "Circular Welded Carbon Steel Pipe and Tubes from Thailand:  Final Analysis Memorandum for Saha Thai Steel Pipe Public Co., Ltd.," dated concurrently with this memorandum (Saha Thai Final Analysis Memorandum).
[21] *See* Wheatland's Case Brief at 5-25.
[22] *Id*. at 5-9.
[23] *Id*.
[24] *Id*.  "Company A" designates a company whose identity is proprietary; the identity of Company A can be found in Wheatland's Case Brief at 5-6.
[25] *Id*. at 9-16.
[26] *Id*.
[27] *Id*.
[28] *Id*. at 16-19.
[29] *Id*. at 16-17.

4

Barcode:4187711-02 A-549-502 REV - Admin Review 3/1/19 - 2/29/20

- Commerce applies AFA when respondents engage in evasion and thus impede Commerce's ability to conduct a review and calculate an accurate dumping margin.[30]
  - The record holds other, independent reasons to assign Blue Pipe total AFA in this review.[31]
    - Blue Pipe failed to submit information requested by Commerce.[32]
  - Commerce should select an effective and appropriate AFA methodology.[33]
    - Commerce should choose as AFA the highest single transaction margin rate calculated for Saha Thai.[34]

*Saha Thai's Rebuttal Brief*
- The application of AFA to Saha Thai under the theory advanced by Wheatland has no basis in law or fact.[35]
  - Commerce has not found the statutory elements necessary to apply total AFA to Saha Thai.[36]
  - The facts cited by Wheatland do not support a finding that Saha Thai withheld information or otherwise failed to cooperate in reporting its affiliations.[37]
    - After the *Preliminary Results*, Wheatland submitted certain information from purported Saha Thai affiliates but failed to explain the purpose of the submission; as a result, Commerce did not request any additional information from Saha Thai.[38]
    - The statutory definition of affiliated person requires that, for a finding of control, a person must be legally or operationally in a position to exercise restraint or direction over the other person.[39]
    - Commerce's regulations state that Commerce will not find that control exists unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product; they also require that the influence affects decisions concerning the subject merchandise or the foreign like product.[40]
    - Wheatland's allegations do not show facts that would satisfy the statutory or regulatory standards for finding affiliation or show that Saha Thai's reporting of its affiliations are deficient in any way.[41]
      - Wheatland makes a vague allegation of a relationship, but it has not pointed to any evidence of "control" between Saha Thai and Company A, nor has it shown how the evidence relied upon shows the kind of relationship that has

---

[30] *Id*. at 17-19.
[31] *Id*. at 19-22.
[32] *Id*. at 19-21.
[33] *Id*. at 22-25.
[34] *Id*.
[35] *See* Saha Thai Rebuttal Brief at 5-14.
[36] *Id*. at 6-7.
[37] *Id*. at 7-14.
[38] *Id*. at 7.
[39] *Id*. at 8-9.
[40] *Id*. at 9.
[41] *Id*. at 9-13.

5

the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise.[42]

· The position for which Wheatland alleges overlaps does not amount to a traditional leadership position such as Chairman or Chief Executive Officer and Wheatland has not proven that it entails a legal or operational position allowing for the exercise of control.[43]

- Wheatland also makes multiple allegations regarding customers affiliated with Saha Thai but does not explain how information that has been on the record since November 2020 could support a finding that information was withheld, as the *Preliminary Results* were not issued until June 2021.[44]

- Wheatland accuses Saha Thai of certain omissions regarding a company at a particular address, but fails to support its assertions or demonstrate how the allegations, if true, would show that Saha Thai's reporting was deficient.[45]

• Wheatland's proposed AFA rates are illegal and illogical.[46]

o Wheatland's case brief included SAS margin calculations which were previously not on the record of this proceeding; Commerce's practice is to reject SAS margin calculations provided by interested parties after Commerce's preliminary determination.[47]

o Wheatland's argument ignores Commerce's practice in selecting AFA rates in administrative reviews.[48]

o None of Wheatland's suggested scenarios for the application of AFA is consistent with the law and the evidence in this proceeding.[49]

*Blue Pipe's Rebuttal Brief*

• Wheatland's arguments are procedurally untimely and not credible and should be rejected.[50]

o Wheatland dumped its rebuttal factual information (RFI) on to the record of this proceeding without providing any explanation of how any of the submitted RFI allegedly was intended to rebut, clarify, or correct information in Blue Pipe's May 6, 2021, supplemental questionnaire response.[51]

o Now for the first time, Wheatland in its case brief finally articulates its arguments, many of which it could have and should have raised in its RFI submission.[52]

o From a procedural standpoint, the arguments raised in Wheatland's case brief that are based on its RFI submission are troubling because the timing and vagueness of its RFI submission have compromised Commerce's ability to administer this review

---

[42] *Id.* at 9-10.
[43] *Id.* at 10-11.
[44] *Id.* at 10-11.
[45] *Id.* at 12-13.
[46] *Id.* at 28-32.
[47] *Id.* at 28-29 (citing *Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review, 2012-2013*, 79 FR 57047 (September 24, 2014), and accompanying Issues and Decision Memorandum (IDM) at Comment 11).
[48] *Id.* at 29-30.
[49] *Id.* at 31-32.
[50] *See* Blue Pipe's Rebuttal Brief at 1-6.
[51] *Id.* at 1.
[52] *Id.*

while maintaining procedural fairness and giving Blue Pipe a meaningful opportunity to address any factual questions presented before Commerce.[53]

o Commerce did not issue any supplemental questionnaires to Blue Pipe after the *Preliminary Results* were issued, presumably because it had no guidance from Wheatland as to the specific discrepancies that the RFI submission was intended to identify.[54]

o Many of the alleged inconsistencies and contradictions identified by Wheatland regarding Blue Pipe's alleged affiliation with certain companies are only based on Wheatland's self-serving mischaracterization of certain documents that could have been explained or clarified by Blue Pipe if Commerce had issued a supplemental questionnaire.[55]

o Wheatland's RFI submission has substantive flaws that render it untrustworthy, inaccurate, misleading, so that ultimately it is not credible record evidence.[56]

- Wheatland does not establish that Blue Pipe inaccurately reported its affiliations.[57]
  o The documents cited in Wheatland's RFI submission do not establish that Blue Pipe is affiliated with Company A.[58]
    ▪ Because Wheatland did not specify what information in its RFI submission would be used as the basis for its affiliation allegation, Blue Pipe could not determine what information needed clarification or correction; with proper notice, Blue Pipe could have provided information to rebut, clarify or correct many of the arguments Wheatland now raises that are based on a flawed interpretation of documents.[59]
    ▪ A careful review of the information cited by Wheatland in its case brief indicates that Wheatland's claims are not supported and are even contradicted by the record evidence.[60]

- Wheatland misstates the legal criteria for the application of AFA.[61]
  o Wheatland fundamentally ignores the statutory provisions that govern when and how Commerce may apply facts available.[62]
  o Wheatland omits any discussion of how Commerce can comply with these statutory requirements based on the record evidence presented.[63]
    ▪ Wheatland strategically chose not to disclose its arguments until the case brief, but in doing so, Wheatland deprived Commerce of AFA because Commerce could not give Blue Pipe the notice of the alleged deficiency and the opportunity to explain or correct the deficiency as required by the statute.[64]

**Commerce Position:**  We disagree with Wheatland that Commerce should rely on total AFA to determine the weighted-average dumping margins for Blue Pipe and Saha Thai.  Sections

---

[53] *Id*. at 1-2.
[54] *Id*. at 2.
[55] *Id*. at 2-3.
[56] *Id*. at 3-6.
[57] *Id*. at 6-9.
[58] *Id*. at 6.
[59] *Id*. at 6-7.
[60] *Id*. at 8-9.
[61] *Id*. at 11-14.
[62] *Id*. at 11-12.
[63] *Id*. at 12.
[64] *Id*. at 12-13.

7

776(a)(1) and (2) of the Act provide that, if necessary information is missing from the record, or if an interested party:  (A) withholds information that has been requested by Commerce; (B) fails to provide such information in a timely manner or in the form or manner requested, subject to subsections 782(c)(1) and (e) of the Act; (C) significantly impedes a proceeding under the AD statute; or (D) provides such information but the information cannot be verified, Commerce shall, subject to section 782(d) of the Act, use facts otherwise available in reaching the applicable determination.

Where Commerce determines that a response to a request for information does not comply with the request, section 782(d) of the Act provides that Commerce will so inform the party submitting the response and will, to the extent practicable, provide that party with an opportunity to remedy or explain the deficiency.  If the party fails to remedy or satisfactorily explain the deficiency within the applicable time limits, subject to section 782(e) of the Act, Commerce may disregard all or part of the original and subsequent responses from that party, as appropriate.

Section 776(b) of the Act provides that Commerce may use an adverse inference in applying the facts otherwise available when a party fails to cooperate by not acting to the best of its ability to comply with a request for information.  In doing so, Commerce is not required to determine, or make any adjustments to, a weighted-average dumping margin based on any assumptions about information an interested party would have provided if the interested party had complied with the request for information.  Further, section 776(b)(2) of the Act states that an adverse inference may include reliance on information derived from the Petition, the final determination from the less-than-fair-value investigation, a previous administrative review, or other information placed on the record.

In our original questionnaire, we asked Saha Thai to identify "all suppliers, (sub)contractors, lenders, exporters, distributors, resellers, and other persons involved in the development, production, sale and/or distribution of the merchandise under review which Commerce may also consider affiliated with your company, in accordance with section 771(33) of the Act and 19 CFR 351.102(b) and 351.401(f). Some factors which you should consider include, for example … and other relationships between your company and the other person (*e.g.*, director/manager relationships)."[65]  Furthermore, we asked Saha Thai, when reporting its home-market sales, to "{r}eport the code designating whether the customer is affiliated."[66]

In a supplemental questionnaire, we asked Saha Thai to "provide a complete family tree … for Saha Thai" (for all Saha Thai's owners) and to "identify any member of these families that has any role in any company involved in the development, production, sale and/or distribution of the merchandise under review."[67]  Further, we asked Saha Thai to "state whether Saha Thai's or any of Saha Thai's affiliates' employees, stockholders, managers, directors, officers, or department heads has an equity or a debt position in any other company involved in the development, production, sale and/or distribution of the merchandise under review."[68]

Our review of the evidence on the record indicates that some of Saha Thai's home-market customers may, in fact, be affiliated with Saha Thai and that Saha Thai did not report them as

---

[65] *See* Commerce's Letter to Saha Thai, dated October 13, 2020at A-6.
[66] *Id*. at B-14.
[67] *See* Commerce's Letter to Saha Thai, dated April 13, 2021 at 1.
[68] *Id*.

affiliated customers, nor did it report certain family members that had a role with respect to those customers. Because our analysis of the evidence on the record involves proprietary information, please see the Saha Thai Final Analysis Memorandum for further details.[69]

Because Saha Thai did not report the fact that these individuals associated with Saha Thai also have roles with respect to the home-market customers in question, we determine that necessary information is missing from the record in accordance with section 776(a)(1) of the Act. Specifically, we do not have complete details on the ties between Saha Thai and these customers to make affiliation determinations; rather, we only have the information that Wheatland was able to find in the public record.

Moreover, we determine that Saha Thai, by not reporting its ties with these home-market customers, withheld information that was requested by Commerce, failed to provide such information in a timely manner or in the form or manner requested, and significantly impeded this review in accordance with sections 776(a)(2)(A) through (C) of the Act.

In addition, we determine that, by withholding this information, Saha Thai has not acted to the best of its ability and that, therefore, an adverse inference is warranted in accordance with section 776(b) of the Act. Saha Thai protested that the home-market customers in question were not engaged in the development, production, sale and/or distribution of the merchandise under review and, therefore, not subject to Commerce's requests for information.[70] However, as explained above, these entities were involved in the sale and distribution of the merchandise under review as customers of Saha Thai. As further explained above, we specifically asked Saha Thai to identify which of its home-market customers were affiliates and Saha Thai failed to do so with respect to the customers in question.

Citing section 782(d) of the Act, Saha Thai asserts that Commerce must notify a respondent where it finds the information provided deficient before it applies facts available. However, as explained above, we asked Saha Thai to identify its affiliates both in the original questionnaire and in a supplemental questionnaire and the record shows that Saha Thai failed to identify all of its affiliates in response to both requests for information. Accordingly, we determine that the requirements of section 782(d) have been met.

Pursuant to sections 776(b) of the Act, we are using an adverse inference in applying the facts otherwise available because Saha Thai failed to cooperate to the best of its ability to comply with our requests for information. As adverse facts available, we determine that the customers in question are all affiliated with Saha Thai. After making this determination, we find that Saha Thai's sales to all these customers were not at arm's length.[71] Because Saha Thai's sales to its affiliated customers exceed five percent of its total home-market sales by quantity,[72] we determine that we require these customers' downstream sales to unaffiliated parties in accordance with 19 CFR 351.403(d). Because of Saha Thai's failures to disclose its ties with

---

[69] See Saha Thai Final Analysis Memorandum.
[70] See Saha Thai's Letter, "Saha Thai's New Factual Information to Rebut, Clarify, or Correct the Information in Wheatland's June 1, 2021, Submission. Circular Welded Carbon Steel Pipe and Tubes from Thailand (AR 19-20)," dated June 21, 2021 (Saha Thai RFI).
[71] See Saha Thai Final Analysis Memorandum at "Test Results for Affiliated Customer(s)" in the home-market program output.
[72] Id. at "Summary of Customer Affiliation & LOT" in the home-market program output.

Barcode:4187711-02 A-549-502 REV - Admin Review 3/1/19 - 2/29/20

these customers as twice requested, we did not have the opportunity to request the downstream sales of these affiliated customers.

Although, as described above, Saha Thai claims with little evidence that the home-market customers in question were not engaged in the development, production, sale or distribution of the merchandise under review, Saha Thai's claims are based on the limited information provided by Wheatland, as well as a product catalog of one of its customers and a website describing the business of another.[73]  However, the fact that a company's usual business involves non-scope products does not preclude it from selling the foreign like product purchased from Saha Thai, nor does it allow Saha Thai to decide unilaterally not to report its affiliations in response to Commerce's questionnaires.  In this review, the record does not establish that any of the home-market customers in question unquestionably did or did not re-sell some or all their purchases from Saha Thai.  Accordingly, as partial adverse facts available, because Saha Thai did not act to the best of its ability in reporting its affiliations, we determine that all of Saha Thai's sales to these customers were ultimately re-sold by those customers as-is in Thailand.

Because we do not have these customers' downstream sales information, as adverse facts available, we determined the net home market sales price for Saha Thai's sales to these home-market customers which failed the arm's-length test, using the second highest Saha Thai net home market sale price to unaffiliated customers for the common product control numbers (CONNUMs) (*i.e.*, those CONNUMS sold to both unaffiliated customers and the home market customers in question).[74]  This is similar to our selection of AFA in the recently completed review of *Hot-Rolled Steel Flat Products from Japan*, where we applied AFA with respect to deficiencies in the respondent's reported home-market downstream sales.[75]

With respect to Blue Pipe, we continue to find that Blue Pipe had no shipments of subject merchandise during the POR.  As a result, we have not calculated a weighted-average dumping margin for Blue Pipe, nor are we adjusting its cash-deposit rate pursuant to the result of this administrative review.  Therefore, there is no basis to apply AFA to Blue Pipe for its alleged failure to report certain home-market customers as affiliates in the context of this review.

**Comment 2:  Whether Saha Thai Created a Fictitious Market**

*Wheatland's Case Brief*
- Saha Thai created pretend sales or sales intended to establish a fictitious market, which Commerce should not consider when determining normal value.[76]
  - By observing the patterns of sales over the current and previous two reviews, the overrepresentation of those sales that survive the ordinary course tests and are actually matched, and juxtaposing those facts against the margin impact of those sales and against the pattern of false statements, withheld facts and obfuscation of

---

[73] *See* Saha Thai RFI at 2-5, 7, and Exhibits 2 and 3.

[74] *See* Saha Thai Final Analysis Memorandum under section 4-B-iii of the home-market program log.  We applied the second highest Saha Thai unaffiliated sales price because the highest unaffiliated sales price is an outlier. Because our analysis determining that the Saha Thai's highest unaffiliated sales price is an outlier is proprietary, *see* Saha Thai Final Analysis Memorandum for our analysis.

[75] *See Certain Hot-Rolled Steel Flat Products from Japan:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 FR 47615 (August 26, 2021) (*Hot-Rolled Steel Flat Products from Japan*), and accompanying IDM at Comment 2.

[76] *See* Wheatland's Case Brief at 25-32.

10

Barcode:4187711-02 A-549-502 REV - Admin Review 3/1/19 - 2/29/20

relationships with that same small group of companies that do match, it becomes apparent that Saha Thai created pretend sales or sales intended to establish a fictitious market.[77]

*Saha Thai's Rebuttal Brief*

- Wheatland's argument is without merit and contrary to the law and record of this proceeding.[78]
  - o Commerce previously established that a fictitious market allegation, to be timely, must be made before the record closes so that Commerce is able to request information that would be relevant to the fictitious market analysis.[79]
    - Wheatland's case brief was the first time a fictious market allegation was presented to Commerce in this proceeding.[80]
  - o Wheatland's allegation fails to provide any legal or factual justification for its claims.[81]
    - The fictitious market analysis focuses on whether a foreign producer is manipulating normal value by artificially lowering its prices on sales of some products within the foreign like product and offsetting those price reductions with increased prices on other sales of different forms of the like product.[82]
    - Wheatland's analysis contradicts Commerce's finding that fictitious market situations can occur when there are small, commercially unsustainable sales.[83]

**Commerce Position**:  We disagree with Wheatland that Saha Thai created fictitious home market sales during the period of review.  Section 773(a)(2) of the Act provides that "{no} pretended sale or offer for sale, and no sale or offer for sale intended to establish a fictitious market, shall be taken into account in determining normal value. The occurrence of different movements in the prices at which different forms of the foreign like product are sold (or, in the absence of sales, offered for sale) in the exporting country after the issuance of an AD order may be considered by the administering authority as evidence of the establishment of a fictitious market for the foreign like product if the movement in such prices appears to reduce the amount by which the normal value exceeds the export price (or the constructed export price) of the subject merchandise."  When undertaking a fictitious market analysis, Commerce will examine not only whether there are price movements, but also whether there are commercial or market factors that explain their price movements.[84]

Our general practice in determining whether a fictitious market exists is to require evidence that the decrease in the price of home market sales of the foreign like product was accompanied by an increase in the price of sales of "different forms of the foreign like product."[85]  In this review,

---

[77] *Id.*
[78] *See* Saha Thai's Rebuttal Brief at 14-18.
[79] *Id.* at 14-15.
[80] *Id.* at 15.
[81] *Id.* at 16-18.
[82] *Id.* at 16-18.
[83] *Id.* at 17-18.
[84] *See Lightweight Thermal Paper from Germany:  Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 34719 (June 18, 2014) (*Lightweight Paper from Germany*), and accompanying IDM at 11.
[85] *See Notice of Final Results of Antidumping Duty Administrative Review:  Furfuryl Alcohol from the Republic of South Africa*, 62 FR 61084, 61085 (November 14, 1997).

11

Barcode:4187711-02 A-549-502 REV - Admin Review 3/1/19 - 2/29/20

Wheatland only cites its claim that Saha Thai's sales to Blue Pipe and Company B[86] would fail the arm's-length test in support of its allegation – Wheatland provided no analysis showing that there was a decrease in the price of home market sales of the foreign like product, much less that any such decrease was accompanied by an increase in the price of sales of "different forms of the foreign like product."

Moreover, Commerce "does not engage in a fictitious market analysis under section 773(a)(2) of the Act absent an adequate allegation from a party."[87]  We previously determined that "an explicit and substantiated fictitious market allegation must be made at an early, information-gathering stage of the investigation or review."[88]  In this review, Wheatland did not raise any argument regarding a potential fictitious market until it appeared in its case brief.

For the foregoing reasons, we determine that Wheatland's fictitious market allegation is both untimely and inadequate.  Accordingly, we continue to use Saha Thai's home market sale prices to Blue Pipe and Company B as bases for normal value.

**Comment 3:  Whether Saha Thai Is Affiliated with Certain Companies**

*Wheatland's Case Brief*
- Saha Thai and Blue Pipe are affiliated because of a close supplier-buyer relationship and should be collapsed.[89]
  - In evaluating whether a close supplier relationship exists, Commerce applies a two-part test.[90]
    - Commerce first examines whether the relationship is significant and could not easily be replaced such that the buyer or supplier has become reliant on the other.[91]
      - Commerce previously found a close supplier relationship where a buyer sourced half of its purchases of a given input from a single supplier.[92]
    - If Commerce finds reliance, it will determine whether the relationship has the potential to impact decisions relating to subject merchandise.[93]
      - Commerce previously found that a party was reliant upon its supplier and, therefore, affiliated where the supplier was "involved in both the production and sales" of the respondent which put the supplier in a position whereby it could "exercise restraint or direction … in a manner that affects the pricing, production, and sale of" the subject merchandise.[94]

---

[86] "Company B" designates a company whose identity is proprietary; the identity of Company B can be found in Wheatland's Case Brief at 25.

[87] *See Antidumping Duties; Countervailing Duties; Final Rule*, 62 FR 27296, 27357 (May 19, 1997).

[88] *See Lightweight Paper from Germany* IDM at 12.

[89] *See* Wheatland's Case Brief at 32-46.

[90] *Id*. at 34.

[91] *Id*.

[92] *Id*. (citing *Mitsubishi Heavy Indus. v. United States*, 54 F. Supp. 2d 1183, 1190-91 (CIT 1999) (*Mitsubishi*) (upholding Commerce's determination that a purchaser would be considered dependent upon its supplier where it depended upon it for 50% or more of its sales during each year of a five-year period)).

[93] *Id*.

[94] *Id*. (citing *Certain Oil Country Tubular Goods from the Republic of Korea:  Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances*, 79 FR 41983 (July 18, 2014) (*OCTG Korea LTFV*), and accompanying IDM at Comment 20).

Filed By: Thomas Schauer, Filed Date: 12/3/21 10:42 AM, Submission Status: Approved

Barcode:4187711-02 A-549-502 REV - Admin Review 3/1/19 - 2/29/20

- o In past cases, in determining whether to treat affiliated companies as a single entity, Commerce considered the case-specific relationships between the companies under examination; all the factors Commerce considers in a collapsing analysis need not be present, as long as the parties are sufficiently related to present the possibility of price manipulation.[95]
- o Commerce should collapse Saha Thai, Blue Pipe, and Company B.[96]
    - There can be little doubt that the companies are reliant on each other.[97]
    - The record also indicates that Saha Thai and Blue Pipe appear to share information.[98]
    - The record also shows that the control, intertwining of operations, and sharing of information between Saha Thai and Blue Pipe allows for the manipulation of the dumping margin.[99]

*Saha Thai's Rebuttal Brief*
- Wheatland has not proven a close supplier relationship between Saha Thai, Blue Pipe, and Company B under the laws or the facts.[100]
    - o Commerce made clear that the standard for finding an affiliation as a result of a close supplier relationship is high and involves more than a mere close business relationship.[101]
        - Commerce found that even an exclusive supply relationship may not lead to a finding of affiliation under a theory of a close supplier relationship.[102]
        - Once Commerce finds that either the buyer or seller has, in fact, become "reliant" on the other, it then determines whether one of the parties is in a position to exercise restraint or direction over the other.[103]
    - o Wheatland's allegations regarding affiliation between Saha Thai, Blue Pipe, and Company B do not satisfy the requirements for finding an affiliation as a result of a close supplier relationship.[104]
        - The record includes Saha Thai's overall transactions with Blue Pipe and Company B for 2018, 2019 and 2020, which shows that Saha Thai is not reliant on these entities.[105]
        - Wheatland's reliance on *Mitsubishi* is misplaced because the Court did not look at whether sales were over fifty percent in a given year but, rather, whether that was

---

[95] *Id*. at 37-38 (citing *Certain Preserved Mushrooms from the People's Republic of China:  Final Results and Final Rescission, in Part, of Antidumping Duty Administrative Review*, 70 FR 54361 (Sep. 14, 2005), and accompanying IDM at Comment 9).
[96] *Id*. at 38-46.
[97] *Id*. at 38-41.
[98] *Id*. at 42.
[99] *Id*. at 45.
[100] *See* Saha Thai's Rebuttal Brief at 18-26.
[101] *Id*. at 18-19.
[102] *Id*. at 19 (citing *Chlorinated Isocyanurates from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 FR 10411 (February 24, 2020), and accompanying IDM at 7).
[103] *Id*. at 19-20 (citing *TIJID, Inc. v. United States*, 366 F. Supp 2d 1286, 1295-1300 (CIT 2005) (*TIJID*), and *Multilayered Wood Flooring from the People's Republic of China, Final Determination of Sales at Less Than Fair Value*, 76 FR 64318 (October 18, 2011), and accompanying IDM at Comment 21).
[104] *Id*. at 20-26.
[105] *Id*. at 20-21.

13

Barcode:4187711-02 A-549-502 REV - Admin Review 3/1/19 - 2/29/20

> true for five contiguous years to the same purchaser, nor did it provide any basis for cumulating multiple purchasers.[106]
>
> - Wheatland shows no evidence that either Blue Pipe or Company B could not secure alternative sources of supply, either at the national or international level.[107]
> - The fact that companies are involved in both the production and sale of subject merchandise is not proof of affiliation; Wheatland still needs to prove that the relations are so unique that they amount to affiliation.[108]
> - The fact that certain customers were able to negotiate a more or less favorable price with Saha Thai is not itself evidence of affiliation.[109]
> - Wheatland does not point to any evidence in the record showing that Saha Thai and Blue Pipe did, in fact, coordinate or exchange information in a way that would lead to a close-supplier relationship finding.[110]
> - Commerce does not address common customers as a factor of reliance; the fact that customers are free to acquire their product both from Saha Thai and from Blue Pipe only shows that there is no coordination between the parties.[111]

- Collapsing Saha Thai, Blue Pipe, and Company B is not justified under the regulations or Commerce's practice.[112]
  o Saha Thai is not affiliated with Blue Pipe or Company B.[113]

*Blue Pipe's Rebuttal Brief*

Blue Pipe is not affiliated with Saha Thai through a close supplier relationship.[114]
  o The legislative history of the statutory provision for affiliation notes that a "close business relationship" is a relationship where "the supplier or buyer becomes reliant upon the other."[115]
  o The sales percentages cited by Wheatland do not demonstrate that Saha Thai is reliant upon Blue Pipe, or that Blue Pipe is reliant upon Saha Thai.[116]
    - Commerce rejected arguments for the existence of a close supplier relationship even where buyer and seller sold exclusively to each other.[117]
    - Blue Pipe is free to buy from other suppliers and does so, and is not reliant upon Saha Thai.[118]
    - The sharing of information alleged by Wheatland reflects normal commercial relationships between unaffiliated parties and does not establish a relationship in which one party is reliant upon the other.[119]

---

[106] *Id.* at 21.
[107] *Id.* at 21-22.
[108] *Id.* at 23-24.
[109] *Id.* at 24-25.
[110] *Id.* at 25.
[111] *Id.* at 25-26.
[112] *Id.* at 26-28.
[113] *Id.* at 27-28.
[114] *See* Blue Pipe's Rebuttal Brief at 9-11.
[115] *Id.* at 9 (citing *TIJID* at 1299).
[116] *Id.* at 9-10.
[117] *Id.* at 10 (citing *Mid Continent Steel & Wire, Inc. v. United States*, 203 F. Supp. 3d 1295, 1303 (2017) (*Mid Continent*)).
[118] *Id.* at 10.
[119] *Id.*

Filed By: Thomas Schauer, Filed Date: 12/3/21 10:42 AM, Submission Status: Approved

Barcode:4187711-02 A-549-502 REV - Admin Review 3/1/19 - 2/29/20

o   Wheatland fails to explain how the relationship between Saha Thai and Blue Pipe is so close that it had the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product.[120]

**Commerce Position**:  We disagree with Wheatland that Saha Thai is affiliated with either Blue Pipe or Company B.  Section 771(33)(G) of the Act, defines an affiliate party as any person who controls any other person and such other person.  Section 771(33) of the Act further provides that a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person.

Commerce's regulations at 19 CFR 351.102(b)(3) state that, in finding affiliation based on control, Commerce will consider, among other factors: (i) corporate or family groupings; (ii) franchise or joint venture agreements; (iii) debt financing, and (iv) close supplier relationships. Control between persons may exist in close supplier relationships in which either party becomes reliant on one another.  With respect to close supplier relationships, Commerce determined that the threshold issue is whether either the buyer or seller has, in fact, become reliant on the other.[121]  Only if such reliance exists does Commerce then determine whether one of the parties is in a position to exercise restraint or direction over the other.[122]  Commerce will not, however, find affiliation on the basis of this factor unless the relationship has the potential to affect decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product.[123]

As a preliminary matter, the record does not support, nor does Wheatland argue for, a finding of affiliation based on the statutory criteria enumerated in section 771(33)(A) through (F) of the Act.  We further find that the record does not indicate that Saha Thai is reliant on Blue Pipe or Company B, nor does the record indicate that either Blue Pipe or Company B are reliant on Saha Thai.

Neither the proportion of sales by Saha Thai to Blue Pipe and Company B nor the proportion of Blue Pipe's and Company B's purchases from Saha Thai demonstrate, in and of themselves, that Saha Thai is reliant on Blue Pipe and Company B or *vice versa*.  Although Wheatland cites *Mitsubishi* in support of its argument, in *Mitsubishi*, the U.S. Court of International Trade (CIT) ruled:

> The Court finds that substantial evidence supports Commerce's conclusion that a supplier's satisfaction of the greater-than-fifty-percent-sales-dependence-for-five-years test demonstrated affiliation on the basis of control. The record indicates that the subject {large newspaper printing presses} are highly customized products, requiring unique technical specifications . . . Coupled with the fact that {large newspaper printing presses} generally take multiple years to produce, it

---

[120] *Id*. at 10-11.
[121] *See* Uruguay Round Agreements Act Statement of Administrative Action, attached to H.R. Rep. No. 103-316 Vol. I at 838, reprinted in 1994 U.S.C.C.A.N. 3773 (SAA) (explaining that "{t}he traditional focus on control through stock ownership fails to address adequately modem business arrangements, which often find one firm "operationally in a position to exercise restraint or direction" over another even in the absence of an equity relationship.  A company may be in a position to exercise restraint or direction, for example, through . . . close supplier relationships in which the supplier or buyer becomes reliant upon the other.")
[122] *Id*.; *see also Samsung Elecs. Co. v. United States*, 70 F. Supp. 3d 1350, 1356-59 (CIT 2015) (*Samsung*).
[123] *See* 19 CFR 351.102(b)(3).

15

logically follows that a long term supplier would adjust its manufacturing operations to satisfy the specific demands of its purchaser. Therefore, it was reasonable for Commerce to conclude that MHI was "legally or operationally in a position to exercise restraint or direction over" suppliers dependent on MHI for fifty percent or more of their sales over a five year period.[124]

Contrary to the facts in *Mitsubishi*, the record of this administrative review does not support a similar finding. There is no evidence on the record suggesting that CWP is a "highly customized product" like newspaper printing presses or that CWP consists of unique products designed to the specific needs of a customer such as Blue Pipe or Company B. We note that, of the top 10 CONNUMs by quantity which Saha Thai sold during the POR, none were exclusively sold to Blue Pipe or Company B.[125] Thus, consistent with Commerce's practice, we find that the proportion of sales to one customer alone does not constitute enough information to determine a close supplier relationship.[126]

On the contrary, to find a close supplier relationship, there must be evidence beyond the proportion of sales, such as whether a seller is precluded from selling to other customers or whether a customer is precluded from finding alternative sources of supply.[127] There is no evidence on the record of this review that indicates that Saha Thai could not look to other buyers of its goods, nor is there evidence that Blue Pipe or Company B could not sell products manufactured by other producers.

Wheatland does cite other factors, such as its claim that Saha Thai and Blue Pipe appear to share information, in support of its argument.[128] However, in *Gift Boxes from China*, we found that "the fact that Red Point and Lindy Bowman share sales and cost information, present themselves as one company in a single exhibit in Hong Kong trade shows, and plan marketing strategies together does demonstrate that the two companies cooperate closely but does not demonstrate either reliance of one upon the other or control of one exercised by the other. Nor does the fact that all merchandise produced by Red Point is labeled with the Lindy Bowman logo demonstrate affiliation, as that appears merely to be a physical characteristic demanded by the customer (*i.e.*, Lindy Bowman)."[129] As described above, the threshold issue is whether either the buyer or seller has become reliant on the other; Commerce practice and precedent show that factors such as sharing information do not demonstrate reliance such that we can make a finding of affiliation based on a close supplier relationship.

---

[124] *See Mitsubishi,* 54 F. Supp. at 1191.

[125] *See* Saha Thai's home-market sales database submitted March 18, 2021 (Barcode 4100544-03).

[126] *See, e.g.*, *Certain Oil Country Tubular Goods from Taiwan:  Final Determination of Sales at Less Than Fair Value*, 79 FR 41979 (July 18, 2014), and accompanying IDM at Comment 1; and *Grain-Oriented Electrical Steel from the Czech Republic:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 79 FR 58324 (September 29, 2014) (*GOES from the Czech Republic*), and accompanying IDM at Comment 1.

[127] *See, e.g.*, *GOES from the Czech Republic* IDM at Comment 1.

[128] *See* Wheatland's Case Brief at 42-45.

[129] *See Notice of Final Determination of Sales at Less Than Fair Value:  Certain Folding Gift Boxes from the People's Republic of China*, 66 FR 58115 (November 20, 2001) (*Gift Boxes from China*), and accompanying IDM at Comment 4.

Barcode:4187711-02 A-549-502 REV - Admin Review 3/1/19 - 2/29/20

Based on the evidence on the record of this review, we conclude that it does not show that Saha Thai is reliant upon either Blue Pipe or Company B or *vice versa*. Accordingly, we determine that Saha Thai is not affiliated with either Blue Pipe or Company B.

**Comment 4: Whether Commerce Should Require Saha Thai and Blue Pipe to Resubmit Certain Submissions**

*Wheatland's Case Brief*
- Commerce should direct the respondents to unbracket information readily available from public records in Thailand.[130]
  - All the rebuttal factual information Wheatland submitted, including the names of shareholders and their equity percentages, director names, financial statements, and affiliations, is publicly available in Thailand, but Wheatland bracketed the information out of an abundance of caution.[131]
  - Wheatland requests that Commerce direct the respondents to unbracket all these exhibits in order to allow for adequate public discourse.[132]
  - Wheatland also suggests that Commerce reconsider Saha Thai's requests to treat as BPI all information related to its affiliates because shareholder names and equity percentages, financial statements, and board lists are readily available to the public in Thailand.[133]
  - Blue Pipe's shareholder names and equity percentages, financial statements, board lists, etc., are matters of the public record in Thailand and, thus, should not be entitled to BPI treatment.[134]

*Saha Thai's Rebuttal Brief*
- Saha Thai's request for proprietary treatment is consistent with Commerce's regulations.[135]
  - Wheatland's request is unnecessary and quite late.[136]
  - To date, Commerce has found no issue with the information identified in Wheatland's Case Brief, and there is no reason to disturb those designations now.[137]

*Blue Pipe's Rebuttal Brief*
- Commerce should reject Wheatland's request to direct respondents to unbracket information.[138]
  - The fact that certain information may be available on the internet does not mean that such information must be treated as public information in all contexts.[139]
  - Commerce's regulations specifically provide that business proprietary information includes names of particular customers, distributors or suppliers.[140]

---

[130] *See* Wheatland's Case Brief at 46-47.
[131] *Id*. at 46.
[132] *Id*. at 47.
[133] *Id*.
[134] *Id*.
[135] *See* Saha Thai's Rebuttal Brief at 32.
[136] *Id*.
[137] *Id*.
[138] *See* Blue Pipe's Rebuttal Brief at 14.
[139] *Id*.
[140] *Id*.

Filed By: Thomas Schauer, Filed Date: 12/3/21 10:42 AM, Submission Status: Approved

Barcode:4187711-02 A-549-502 REV - Admin Review 3/1/19 - 2/29/20

o   Commerce regularly accepts the bracketing of information that is available on the internet as long as it meets the Commerce's definitions for business proprietary information.[141]

**Commerce Position:**  Wheatland submitted its rebuttal factual information submissions on June 1, 2021.[142]  Nowhere in either of these submissions did Wheatland claim that any of this information should be made public.  By not identifying this issue until it submitted its case brief, even if we were to require Saha Thai or Blue Pipe to unbracket the information identified by Wheatland, it is already too late to allow the information to be discussed publicly as the case briefs had already been submitted.  Accordingly, for this review, we have not required Saha Thai or Blue Pipe to unbracket certain information as suggested by Wheatland.

### Comment 5:   Whether Commerce Must Take Steps to Ensure the Government Can Collect the Duties Owed

*Wheatland's Case Brief*
- Commerce should take steps to ensure that the government can collect the duties owed.[143]
    - o   In the past, CBP found that Blue Pipe evaded the order on CWP from Thailand.[144]
    - o   Absent action by Commerce and CBP, the government's ability to collect duties as a result of this or prior reviews may be in jeopardy.[145]

*Saha Thai's Rebuttal Brief*
- Actions taken under CBP'S separate legal authority have no bearing on the calculation of an AD margin in this review.[146]
    - o   Wheatland's brief is devoid of any demonstration of how CBP's finding is in any way related to the calculation of Saha Thai's antidumping duty rate.[147]
    - o   What steps Wheatland would have Commerce take is unclear.[148]

**Commerce Position:**  Any concerns Wheatland has with the conduct of prior administrative reviews is misplaced in the context of this review.  With respect to this administrative review, we will issue assessment instructions to CBP in a timely manner and pursuant to Commerce practice.  Wheatland should address any post-administrative review assessment issues directly with CBP.

---

[141] *Id*.
[142] *See* Wheatland's Letters, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Rebuttal Factual Information to Blue Pipe's Supplemental Questionnaire Response," dated June 1, 2021; and "Circular Welded Carbon Steel Pipes and Tubes from Thailand:  Rebuttal Factual Information to Saha Thai's Supplemental Questionnaire Response," dated June 1, 2021.
[143] *See* Wheatland's Case Brief at 47.
[144] *Id*.
[145] *Id*.
[146] *See* Saha Thai's Rebuttal Brief at 32-33.
[147] *Id*. at 32.
[148] *Id*. at 33.

Filed By: Thomas Schauer, Filed Date: 12/3/21 10:42 AM, Submission Status: Approved

Barcode:4187711-02 A-549-502 REV - Admin Review 3/1/19 - 2/29/20

**Comment 6:  Whether Commerce Should Reconsider Prior Reviews to Account for Potential Fraud**

*Wheatland's Case Brief*
- Considering the evidence of fraud in the instant and prior segments which Wheatland has presented, Commerce should initiate a changed circumstance review to determine whether there was malfeasance in prior proceedings and ensure that the next sunset review is conducted only after addressing any misconduct.[149]

*Saha Thai's Rebuttal Brief*
- Commerce should not initiate a changed circumstances review.[150]
  - A changed circumstance review may be initiated where Commerce receives information demonstrating "changed circumstances sufficient to warrant a review of such determination" and the allegations presented in Wheatland's brief do not rise to that level.[151]

**Commerce Position:**  While it is true that we are applying partial AFA with respect to Saha Thai as described in Comment 1 above, it is because we determined that Saha Thai did not act to the best of its ability in this administrative review.  We do not find that the record evidence warrants the initiation of a changed circumstances review, as suggested by Wheatland.

**Comment 7:  Whether Commerce Should Adjust Saha Thai's Costs to Account for a Particular Market Situation**

*Saha Thai's Case Brief*
- Commerce should not adjust Saha Thai's costs to account for a particular market situation (PMS).[152]
  - Commerce has no legal authority to make a PMS adjustment solely for sales below cost purposes – it may only make a PMS adjustment to a respondent's costs when basing normal value on constructed value.[153]
  - The CIT confirmed that Commerce has no authority to apply a PMS-cost adjustment when analyzing whether home market sales prices are below costs of production.[154]
  - The statutory language and Commerce's own prior case law establish that the PMS provisions are reserved for extraordinary situations.[155]

---

[149] *See* Wheatland's Case Brief at 48-49.
[150] *See* Saha Thai's Rebuttal Brief at 33.
[151] *Id*. (citing section 751(b)(1) of the Act).
[152] *See* Saha Thai's Case Brief at 3-41.
[153] *Id*. at 3-8.
[154] *Id*. at 8-10 (citing *Husteel Co. v. United States*, Slip Op. 20-2, 2020 WL 200815 (CIT January 3, 2020) (*Husteel I*); *Saha Thai Steel Pipe Public Co. v. United States*, Slip Op. 19-165, 2019 WL 6997904 (CIT December 18, 2019) (*Saha Thai I*); *Borusan Mannesmann Boru Sanayi v. Ticaret A.S.*, No. 19-00056, 2020 WL 102258, at *11 (CIT January 7, 2020); and *Dong-A Steel Co. v. United States,* 475 F. Supp. 3d 1317 (CIT September 29, 2020)).
[155] *Id*. at 10-12 (citing *Statement of Administrative Action accompanying the Uruguay Round Agreements Act*, H.R. Doc. No. 103-316, vol. 1 (1994) (SAA), at 822; *Notice of Final Determinations of Sales at Less Than Fair Value: Certain Durum Wheat and Hard Red Spring Wheat from Canada*, 68 FR 52741 (September 5, 2003), and accompanying IDM at Comment 1; and *Certain Cold- Rolled and Corrosion-Resistant Carbon Steel Flat Products from Korea:  Final Results of Antidumping Duty Administrative* Reviews, 62 FR 18404, 18412 (April 15, 1997)).

19

Barcode:4187711-02 A-549-502 REV - Admin Review 3/1/19 - 2/29/20

- o The CIT ruled that Commerce cannot find a PMS based on global-wide circumstances.[156]
  - Given the Court's decisions, Commerce must determine whether the alleged price distortion of hot-rolled coil based on global overcapacity was unique to Thailand.[157]
- o Commerce must empirically analyze the PMS allegation with respect to actual costs.[158]
  - Commerce articulated a detailed, data-driven methodology for benchmarking costs of production to determine whether they were incurred in the ordinary course of trade.[159]
- o The factual information submitted by Wheatland does not support a PMS finding in this review.[160]
  - Evidence on the record establishes that global (and especially Chinese) steel overcapacity decreased significantly both prior to and during the POR and the Chinese government recently instituted numerous measures to reduce capacity levels.[161]
  - Evidence on the record demonstrates that there has been significant stabilization in the steel market because of increased consumption globally and in China during the POR.[162]
  - Evidence on the record demonstrates that decreases in global overcapacity accompanied by increasing national demand and consumption of steel have resulted in reduced surpluses, which also resulted in reduced exports (as a percentage of production) of steel during the POR.[163]
  - There is no evidence showing that Thai producers' costs to manufacture subject CWP in this administrative review were distorted by alleged steel overcapacity in China or globally.[164]
  - Evidence on the record demonstrates that Thai prices for hot-rolled coil were high and not distorted.[165]
  - The Thai antidumping and safeguard orders do not create a PMS for this POR because the Government of Thailand (GOT) terminated the safeguard measures on both alloy and non-alloy hot-rolled coil imports.[166]
  - The record evidence does not support that the Thai government subsidizes hot-rolled coil (HRC) producers in Thailand.[167]
- o Commerce's preliminary quantification of the PMS cost adjustment is flawed.[168]

---

[156] *Id*. at 13-16 (citing, *e.g.*, *NEXTEEL Co., Ltd. v. United States*, Consol. Court No. 17-00091, Slip Op. 19-1 (Ct. Int'l Trade January 2, 2019) (*NEXTEEL I*)).
[157] *Id*. at 16.
[158] *Id*. at 16-19.
[159] *Id*. at 16-17 (citing *Steel Concrete Reinforcing Bar from Taiwan: Final Determination of Sales at Less Than Fair Value*, 82 FR 34925 (July 27, 2017), and accompanying IDM at Comment 1).
[160] *Id*. at 20-37.
[161] *Id*. at 22-26.
[162] *Id*. at 27.
[163] *Id*. at 27-29.
[164] *Id*. at 30-33.
[165] *Id*. at 33-35.
[166] *Id*. at 35-37.
[167] *Id*. at 37.
[168] *Id*. at 38-42.

20

- Commerce improperly calculated a PMS adjustment for this specific POR based on data from outside the POR.[169]
- Commerce improperly calculated a PMS adjustment based on incorrect and biased capacity utilization rates.[170]
- Commerce improperly calculated a PMS adjustment on a global basis.[171]

*Wheatland's Rebuttal Brief*
- Commerce should adjust Saha Thai's costs to account for a PMS.[172]
  - The law unambiguously allows Commerce to use "any other calculation methodology" once a PMS is found.[173]
    - The U.S. Court of Appeals for the Federal Circuit (Federal Circuit) explained that Commerce may depart from the costs reported in respondents' books and records for the purposes of the sales-below-cost test to avoid distorting the overall dumping analysis.[174]
    - Enactment of the Trade Preferences Extension Act of 2015 (TPEA)[175] only expanded this pre-existing authority, by clarifying that the circumstances that may be considered outside the ordinary course of trade include situations in which Commerce determines that the PMS prevents a proper comparison with the export price or constructed export price.[176]
  - Assuming the statute is silent or ambiguous, Commerce's interpretation is reasonable.[177]
    - Commerce's interpretation is consistent with the legislative history and with statements by legislators when the PMS provision was introduced.[178]
    - Commerce's interpretation is also consistent with the statutory scheme.[179]
  - Pending judicial decisions do not prohibit Commerce from adjusting for a PMS in the sales-below-cost test.[180]
    - None of the cases Saha Thai cited are final, and two are on appeal.[181]
    - The opinions Saha Thai cited are wrongly decided, as they are based on a mistaken application of the *expresio unius est exclusio* doctrine to invalidate Commerce's reasonable interpretation of statutory silence.[182]
  - Saha Thai's preferred interpretation produces absurd results.[183]
    - Under Saha Thai's theory, as long as the PMS drives down costs far enough that at least some home market prices pass the cost test, there is no remedy for that PMS.[184]

---

[169] *Id.* at 38-39.
[170] *Id.* at 39-40.
[171] *Id.* at 40-41.
[172] *See* Wheatland's Rebuttal Brief at 2-23.
[173] *Id.* at 3-5.
[174] *Id.* at 3 (citing *Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358, 1367-68 (Fed. Cir. 2014)).
[175] *See* TPEA, Pub. L. No. 114-27, 129 Stat. 362 (2015).
[176] *Id.* at 4-5.
[177] *Id.* at 5-10.
[178] *Id.* at 5-6.
[179] *Id.* at 6-10.
[180] *Id.* at 10-12.
[181] *Id.* at 10.
[182] *Id.* at 11-12.
[183] *Id.* at 12-14.
[184] *Id.* at 14.

21

o  Saha Thai's other statutory arguments fail.[185]
  ▪  Commerce previously rejected Saha Thai's argument that PMS provisions are reserved for "extraordinary circumstances" and that such circumstances are not present here.[186]
  ▪  There is nothing in the statute that prohibits Commerce from finding that global phenomena such as overcapacity can have a particular impact on an individual country's market and the cases cited by Saha Thai are not final.[187]
  ▪  There is nothing in the statute that requires Commerce to examine an individual respondent's costs to determine whether a PMS exists; to the contrary, a PMS affects an entire market, rendering all producers' costs outside the ordinary course of trade.[188]
o  Commerce correctly found a PMS existed during the POR.[189]
  ▪  The fact that global overcapacity may have eased somewhat does not mean that the overcapacity crisis has now ended; to the contrary, global capacity utilization remained under 80 percent in 2019, barely changed from 2018 and major Thai producers of HRC continued to express dismay regarding the harm that global overcapacity and imports had on their operations during the POR.[190]
  ▪  The safeguard measure that was terminated during the POR only affected certain products, while the other safeguard measure remained in effect throughout the POR and numerous Thai AD orders on HRC remained in effect throughout the POR; the GOT's failure to assess duties under both the safeguard and AD orders in effect during the POR for exported downstream steel products allowed dumped and injurious imports of HRC to continue distorting the Thai HRC market without remedy.[191]
  ▪  Because there have been no recent administrative reviews under the countervailing duty order on HRC from Thailand, the 2.38 percent rate is the most recent one available, and it confirms that Thai HRC producers are subsidized by the GOT; moreover, in 2019 Commerce conducted a sunset review of the order and determined that countervailable subsidies would be likely to continue or recur if the order were revoked, and the rate likely to prevail would be 2.38 percent.[192]
o  Commerce should continue to rely on Wheatland's regression analysis to adjust for the PMS.[193]
  ▪  Commerce already considered and properly rejected Saha Thai's arguments in the *Preliminary Results*.[194]
  ▪  Saha Thai does not explain why its suggested parameters are preferable.[195]

---

[185] *Id*. at 14-16.
[186] *Id*. at 14-15.
[187] *Id*. at 15-16.
[188] *Id*. at 16.
[189] *Id*. at 17-22.
[190] *Id*. at 18-21.
[191] *Id*. at 21.
[192] *Id*. at 22.
[193] *Id*. at 22-23.
[194] *Id*.
[195] *Id*. at 23.

22

- ▪ Wheatland adopted the parameters it used because they had already been accepted by Commerce in prior proceedings and, thus, Wheatland's model complies with the models that Commerce has itself already deemed reliable.[196]

**Commerce Position:** For the final results of review, we continue to find that a cost-based PMS existed in Thailand during the POR concerning the cost of HRC used in the production of CWP. The cost-based PMS that we found to have existed in the *Preliminary Results* and continue to find existed in Thailand during the POR concerning HRC, results from the collective impact of the effects of the subsidization of HRC by the GOT and distorted import prices of HRC due to global overcapacity, dumping, and subsidization. In reaching our decision, we considered the components of Wheatland's PMS Allegation as a whole, based on their cumulative effect on the input costs for HRC in the production of CWP. Based on the totality of the conditions in the HRC market and the production of CWP in Thailand, we continue to find that Wheatland's PMS allegation describes facets of a single cost-based PMS.

*Legal Authority to Make a PMS Adjustment*
Section 773(a)(1)(B)(i) of the Act defines NV as "the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price." Pursuant to section 771(15) of the Act, Commerce shall find "sales and transactions" to be "outside the ordinary course of trade" in situations in which it "determines that the particular market situation prevents a proper comparison with the export price or constructed export price." Section 504 of the Trade Preferences Extension Act of 2015 (TPEA) amended the definition of "ordinary course of trade" to add the concept/term "particular market situation."

The Act does not define the term "particular market situation," but the Statement of Administrative Action accompanying the Uruguay Round Agreements Act (SAA) explains that such a situation may exist for sales "where there is government control over pricing to such an extent that home market prices cannot be considered competitively set."[197] Prior to the TPEA, in a limited number of cases, Commerce found that particular market situations existed and, as a result, declined to use an entire market for purposes of calculating NV, as provided for in section 773(a)(1) of the Act and section 351.404(c)(2) of Commerce's regulations. In addition to adding the concept of "particular market situation" to the definition of the term "ordinary course of trade" in section 771(15) of the Act, section 504 of the TPEA added the concept of "particular market situation" to the definition of CV under section 773(e) of the Act, and through these provisions for purposes of the COP under section 773(b)(3) of the Act. Section 773(e) of the Act states that "if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this subtitle or any other calculation methodology."

We disagree with Saha Thai's assertion that Commerce is legally precluded from making a PMS adjustment to Saha Thai's COP in the context of the sales-below-cost test. The plain language of the statute and the legislative history of the TPEA amendments support that Commerce possesses

---

[196] *Id.*
[197] *See* SAA, H.R. Doc. 103-316, vol. 1 (1994) at 822.

the discretion to adjust Saha Thai's COP as part of a sales-below-cost test.  They also establish that Commerce has discretion when selecting a calculation methodology to address distortions in a particular market.  As discussed above, if Commerce finds that the "cost of materials and fabrication or other processing of any kind" under section 773(e) of the Act is found to have been distorted because of a cost-based PMS, then it is logical that the very same "cost of materials and of fabrication or other processing of any kind" under section 773(b)(3)(A) of the Act must also be distorted; and, consequently, a cost-based PMS adjustment is warranted in both situations.

Saha Thai points to CIT decisions where the CIT held that the Section 504 TPEA amendments did not provide a basis for adjusting the cost of production in the sales-below-cost test.[198]  These rulings are not final and remain subject to appeal.

Section 773(a) mandates Commerce to determine NV based on the rules set forth to achieve a "fair comparison" between NV and export price or constructed export price.  The statute in its basic definition of NV requires that NV reflect a price that is in the "ordinary course of trade."[199] "Ordinary course of trade" is defined in section 771(15) as "the conditions and practices which, for a reasonable period of time prior to the exportation of the subject merchandise, have been normal to the trade under consideration with respect to merchandise of the same class or kind."[200]  Section 773(b)(3) states that in the "Calculation of cost of production," there are at least three different calculations which Commerce must use to determine the cost of production in the period of time prior to the time of export – 773(b)(3)(A), which covers "the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that foreign like product in the ordinary course of business," 773(b)(3)(B), which covers "an amount for selling, general and administrative expenses based on actual data pertaining to production and sales of the foreign like product by the exporter in question," and 773(b)(3)(C), which covers "the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the foreign like product in condition packed ready for shipment."  In other words, all of these amounts must be calculated to determine if the costs of production used to determine the price of the merchandise in the comparison market have been incurred in the "ordinary course of trade."

The TPEA provided a third exception to the term "ordinary course of trade" to include a situation in which Commerce finds that "the particular market situation prevents a proper comparison with the export price or constructed export price."[201]  Thus, where a PMS affects the COP of the foreign like product through distortions to the cost of an input, it is reasonable to conclude that such a situation may prevent a proper comparison of the EP or CEP with NV that is based on home market prices just as with NV that is based on CV.  The statute also authorizes Commerce to use "any" alternative cost calculation methodology if it determines that a "particular market

---

[198] *See* Saha Thai's Case Brief at 8-10 (citing *Saha Thai I*, Slip Op. 19-165, 2019 WL 6997904 (CIT December 18, 2019); *Saha Thai Steel Pipe Co., Ltd. v. United States*, CIT Slip Op. 20-181, Consol. Ct. No18-00214 (December 21, 2020) (*Saha Thai II*); *Husteel Co. v. United States*, 476 F. Supp. 3d 1363 (CIT October 19, 2020); *Borusan Mannesmann Boru Sanayi Ve Ticaret A.Ş. v. United States*, 494 F. Supp. 3d 1365 (CIT February 17, 2021); and *Hyundai Steel Co. v. United States*, Consol. Court No. 18-00154, Slip. Op. 21-88 (CIT July 19, 2021) at 16).
[199] *See* section 773(a)(1)(B)(i) of the Act.
[200] *See* section 771(15) of the Act.
[201] *Id.* (Commerce "shall consider" such transactions outside ordinary course of trade).

situation exists such that the cost of materials... does not accurately reflect the {COP} in the ordinary course of trade."[202]

The TPEA already allowed for an exception to the term "ordinary course of trade" when it indicated under section 771(15)(A) that "sales disregarded under section 773(b)(1) were "outside the ordinary course of trade."  The same is true for "transactions disregarded under section 773(f)(2)."  The fact that particular market situation is left undefined, except to provide that this third exception to the "ordinary course of trade" definition "prevents a proper comparison with the export price or construct export price," suggests that Commerce was permitted to incorporate both calculations of "sales disregarded under section 773(b)(1)" and "transactions disregarded under section 773(f)(2)" into its particular market situation analysis, when the facts alleged as part of the particular market situation warranted such an analysis.

Accordingly, we determine that Commerce is within its discretion, once it determines that a PMS exists, to apply its below-cost test and disregard certain sales, if necessary, under section 773(b) of the Act, when the facts warrant such an application.

Such an interpretation of the Act is not only reasonable by its terms, but also logical in application.  The definition of "ordinary course of trade" is directly applicable when Commerce determines NV.[203]  Similarly, section 773(e) of the Act discusses constructed value and provides Commerce with broad authority to use "any other calculation methodology" if costs are distorted by a PMS.  Although section 773(e) of the Act is the subsection that is applicable to CV, given the applicability of the definition "ordinary course of trade" when Commerce determines normal value (section 773(a)(1)(B)(i)), having Commerce forgo considering costs distorted by a PMS for CV, but still consider and rely on those distorted costs for purposes of COP and the sales-below-cost test creates an illogical discordance.  Commerce considers the totality of the statute and the TPEA amendments that expanded the fundamental and ubiquitous term "ordinary course of trade" to include PMS considerations.[204]

Commerce's interpretation that the TPEA permits it to adjust Saha Thai's COP based upon the cost-based PMS that we found to have existed in Thailand during the POR is also supported by the relevant legislative history, which states that the amendments ultimately enacted in the TPEA "provide that where a particular market situation exists that distorts pricing or cost in a foreign producer's home market, the Department of Commerce has flexibility in calculating a duty that is not based on distorted pricing or costs."[205]  Reviewing the TPEA's legislative history, the Court has recognized that the statute reflects Congress's "desire to give Commerce the ability to choose the appropriate methodology when a particular market situation exists."[206]  The TPEA amendments and their legislative history reflect Congress's intent to expand Commerce's discretion in administering the statute when a PMS is found to have existed. Based on the statutory language and the legislative intent on this matter, Commerce has consistently found that section 504 of the TPEA added the concept of a PMS in the definition of

---

[202] *See* section 773(e) of the Act.
[203] *See* section 773(a)(1)(B)(i) of the Act.
[204] *See, e.g.*, *Norfolk & W. Ry. Co. v. American Train Dispatchers' Ass'n*, 499 U.S. 117, 129 (1991) (declining to resort to a canon of construction that supported a particular interpretation of a statute when the "whole context," "dictate a different conclusion" process).
[205] *See* S. Rep. No. 114-45 at 37 (2015).
[206] *See* *NEXTEEL Co. v. United States*, 355 F. Supp. 3d 1336, 1349 (CIT 2019).

the term "ordinary course of trade," for purposes of CV "and through these provisions for purposes of the COP under section 773(b)(3) of the Act."[207]  Given the broad discretion afforded to Commerce in the statutory language and the legislative history regarding the "particular market situation" concept, Commerce's adjustment of Saha Thai's COP is a reasonable interpretation of the statute and is in accordance with law.

*Existence of a PMS*
We disagree with Saha Thai's assertion that the record does not support a PMS finding in this review.  We acknowledge that global overcapacity decreased in recent years, including the POR.  However, global overcapacity is still significant, accounting for over 25 percent of global production in 2019.[208]  Furthermore, China still had over 155 million metric tons of excess capacity during the POR, accounting for almost one third of total global excess capacity (*i.e.*, 487 metric tons).[209]  In addition, despite the fact that overcapacity has declined somewhat, the prices of HRC imports have not changed significantly over the past five years,[210] a period over which we have previously found a particular market situation existed in part due to global overcapacity.  Thus, we conclude that global overcapacity continued to contribute to a PMS in Thailand during the POR concerning the cost of HRC used in the production of CWP.

Saha Thai cites two GOT termination notices as evidence that safeguard duties for HRC imports were no longer in effect during this POR.[211]  However, only one of these termination notices went into effect prior to the POR.  The first termination notice entered into effect prior to the POR on February 27, 2019, but only removed safeguard duties on entries under certain Thai subheadings under HS subchapters 7225 and 7226.[212]  The second termination notice did not enter into effect until after the POR, on June 7, 2020, and removed safeguard duties on entries under certain Thai subheadings under HS subchapter under 7208.[213]  Therefore, safeguard measures were still in effect during the POR.

Finally, with respect to GOT subsidization of HRC, all imports of HRC from Thailand into the United States remain subject to a CVD rate of 2.38 percent.[214]  Although Saha Thai objects that the 2.38 percent *ad valorem* subsidy rate is outdated, Saha Thai points to no evidence indicating

---

[207] *See, e.g.*, *Certain Oil Country Tubular Goods from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 FR 18105 (April 17, 2017), and accompanying IDM at Comment 3; and *Circular Welded Non-Alloy Steel Pipe from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2015-2016*, 83 FR 27541 (June 13, 2018), and accompanying IDM at Comment 1.
[208] *See* Saha Thai's Letter, "Saha Thai's Rebuttal Factual Information and Comments Concerning Petitioner's Particular Market Situation (PMS) Allegation Circular Welded Carbon Steel Pipe and Tubes from Thailand (AR 19-20)," dated February 19, 2021 (Saha Thai PMS RFI) at CAP-1.
[209] *Id*.
[210] *See* Wheatland's Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand:  Particular Market Situation Allegation – Quantitative Submission," dated January 4, 2021 (PMS Quantitative Allegations) at Exhibit 5.  In 2015 and 2017, HRC import average unit values (AUVs) were $611.42 and $606.26, respectively, which are consistent with the 2019 import AUV of $611.53.  *Id*.  As we observed in the *Preliminary Results*, the low 2016 import AUVs appear to be an outlier.  *See Preliminary Results* PDM at 8.
[211] *See* Saha Thai PMS RFI at 32 and Exhibits CAP-14 and CAP-15.
[212] *Id.* at Exhibit CAP-14.
[213] *Id.* at Exhibit CAP-15.
[214] The CVD order was continued in the most recent sunset review with a CVD rate likely to prevail of 2.38 percent. *See Certain Hot-Rolled Carbon Steel Flat Products from Thailand:  Final Results of the Third Expedited Five Year (Sunset) Review of the Countervailing Duty Order*, 84 FR 27085 (June 11, 2019) (*HRC from Thailand Sunset Review*), and accompanying IDM.

Barcode:4187711-02 A-549-502 REV - Admin Review 3/1/19 - 2/29/20

that the GOT ceased the subsidization of HRC in Thailand since the last administrative review of the CVD order on HRC from Thailand. In the most recent *HRC from Thailand Sunset Review* in 2019, we stated that "Commerce finds that countervailable subsidies would be likely to continue or recur in the event that the *CVD Order* was revoked as the subsidy programs found countervailable in this investigation continue to exist."[215]

For these reasons, we continue to find that the collective impact of the effects of the subsidization of HRC by the GOT and distorted import prices of HRC due to global overcapacity, dumping, and subsidization constitutes a PMS in Thailand during the POR concerning the cost of HRC used in the production of CWP.

*Quantification of PMS Adjustment*
We disagree with Saha Thai's claim that the preliminary quantification of the PMS cost adjustment is flawed. Our preliminary upward adjustment is based on Wheatland's regression analysis that quantifies the relationship between the AUVs of imported HRC in Thailand and global uneconomic capacity, using data from ten calendar years ending during the POR.[216]

Saha Thai argues that Commerce improperly calculated a PMS adjustment for this specific POR based on data from outside the POR. Although Saha Thai claims that we ignored our practice of determining cost of production for a specific POR and using data that most closely approximates that POR, Saha Thai misunderstands our established practice of considering five years' worth of production data in calculating a PMS adjustment. The purpose of the PMS adjustment is to calculate what the given country's import AUV would be if uneconomic capacity were resolved, *i.e.*, if the steel industry's five-year production average equaled 80 percent of capacity. In *OCTG from Korea AR1718*, we explained our reasoning for using a five-year average of production values rather than the value from a single year alone, and why the health of a capital-intensive industry like steel cannot be gauged based on performance in a single year:

> "A five-year average represents a rational, medium term perspective for assessing the economic health of the industry which takes into consideration some fluctuation in the market and provides a reasonable basis on which to assess future prospects. A five-year average is frequently relied upon in the steel industry for statistical reporting to show trends in production and capacity. Five years is a typical timeframe for strategic planning to outline the operational and financial objectives of an enterprise, including in the steel industry. In addition, a five-year average for capacity utilization has been used in other steel policy initiatives of the U.S. government.
>
> Thus, we find that a counterfactual global production capacity based on a longer, 5-year time frame is more consistent with steel industry planning and considerations, the capital-intensive nature of the steel industry, and susceptibilities to market fluctuations that accompany steel production, purchases, and sales. Accordingly, the counterfactual global production capacity we are relying on in our determination is based on the average of global production

---

[215] *Id.* at 7.
[216] *See* PMS Quantitative Allegations at Exhibit 3.

27

Barcode:4187711-02 A-549-502 REV - Admin Review 3/1/19 - 2/29/20

during a five-year period including the contemporaneous year, rather than just on the production of steel during the contemporaneous year alone."[217]

Like OCTG, the product at issue in this review, CWP, is a steel pipe product for which the major input is HRC. Accordingly, we continue to find that it is appropriate to consider five years of production data when calculating a PMS adjustment based on the results of the regression analysis, as we did for the *Preliminary Results*.

Saha Thai also argues that Commerce improperly calculated a PMS adjustment based on incorrect and biased capacity utilization rates. Specifically, Saha Thai states that Wheatland calculated an "Implied Uneconomic Capacity" figure based, in part, on the "Production (Previous All-Time High)". The previous all-time high figure used by Wheatland was from 2018 (before the POR). Saha Thai argues that the calculation should use the previous all-time high from before the 5-year regression period (*i.e.*, 2014). Saha Thai contends that, by using the 2018 figure as the "previous all-time high," Wheatland specifically included in its calculation the exact disqualifying bias it was trying to avoid. However, Saha Thai again misunderstands our calculations.

The "uneconomic capacity" data that goes into the regression analysis is defined, for each of the 10 years, as capacity in that year minus the highest prior production value (*i.e.*, capacity in that year minus the greatest amount produced in the past). Using the 2018 production value to calculate uneconomic capacity in 2019 is perfectly consistent with the model and does not introduce any bias. Further, the five-year time frame has nothing to do with the regression analysis itself and therefore could not possibly introduce any bias into the regression, as it only comes into play in step 2 of our analysis, when we use the results of the regression to calculate the PMS adjustment. In step 2, we take the coefficient from the uneconomic capacity variable in the regression (which measures the relationship between uneconomic capacity and import AUVs of HRC in the given country) and use it to calculate how much higher the national AUV would be if uneconomic capacity were resolved, *i.e.*, if the steel industry's five-year production average equaled 80 percent of capacity.

Finally, Saha Thai argues that Commerce improperly calculated a PMS adjustment on a global basis while defending it as necessary to account for local market conditions and yet ignoring local market conditions. Although some of the variables in the regression equation are based on global data, Saha Thai ignores the variables that are country-specific, including the dependent variable (import AUVs), and the independent variables gross fixed capital formation and exchange rate.

For the foregoing reasons, we are continuing to adjust Saha Thai's costs using the PMS adjustment we used in the *Preliminary Results*.

---

[217] *See Certain Oil Country Tubular Goods from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 FR 41949 (July 13, 2020) (*OCTG from Korea AR1718*), and accompanying IDM at 54.

Filed By: Thomas Schauer, Filed Date: 12/3/21 10:42 AM, Submission Status: Approved

Barcode:4187711-02 A-549-502 REV - Admin Review 3/1/19 - 2/29/20

**Comment 8:   Whether Commerce's Preliminary Determination for Non-Examined Companies Was Lawful**

*Saha Thai's Case Brief*
- Commerce's preliminary results for non-examined companies is contrary to law.[218]
  - Commerce may not conduct an antidumping administrative review which results in a change in the cash deposit rate unless the company had an U.S. entry of subject merchandise during the POR.[219]
  - The evidentiary record of this review establishes that some of the non-examined companies did not have entries of subject merchandise during the POR.[220]
    - Given this undisputed data, it was contrary to law for Commerce to assign Saha Thai's antidumping rate to the companies that did not have any U.S. entries of subject merchandise during the POR.[221]

*Wheatland's Rebuttal Brief*
- Commerce should not rescind the review for all non-examined companies.[222]
  - Customs data is not always a reliable indicator of all shipments during the POR, and because of this, Commerce may elect to conduct administrative reviews notwithstanding that CBP data indicate no entries during the POR.[223]
  - For Commerce to reliably capture all shipments during the POR, it is a respondent's responsibility to certify that there were no exports, sales, or entries of subject merchandise during the POR to justify rescission; this certification is a necessary piece of evidence that Commerce must consider along with the CBP data.[224]

**Commerce Position:**  We disagree with Saha Thai.  We previously determined that "the information from the CBP data queries alone is not sufficient to reliably conclude that there were no entries of subject merchandise from a company under review during the POR."[225]  Because of this, Commerce's long-standing policy is to require a company under review which claims it had no shipments to submit a claim of "no shipments."  This allows Commerce to confirm the claim over the course of the review and to "issue supplemental questionnaires, do further research into CBP data, allow time for parties to comment and submit further information, and ultimately consider and weigh potentially conflicting data and, where necessary or appropriate, scheduling and conducting verification of the respondent's claims of no shipments."[226]  Further, when Commerce determines that a given company had no shipments, the review for that company is

---

[218] *See* Saha Thai's Case Brief at 42-49.
[219] *Id*. at 43-47.
[220] *Id*. at 48-49.
[221] *Id*. at 49.
[222] *See* Wheatland's Rebuttal Brief at 24-25.
[223] *Id*. at 24 (citing *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China; Final Results of 1999-2000 Administrative Review, Partial Rescission of Review, and Determination Not To Revoke Order in Part*, 66 FR 57420 (November 15, 2001), and accompanying IDM at Comment 10; and *Fresh Garlic from the People's Republic of China:  Final Results and Partial Rescission of the 14th Antidumping Administrative Review*, 75 FR 34976 (June 14, 2010), and accompanying IDM at Issue 2).
[224] *Id*.
[225] *See, e.g.*, *Fresh Garlic from the People's Republic of China:  Final Results and Partial Rescission of the 14th Antidumping Duty Administrative Review*, 75 FR 34976 (June 21, 2010), and accompanying IDM at Comment 2.
[226] *Id*.

Filed By: Thomas Schauer, Filed Date: 12/3/21 10:42 AM, Submission Status: Approved

not rescinded but rather Commerce makes a final determination of no shipments and issues appropriate liquidation instructions.

Consistent with this practice, the *Initiation Notice* for the instant review notified all respondents that "{i}f a producer or exporter named in this notice of initiation had no exports, sales, or entries during the {POR}, it must notify Commerce within 30 days of publication of this notice in the *Federal Register*."[227]  Aside from K-Line, however, no party submitted a no-shipments certification.  We further found the Blue Pipe had no shipments because its sales were appropriately attributed to Saha Thai.

We also determine that the cases cited by Saha Thai are unavailing.  In *Carbon Bricks from China*, Commerce made its determination that "certain companies subject to this review had no reviewable entries of subject merchandise during the POR" with respect to "the companies that submitted no shipment certifications."[228]  Thus, there is no inconsistency between that case and the instant review.  With respect to *Standard Pipe from Turkey*, Commerce made its determination that the respondent had no reviewable entries based on an analysis that included requesting additional information from the respondent.[229]  Thus, there is no inconsistency between that case and the instant review.

Accordingly, consistent with our practice, we determine that the CBP data query alone is not sufficient to reliably conclude that there were no entries of subject merchandise from the non-examined respondents during the POR, or that the review initiated for these companies should be rescinded.  Therefore, we continue to base the weighted-average dumping margin for these companies on the weighted-average dumping margin for the sole respondent for whom we calculated a weighted-average dumping margin for the final results of review, *i.e.*, Saha Thai.

**Comment 9:   Whether Commerce Should Calculate an Individual Weighted-Average Dumping Margin for Thai Premium Pipe Co., Ltd.**

*TPP's Case Brief*
- Commerce should examine TPP as a voluntary respondent and calculate an individual antidumping duty margin for TPP.[230]
  - Although Commerce indicated it had the resources to investigate at least two respondents, Commerce calculated a dumping rate for only one mandatory respondent.[231]
    - Because Blue Pipe had no U.S. shipments, it cannot be properly examined as a mandatory respondent in this review, and Commerce therefore has the resources to examine TPP as a second mandatory respondent in this review.[232]

---

[227] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 FR 24743 (May 29, 2019) (*Initiation Notice*).

[228] *See Certain Magnesia Carbon Bricks from the People's Republic of China:  Preliminary Results of the Antidumping Duty Administrative Review; 2017-2018*, 84 FR 55287, 55288 (October 16, 2019) (*Carbon Bricks from China*).

[229] *See Certain Welded Carbon Steel Standard Pipe and Tube from Turkey:  Notice of Final Rescission of Countervailing Duty Administrative Review, In Part*, 77 FR 6542 (February 8, 2012), and accompanying IDM at Comment 1.

[230] *See* TPP Case Brief at 2-3; *see also* TPP Case Brief Supplement at 1-5.

[231] *See* TPP Case Brief at 2-3.

[232] *Id*. at 3.

Barcode:4187711-02 A-549-502 REV - Admin Review 3/1/19 - 2/29/20

- o The antidumping duty rate calculated for Saha Thai does not reasonably reflect the antidumping duty rate of TPP during the POR.[233]
  - ▪ The Federal Circuit and the CIT have held that the "all others rate" should be "reasonably reflective of potential dumping margins for non-investigated exporters or producers."[234]
  - ▪ Whereas Commerce calculated a 7.23 percent margin for Saha Thai, the margin calculation for TPP based on its own sales and cost data is zero percent without a PMS adjustment or 6.13 percent with the PMS adjustment Commerce used in the *Preliminary Results*.[235]
  - ▪ Commerce devoted significant time and resources in considering, analyzing, and drafting responses to Wheatland's numerous improper and erroneous filings while, at the same time, Commerce disregarded TPP's timely filed voluntary responses because of a putative lack of resources and significant caseload.[236]
    - - Commerce's inequitable distribution of resources and prejudiced TPP.[237]

*Wheatland's Rebuttal Brief*
- • Commerce should not calculate a rate for TPP.[238]
  - o Commerce has the sole authority to determine the extent of its resources and is uniquely well-situated to evaluate demands on its resources and how to best use those resources in the pursuit of its statutory obligations.[239]
  - o TPP has not shown that Commerce's decision was not based on substantial evidence, nor that this decision violated the explicit directives of the Act.[240]

**Commerce Position**:  We disagree with TPP.  While it is true that we ultimately did not calculate an individual weighted-average dumping margin for Blue Pipe, that determination was only concluded after analysis of Blue Pipe's questionnaire response,[241] two supplemental responses,[242] and submissions of rebuttal factual information by both Wheatland and Blue Pipe.[243]  Further, as can be seen above, we received substantial comments regarding Blue Pipe in this review.  Thus, we expended substantial resources analyzing Blue Pipe in this review.

---

[233] *See* TPP Case Brief Supplement at 1-5.

[234] *Id*. at 2-3 (citing, *e.g.*, *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378-79 (Fed. Cir. 2013)).

[235] *Id*. at 3-4.

[236] *Id*. at 4.

[237] *Id*.

[238] *See* Wheatland's Rebuttal Brief at 25.

[239] *Id*.

[240] *Id*.

[241] *See* Blue Pipe's Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand:  Section A Questionnaire Response," dated November 10, 2020; *see also* Blue Pipe's Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand:  Section B Questionnaire Response," dated December 10, 2020; Blue Pipe's Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand:  Section C Questionnaire Response," dated December 10, 2020; and Blue Pipe's Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand:  Section D Questionnaire Response," dated December 14, 2020

[242] *See* Blue Pipe's Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand:  1st Supplemental Questionnaire Response," dated February 24, 2021; *see also* Blue Pipe's Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand:  2nd Supplemental Questionnaire Response," dated May 6, 2021.

[243] *See* Wheatland's Letter, "Circular Welded Carbon Steel Pipes and Tubes From Thailand:  Section A Rebuttal Factual Information," dated November 24, 2020; *see also* Wheatland's Letter, Circular Welded Carbon Steel Pipes and Tubes from Thailand:  Rebuttal Factual Information to Blue Pipe's Supplemental Questionnaire Response," dated June 2, 2021.

Filed By: Thomas Schauer, Filed Date: 12/3/21 10:42 AM, Submission Status: Approved

Barcode:4187711-02 A-549-502 REV - Admin Review 3/1/19 - 2/29/20

Because of this, we did not have the resources necessary to separately examine a third respondent in this review.

TPP's argument that Saha Thai's rate is not reflective of the rate that would be applicable to TPP is purely speculative. Although TPP claims that the rate calculated using its data would be somewhat less than the rate we calculated for Saha Thai, we have not analyzed TPP's response to ascertain whether it reported its data properly, nor can we know whether we would have made no adjustments to TPP's data outside of the PMS adjustment. Given the speculative nature of TPP's argument on this point, we have no basis for concluding that the weighted-average dumping margin that we calculated for Saha Thai is not reasonably reflective of the potential weighted-average dumping margin for TPP or any of the other non-examined companies.

Finally, although TPP asserts that it was prejudiced by the fact that we had to reject improper filings by Wheatland, TPP erroneously conflates the resources necessary to reject Wheatland's submissions with the resources necessary to analyze a complete response, issue supplemental questionnaires, and calculate margins for a respondent. The resources required to ascertain whether a submission is properly filed and to reject that response, if necessary, is orders of magnitude less than calculating a margin for a respondent, which involves analyzing a complete response, issuing supplemental questionnaires, analyzing the responses to those questionnaires, and drafting computer programs to calculate a respondent's weighted-average dumping margin.

Because we did not have the resources to analyze a third respondent in this review, we have not calculated an individual weighted-average dumping margin for TPP in this administrative review.

## VI.    RECOMMENDATION

Based on our analysis of the comments received, we recommend adopting the above positions. If these recommendations are accepted, we will publish the final results of this review and the final weighted-average dumping margins in the *Federal Register*.

☒                          ☐
_____          _____

Agree                    Disagree
                         12/2/2021

X   _____

   Signed by: RYAN MAJERUS

Ryan Majerus
Deputy Assistant Secretary
 for Policy and Negotiations,
 performing the non-exclusive functions and duties of the
 Assistant Secretary for Enforcement and Compliance

Filed By: Thomas Schauer, Filed Date: 12/3/21 10:42 AM, Submission Status: Approved