## UNITED STATES COURT OF INTERNATIONAL TRADE

*Before*: The Honorable Stephen A. Vaden, Judge

| | |
|---|---|
| SAHA THAI STEEL PIPE PUBLIC COMPANY LIMITED, )<br><br>Plaintiff, )<br>and )<br><br>THAI PREMIUM PIPE COMPANY LTD., )<br><br>Plaintiff-Intervenor, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br>and )<br><br>WHEATLAND TUBE COMPANY, NUCOR TUBULAR PRODUCTS INC., )<br><br>Defendant-Intervenors. ) | **Court No. 21-00627**<br><br>**NONCONFIDENTIAL**<br>*Confidential information is contained in brackets on pages ii, 2, 22, 23, 28, 31-41, 48, and 51.*<br><br>*Such information has been redacted in the Public Version* |

## PLAINTIFF SAHA THAI'S BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD

Daniel L. Porter
James P. Durling
James C. Beaty
Ana Amador

**Curtis, Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, NW
Washington, DC, 20006

May 9, 2022

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................... 1

STATEMENT PURSUANT TO RULE 56.2 ..................................................................... 3

STATEMENT OF FACTS ................................................................................................. 5

ARGUMENT .................................................................................................................... 10

I.   COMMERCE HAS NO LEGAL AUTHORITY TO MAKE A PMS
     ADJUSTMENT TO SAHA THAI'S COSTS OF PRODUCTION FOR SALES-
     BELOW COST TEST PURPOSES ...................................................................... 10

II.  EVEN ASSUMING COMMERCE HAS THE STATUTORY AUTHORITY TO
     APPLY THE PMS PROVISION IN ITS BELOW-COST ANALYSIS,
     COMMERCE'S CONCLUSION OF THE EXISTENCE OF A PMS AND
     CALCULATION OF A PMS ADJUSTMENT ARE NOT SUPPORTED BY
     SUBSTANTIAL EVIDENCE AND ARE NOT IN ACCORDANCE WITH LAW
     ............................................................................................................................... 12

     A.   Commerce's Conclusion That A PMS Existed Is Unsupported By
          Substantial Evidence And Is Otherwise Not In Accordance With Law ..... 12

          1.   Commerce's conclusion that global overcapacity affected Thai
               prices for hot-rolled coil is not supported by the evidentiary record 13

          2.   Commerce's conclusion that Saha Thai's HRC suppliers received
               countervailable subsidies from the Thai Government is completely
               unsupported by the evidentiary record ............................................ 16

     B.   Commerce's Calculation of a PMS Adjustment Is Unsupported By
          Substantial Evidence And Is Otherwise Not In Accordance With Law ..... 17

III. COMMERCE'S DECISION TO APPLY PARTIAL FACTS AVAILABLE IS
     NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS NOT IN
     ACCORDANCE WITH LAW ............................................................................... 22

     A.   Commerce's Affiliation Conclusion Is Based On A Belated and Deficient
          Submission by Petitioners That Commerce Should Have Rejected .......... 23

     B.   Commerce's Decision To Apply Adverse Facts Available Is Premised
          Upon Wholly Incorrect Subsidiary Conclusions That Saha Thai Had
          Affiliated Home Market Customers That Re-Sold Subject Merchandise In
          The Thai Market ......................................................................................... 28

NONCONFIDENTIAL

1.  The statute and regulations provide an express legal framework within which Commerce must evaluate claims of affiliation .......... 29

2.  Commerce's conclusion that Saha Thai was affiliated with [      ] home market customers who re-sold the subject merchandise is not supported substantial evidence or is in accordance with law........... 31

C.  Commerce's Decision To Apply Adverse Facts Otherwise Available Is Unlawful Because There Is No Evidence That Saha Thai Impeded The Investigation And Because Commerce Did Not Comply With The Statutory Obligation Set Forth in 19 U.S.C. §1677m ................................................. 42

1.  When Commerce does not use a respondent's own information, specific statutory provisions govern the possible application of facts otherwise available with adverse inferences ..................................... 42

2.  The evidentiary record confirms that Saha Thai responded to each Commerce questionnaire to the best of its ability ........................... 47

3.  Commerce's decision to apply adverse facts available is unlawful because Commerce did not comply with the statutory obligation set forth in 19 U.S.C. §1677m ............................................................. 50

IV.  COMMERCE MUST REVISE THE CALCULATION OF THE AD ASSESSMENT RATE IN THIS REVIEW BECAUSE IT INCLUDES OUT-OF-SCOPE MERCHANDISE ..................................................................................... 52

CONCLUSION ............................................................................................. 55

# TABLE OF AUTHORITIES

## Cases

*Bluescope Steel v. United States*,
548 F. Supp. 3d 1351 (Ct. Int. Trade 2021) ............................................................. 45, 46

*Borlem S.A.-Empreedimentos Industriais v. United States*,
913 F.2d 933 (Fed. Cir. 1990) ........................................................................... 54

*Bowe-Passat v. United States*,
17 CIT 335 (1993) ...................................................................................... 50

*Clearon Corp. v. United States*,
359 F. Supp. 3d 1344 (Ct. Int'l Trade 2019) ............................................................ 44

*Dongkuk Steel Mill Co. v. United States*,
29 CIT 724 (2005) ...................................................................................... 30

*Essar Steel Ltd. v. United States*,
678 F.3d 1268 (Fed. Cir. 2012) ....................................................................... 48, 51

*F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*,
216 F.3d 1027 (Fed. Cir. 2000) .......................................................................... 47

*Garg Tube Exp. LLP v. United States*,
No. 20-00026, 2022 Ct. Intl. Trade LEXIS 25 (CIT March 11, 2022) ........................ 17

*Ghigi 1870 S.P.A. v. United States*,
547 F. Supp. 3d 1332 (Ct. Int. Trade, 2021) ............................................................ 44

*Heavy Indus. Co., Ltd. v. United States*,
393 F. Supp. 3d 1293 (Ct. Int'l Trade 2019) .......................................................... 34, 35

*HiSteel Co., Ltd. v. United States*,
547 F. Supp. 3d 1233 (Ct. Int'l Trade 2021) ........................................................... 17

*Husteel Co. v. United States*,
471 F. Supp. 3d 1349 (Ct. Int'l Trade 2020) ........................................................... 21

*Hyundai Heavy Indus. Co. v. Hyosung Corp. & Iljin Elec. Co.*,
485 F. Supp. 3d 1380 (Ct. Int'l Trade 2020) ........................................................... 45

*Hyundai Steel Co. v. United States*,
518 F. Supp. 3d 1309 (Ct. In. Trade 2021) ......................................................... 45, 46, 51

*Hyundai Steel v. United States*,
19 F.4th 1346 (Fed. Cir. 2021) ...................................................................... 11, 12

*Jindal Poly Films Ltd. of India v. United States*,
365 F. Supp. 3d 1379 (Ct. Int'l Trade, 2019) ......................................................... 45, 46

*Jinko Solar Co. v. United States,*
   229 F. Supp. 3d 1333 (Ct. of Int'l Trade 2017) ............................................................ 30

*Mukand, Ltd. v. United States,*
   767 F.3d 1300 (Fed. Cir. 2014) .................................................................................... 47

*Nexteel Co. v. United States,*
   No. 20-03898, 2022 Ct. Intl. Trade LEXIS 36 (CIT April 19, 2022) ........................... 17

*Nippon Steel Corp. v. United States,*
   337 F.3d 1373 (Fed. Cir. 2003) .................................................................................... 47

*NSK Ltd. v. United States,*
   481 F.3d 1355 (Fed. Cir. 2007) .................................................................................... 51

*Saha Thai Steel Pipe Pub. Co. v. United States,*
   547 F. Supp. 3d 1278 (Ct. Int'l Trade 2021) ............................................................ 9, 52

*Shelter Forest Int'l Acquisition, Inc. v. United States,*
   497 F. Supp. 3d 1388 (Ct. Int'l Trade 2021) ................................................................ 45

*Sigma Corp. v. United States,*
   841 F. Supp. 1255 (1993) ............................................................................................ 49

*Sonoco Steel Tube Div. Ferrum, Inc. v. United States,*
   12 CIT 990 (1988) ...................................................................................................... 54

## Statutes

19 U.S.C. § 1677b ....................................................................................................... 10, 11

19 U.S.C. § 1677m ....................................................................................................... passim

19 U.S.C. §1675(a) ...................................................................................................... 42, 52

19 U.S.C. §1677(33). .............................................................................................. 29, 34, 39, 40

19 U.S.C. §1677e ...................................................................................................... 43, 44, 47, 50

Trade Preferences Extension Act of 2015, Pub. L. No. 114-27 (June 29, 2015) .............. 10

## Regulations

19 C.F.R. §351.102 ...................................................................................................... 30, 31

19 C.F.R. §351.301 .................................................................................................. 24, 26, 36

19 C.F.R. §351.303 .................................................................................................... 24, 26

## Administrative Decisions

*Circular Welded Carbon Steel Pipes and Tubes From Thailand,*
   51 Fed. Reg. 8,341 (March 11, 1986) ............................................................................. 5

*Certain Hot-Rolled Carbon Steel Flat Products Final Affirmative Countervailing Duty Determination,* 66 Fed. Reg. 50,410 (October 3, 2001) ................................................. 16

*Certain Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review,* 65 Fed. Reg. 60,910 (Oct. 13, 2000) ........................................................................... 7

*Certain Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review,* 66 Fed. Reg. 53,388 (Oct. 22, 2001) ........................................................................... 7

*Certain Welded Carbon Steel Pipes and Tubes from Thailand: Final Results of Antidumping Duty Administrative Review,* 69 Fed. Reg. 61,649 (Oct. 20, 2004) ........................................................................... 7

*Chlorinated Isocyanurates From Spain*: Final Results of Antidumping Duty Administrative Review, 72 Fed. Reg. 64,194 (Nov. 15, 2007) ..................................... 27

*Circular Welded Carbon Steel Pipes and Tubes From Thailand: Amended Final Results of Antidumping Duty Administrative Review; 2015-2016,* 83 Fed. Reg. 18,001 (Apr. 25, 2018) ................................................................... 7

*Circular Welded Carbon Steel Pipes and Tubes from Thailand: Final Results of Antidumping Duty Administrative Review,* 73 Fed. Reg. 61,019 (Oct. 15, 2008) .......... 7

*Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review,* 75 Fed. Reg. 64,696 (Oct. 20, 2010) .......... 7

*Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review,* 77 Fed. Reg. 61,738 (Oct. 11, 2012) .......... 7

*Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review; 2011-2012,* 78 Fed. Reg. 65,272 (Oct. 31, 2013) ..................................................................................................... 7

*Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review; 2012-2013,* 79 Fed. Reg. 64,170 (Oct. 28, 2014) ..................................................................................................... 7

*Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review; 2013-2014,* 80 Fed. Reg. 59,732 (Oct. 2, 2015) ..................................................................................................... 7

*Circular Welded Carbon Steel Pipes and Tubes from Thailand: Notice of Final Results of Antidumping Duty Administrative Review,* 71 Fed. Reg. 54,266 (Sept. 14, 2006)......... 7

*Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019– 2020,* 86 Fed. Reg. 69,620 (Dec. 8, 2021) ........................................................... 1, 3

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Plaintiff Saha Thai Steel Pipe Public Company Limited (hereinafter, "Saha Thai") hereby submits its principal brief challenging the U. S. Department of Commerce's ("Commerce") final determination in the 2019-2020 administrative review of the antidumping duty ("AD") order concerning circular welded carbon steel pipes and tubes from Thailand.  *See Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments*; 2019– 2020, 86 Fed. Reg. 69,620 (Dec. 8, 2021) ("*Final Results*"), Appx14281-14286 and accompanying Issues and Decision Memorandum, Appx14287-14319.

In the sections below we explain why the Commerce determination is not supported by substantial evidence and not otherwise in accordance with law.  In **Section I** we explain Commerce has no legal authority to make a PMS adjustment to Saha Thai's costs of production for sales-below cost test purposes.  Whatever uncertainty existed at the time that Commerce rendered its final results in the underlying AD review, there is *now* no dispute that Saha Thai's statement of the statutory requirements is correct.  The Court of Appeals for the Federal Circuit ("Federal Circuit") has now ruled definitively that Commerce has no statutory authority to use the existence of a PMS as a basis for adjusting a respondent's costs of production to determine whether a respondent has made home market sales below cost.

In **Section II** we demonstrate that, even assuming Commerce has the statutory authority to apply the "particular markets situation" ("PMS") provision in its below-cost analysis, Commerce's conclusion of the existence of a PMS and the associated

calculation of a PMS adjustment are not supported by substantial evidence and are not in accordance with law.  Commerce's rationale for finding the existence of a PMS in Thailand is based on factual premises that are just not true.  And Commerce's calculation of the PMS adjustment it applied is riddled with serious methodological errors.

In **Section III** we demonstrate why Commerce's decision to apply partial facts available is not supported by substantial evidence and is not in accordance with law.  In particular, we demonstrate that:

- Commerce's decision to accept, very late in the proceeding, Petitioner's new factual information that did not comply with Commerce regulations was an abuse of discretion and therefore unlawful;

- Commerce's conclusion that there were [      ] home market customers who resold the subject merchandise that were affiliated to Saha Thai is not supported by substantial evidence is otherwise not in accordance with law;

- Commerce's conclusion that Saha Thai impeded the AD review is not supported by substantial evidence and completely violated its statutory obligations under 19 U.S.C. §1677m.

Finally, in **Section IV** we argue that Commerce must revise the calculation of Saha Thai's company-specific AD rate because it includes out-of-scope merchandise.

## STATEMENT PURSUANT TO RULE 56.2

### A.   Administrative Determinations Under Appeal

Saha Thai seeks judicial review of Commerce's final results of anti-dumping duty administrative review and final determination of no shipments of certain welded carbon steel pipes and tubes from Thailand, covering the period March 1, 2019 to February 29, 2020. *See Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments*; 2019– 2020, 86 Fed. Reg. 69,620 (Dec. 8, 2021) ("*Final Results*"), Appx14281-14286 and accompanying Issues and Decision Memorandum, (I&D) Appx14287-14319.

### B.   Issues of Law Presented

The relevant issues of law presented by this appeal are as follows:

- Whether Commerce has the statutory authority to apply a PMS adjustment in the context of its sales-below-cost test.

- Assuming that Commerce has the statutory authority, whether Commerce's conclusion that a PMS existed and Commerce's calculation of a PMS adjustment are supported by substantial evidence and are in accordance with law.

- Whether Commerce's decision to apply partial facts available with an adverse inference because of alleged failure to report re-sales data of alleged affiliated home market customers is supported by substantial evidence and is in accordance with the law.

- Whether Commerce must revise the calculation of Saha Thai's company-specific AD rate for the underlying AD review because that rate includes out-of-scope merchandise.

**C.**     **Statement of Reasons for Vacating Commerce Determinations**

Commerce's AD determination should be vacated because it is not supported by substantial evidence and is otherwise not in accordance with law.  The reasons are set forth below.

## STATEMENT OF FACTS

Although the *Final Results* in this particular proceeding were issued in December 2021, this order has had a long history reaching back to 1986.  Although ultimately the Court will consider the specific facts on this record, it is important that this Court conduct its review of specific facts here in a broader context of an AD order that has been in place for decades.  This record reveals that Saha Thai has consistently complied with Commerce's investigations, has never faced "facts otherwise available" before, and has consistently been found to have low dumping margins. It was only last year that Commerce out of the blue and with no factual basis concluded that Saha Thai's AD efforts were somehow so deficient as to warrant "facts otherwise available" with adverse inferences.

Saha Thai submits that the most recent Commerce AD review determination (for the underlying 2019-2020 AD review) has no factual basis, flies in face of decades of prior Commerce determinations, and should not stand.

- **Prior Commerce AD Reviews for Circular Welded Pipe (CWP)**

The original AD order was imposed in 1986.  *Antidumping Duty Order; Circular Welded Carbon Steel Pipes and Tubes From Thailand*, 51 Fed. Reg. 8,341 (March 11, 1986).  Saha Thai participated in the original investigation and in every single active AD review since.  And so, specifically, over the past two-decades, and until last year, Saha Thai has participated as a mandatory respondent in a Commerce AD review 13 times. Over two decades, Saha Thai has regularly participated in Commerce's annual reviews,

submitted tens of thousands of pages of responses, and gone through repeated strenuous

verifications.  In every review Saha Thai submitted complete U.S. sales data, complete

home market (Thailand) sales data, and complete costs of production. Moreover, as

detailed below, year after year Saha Thai has consistently obtained low AD rates based

on its information as submitted:

**Saha Thai AD Margins in Active Reviews for Past Twenty Years**

| POR | AD Margin | Did Commerce utilize Saha Thai sales and cost data |
|---|---|---|
| 1998-1999 | 1.81% | Yes |
| 1999-2000 | 1.92% | Yes |
| 2002-2003 | 0.17% | Yes |
| 2004-2005 | 2.26% | Yes |
| 2006-2007 | 4.21% | Yes |
| 2008-2009 | 2.13% | Yes |
| 2010-2011 | 0.92% | Yes |
| 2011-2012 | 0.00% | Yes |
| 2012-2013 | 0.00% | Yes |
| 2013-2014 | 0.00% | Yes |
| 2015-2016 | 0.69% | Yes |
| 2016-2017 | 0.00%[1] | Yes |
| 2017-2018 | 0.00%[2] | Yes |

All of the above AD rates can be found in Commerce's published final AD review

determinations.[3]

---

[1] This AD rate is the revised AD rate following court remand.  *See* Commerce Remand
Redetermination pursuant to Slip Op. 20-181, dated March 14, 2021.
[2] This AD rate is the revised AD rate following court remand.  *See* Commerce Remand
Redetermination pursuant to Slip Op. 20-148, dated March 14, 2021.
[3] All of the information in this table can be found in Commerce's published AD review
determinations.  *See Certain Welded Carbon Steel Pipes and Tubes From Thailand: Final*

■ **Commerce's 2019-2020 administrative review**.

Commerce initiated the 2019-2020 review in May 2020.  Appx1048-1055.  As in prior reviews, Saha Thai was chosen as mandatory respondent. Appx3121. And as in prior reviews, Saha Thai presented its information about affiliated parties as well as all required sales data. Appx82825-82830.  Saha Thai is absolutely certain that from an AD compliance standpoint, its actions for the 2019-2020 review were virtually identical to the actions for other recent periods of review.

In June 8, 2021, Commerce published its preliminary AD determination.  See Circular Welded Carbon Steel Pipes and Tubes From Thailand: Preliminary Results of

---

*Results of Antidumping Duty Administrative Review*, 65 Fed. Reg. 60,910 (Oct. 13, 2000) (POR 1998-1999); *Certain Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review*, 66 Fed. Reg. 53,388 (Oct. 22, 2001) (POR 1999-2000); *Certain Welded Carbon Steel Pipes and Tubes from Thailand: Final Results of Antidumping Duty Administrative Review*, 69 Fed. Reg. 61,649 (Oct. 20, 2004) (POR 2002-2003); *Circular Welded Carbon Steel Pipes and Tubes from Thailand: Notice of Final Results of Antidumping Duty Administrative Review*, 71 Fed. Reg. 54,266 (Sept. 14, 2006) (POR 2004-2005); *Circular Welded Carbon Steel Pipes and Tubes from Thailand: Final Results of Antidumping Duty Administrative Review*, 73 Fed. Reg. 61,019 (Oct. 15, 2008) (POR 2006-2007); *Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review*, 75 Fed. Reg. 64,696 (Oct. 20, 2010) (POR 2008-2009); *Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review*, 77 Fed. Reg. 61,738 (Oct. 11, 2012) (POR 2010-2011); *Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review*; 2011-2012, 78 Fed. Reg. 65,272 (Oct. 31, 2013) (POR 2011-2012); *Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review*; 2012-2013, 79 Fed. Reg. 64,170 (Oct. 28, 2014) (POR 2012-2013); *Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review*; 2013-2014, 80 Fed. Reg. 59,732 (Oct. 2, 2015) (POR 2013-2014); *Circular Welded Carbon Steel Pipes and Tubes From Thailand: Amended Final Results of Antidumping Duty Administrative Review*; 2015-2016, 83 Fed. Reg. 18,001 (Apr. 25, 2018) (POR 2015-2016); Commerce Remand Redetermination pursuant to Slip Op. 20-181 (POR 2016-2017); Commerce Remand Redetermination pursuant Slip Op. 20-148 (POR 2017-2018).

Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2019–2020, 86 Fed. Reg. 30,406 (June 8, 2021) ("Preliminary Results"), Appx13755-13758.  In its Preliminary Results, Commerce calculated a dumping margin of 7.23% for Saha Thai.  *Id.*  The AD margin contrasted with the rate applied in prior reviews (0%) and resulted from the application by Commerce of an upward adjustment to the reported cost of hot-rolled coil ("HRC") incurred to produce circular welded pipe ("CWP") on the basis of a particular market situation ("PMS").  Commerce applied this cost-based PMS adjustment despite Saha Thai submitting voluminous factual information and economic analysis demonstrating that such adjustment was not justified. Commerce applied this adjustment despite numerous judicial decisions, including now by the Federal Circuit, rejecting the application of a PMS adjustment to costs for determining normal value in the context of a sales below cost test.

Moreover, Commerce's *Preliminary Results* explicitly rejected Petitioner's claims regarding an alleged failure to report certain affiliations.  Unlike some situations where Commerce does not address an issue in the preliminary determination, here Commerce addressed and rejected Petitioner's claims about reporting for alleged affiliates.

On December 8, 2021, Commerce issued its *Final Results* assigning an AD rate to Saha Thai of 36.97% partially based on facts available with an adverse inference related to Saha Thai's reporting of information from its alleged affiliates. Appx14332-14334. Specifically, Commerce claimed that it was appropriate to apply "partial adverse facts available" because: "{Commerce's} review of the evidence on the record indicates that some of Saha Thai's home-market customers may, in fact, be affiliated with Saha Thai

- 8 -

and that Saha Thai did not report them as affiliated customers, nor did it report certain family members that had a role with respect to those customers."  Appx14295-14296.

This finding led to a difference of almost 30 percentage points between Commerce's Preliminary and Final results.  Appx14310-14315.

- **Scope ruling**

Saha Thai respectively submits that this Court must also consider, as context for the specific determinations in this proceeding, the pending change in Commerce's prior determination that dual-stenciled pipe was within the scope of this Order.  *See Saha Thai Steel Pipe Pub. Co. v. United States,* 547 F. Supp. 3d 1278 (Ct. Int'l Trade 2021).  As a result of this Court's decision, Commerce determined on remand that dual-stenciled pipe is not covered by the Order. Final Results of Redetermination Pursuant to Court Remand, *Saha Thai Steel Pipe Pub. Co. v. United States,* 547 F. Supp. 3d 1278 (Ct. Int'l Trade 2021).

**ARGUMENT**

I.    **COMMERCE HAS NO LEGAL AUTHORITY TO MAKE A PMS ADJUSTMENT TO SAHA THAI'S COSTS OF PRODUCTION FOR SALES-BELOW COST TEST PURPOSES**

In its Final Results Commerce calculated Saha Thai's AD margin after adjusting Saha Thai's cost of production to take into account a "particular market situation" (referred to as "PMS").  Appx14310-14315. As we detail below, that PMS adjustment to Saha Thai's actual costs of production was contrary to the statute and therefore unlawful.

The AD rate for Saha Thai was based solely on "price-to-price" comparisons. That is, the entire AD margin calculated by Commerce was not based on comparing U.S. prices to constructed value, but rather based on comparing net U.S. prices to above-cost net home market prices.  Such comparison methodology was entirely appropriate because (1) Saha Thai had a viable home market and (2) and there was not even any allegation, let alone finding, that Saha Thai's home market sales should not be used.  And so, Commerce utilized its price-to-price comparison methodology for 100% of Saha Thai's U.S. sales transactions.  *See* Commerce's Output Log for Final Results (confirming that the AD margin results were based on 654 price-to-price comparisons and no "CV" {constructed value} comparisons.)  Appx99672.

This fact is important because Section 504 of the Trade Preferences Extension Act of 2015, Pub. L. No. 114-27 (June 29, 2015 ("TPEA"), amending 19 U.S.C. § 1677b(e) only allows adjustment to the producer's actual costs of production (because of an alleged PMS) for purposes of calculating <u>constructed value</u>.  There is no statutory

authority for Commerce to use an alleged PMS to adjust a producer's production costs for the purposes of analyzing sales below cost under 19 U.S.C. § 1677b(b).

In its I&D Memo for the underlying AD review, Commerce stated that they disagreed with Saha Thai's legal conclusion, Appx14310-14311, notwithstanding the numerous decisions by this Court, consistently rejecting Commerce's legal position. However, whatever uncertainty existed at the time that Commerce rendered its final results in the underlying AD review, there is *now* no dispute that Saha Thai's statutory interpretation is correct. The Federal Circuit has now ruled definitely that this legal conclusion about Commerce's lack of statutory authority is correct. Specifically, in *Hyundai Steel v. United States*, 19 F.4th 1346 (Fed. Cir. 2021), the Federal Circuit held as follows:

> We agree with the Trade Court that the 2015 amendments to the antidumping statute do not authorize Commerce to use the existence of a PMS as a basis for adjusting a respondent's costs of production to determine whether a respondent has made home market sales below cost.

*Id* at 1348.

Given the Federal Circuit's definitive ruling that Commerce has no legal authority to make a PMS adjustment to costs of production for sales-below cost test purposes under 19 U.S.C. §1677b(b), we respectfully submit that this Court must hold Commerce's final determination unlawful and remand to Commerce with instructions to calculate a new AD margin for Saha Thai without application of a PMS adjustment.

II.    **EVEN ASSUMING COMMERCE HAS THE STATUTORY AUTHORITY TO APPLY THE PMS PROVISION IN ITS BELOW-COST ANALYSIS, COMMERCE'S CONCLUSION OF THE EXISTENCE OF A PMS AND CALCULATION OF A PMS ADJUSTMENT ARE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND ARE NOT IN ACCORDANCE WITH LAW**

As noted above, we respectfully submit that the Federal Circuit's decision in *Hyundai Steel* is binding precedent for this Court concerning Commerce's lack of authority, under the TPEA, to apply a PMS adjustment in its sales-below-cost analysis. That stated, we recognize that the time period for filing a writ of certiorari for Supreme Court review has not yet expired. There is a theoretical possibility (however small) that, by the time this Court is ready to render its decision in this case, the Supreme Court has overturned the Federal Circuit's legal conclusion concerning Commerce's lack of authority. Accordingly, for the sake of completeness, we set forth below why Commerce's finding that a PMS existed and Commerce calculation of a PMS adjustment are both unsupported by substantial evidence and otherwise not in accordance with law.

A.    **Commerce's Conclusion That A PMS Existed Is Unsupported By Substantial Evidence And Is Otherwise Not In Accordance With Law**

In its I&D Memo Commerce made clear that its conclusion of the existence of a cost-based PMS for Thai CWP producers was based on (a) "distorted import prices of hot-rolled coil ("HRC") the {primary input for CWP} due to global overcapacity, dumping, and subsidization" and (b) the "effects of the subsidization of HRC by the GOT." Appx14313-14314. As we detail below, the evidentiary record does not support either of Commerce's two factual predicates for its determination of a PMS.

### 1. Commerce's conclusion that global overcapacity affected Thai prices for hot-rolled coil is not supported by the evidentiary record

Commerce's conclusion of the existence of a cost-based PMS appears to have accepted Petitioner's claims that large volumes of unfairly traded and injuriously low-priced hot-rolled coil (referred to as "HRC") – and in particular HRC from China -- were imported into Thailand during the POR. Appx14313. However, neither these Petitioner claims nor any information purportedly submitted by Petitioner in support thereof indicate that a particular market situation exists in Thailand.

At the outset we note that Commerce appears to have accepted Petitioner's premise that steel overcapacity is a global problem and that this global steel overcapacity is distorting the cost of steel all over the world. Appx14313. But by acknowledging that the alleged steel overcapacity is a global problem, Commerce undermines its central proposition that a "unique" and "particular" market situation had arisen in the Thai steel market. By Commerce's own admission and logic, because global steel overcapacity distorted the cost of steel production all over the world, the Thai steel market was no more "particular" than any other country throughout the rest of the world, including the United States.

Even if the effects of global overcapacity manifest differently in different markets, however, that does not make the situation "particular" to those markets. Commerce's "particular" market arguments, therefore, should be rejected for this threshold reason. In addition, recent generally accepted and authoritative data show that any prior problems relating to steel capacity, production, and capacity utilization were significantly reduced

during the POR and effectively were under control even before the POR had commenced. The evidentiary record before Commerce (which we reiterate below) unambiguously demonstrates that the steel overcapacity situation has significantly improved globally in recent years, specifically in China, undermining the Department's conclusion -- that overcapacity led to distorted HRC costs during the POR.

In the underling AD review, Saha Thai provided Commerce extensive information and data about changes in global steel capacity and production. *See* Saha Thai's Rebuttal Factual Information and Comments Concerning Petitioner's Particular Market Situation (PMS) Allegation, February 19, 2021, (hereinafter "Saha Thai's PMS Rebuttal Factual Submission"). Appx90956-92269. Exhibit CAP-1 of this Saha Thai factual information submission summarizes data reported in the World Steel Association Yearbook 2020 and by the Organization for Economic Co-operation and Development (OECD) in its reports titled "Recent developments in steelmaking capacity," regarding worldwide steel capacity, production, apparent use, excess capacity and capacity utilization. Appx91679. The OECD reports from 2019 and 2020 are provided in Exhibits CAP-2 and CAP-3 to Saha Thai's PMS Rebuttal Factual Submission, Appx91681-91736; the World Steel Association Yearbook 2020 is provided in the Exhibit CAP-4, Appx91785-91878.

The comprehensive data provided in Saha Thai's PMS Rebuttal Factual Submission, and in particular Exhibit CAP-1, shows that : (Appx90978)

- Capacity — On a global level, annual capacity during 2016, 2017 and 2018 consistently *decreased* (from the prior year levels) by 0.36 % in 2016, 0.71% in 2017 and 0.99% in 2018. Chinese capacity *decreased* at an even faster rate — by 1.82% in 2016, 2.38% in 2017 and 3.13% in 2018. In 2019, the global capacity increased only slightly to account for the increases in demand discussed below.

- 14 -

- Production — Even with a reduced capacity, there was a robust 5.16% *increase* in global steel production in 2018 and 2.72% increase in 2019.  Chinese production mirrored this trend, increasing by 7.83% in 2018 following a 7.33% increase in 2019.

- Excess Capacity — Global excess capacity *decreased* significantly over the last four consecutive years by 2.16% in 2016, 16.29% in 2017, 18.32% in 2018 and 3.10% in 2019.  Chinese excess capacity showed a marked reduction, decreasing by 6.30% in 2016, 23.79% in 2017, 31.98% in 2018 and 21.97% in 2019.

- Capacity Utilization — On account of decreasing trends in capacity and excess capacity accompanied by corresponding increasing trends in production, capacity utilizations during 2018 and 2019 increased.  Global capacity utilization consistently increased by 6.21% in 2018 and by 1.24% in 2019.  Likewise, Chinese capacity utilization increased by 10.04% in 2018 and by 5.08% in 2019.

- Excess Capacity as % of Production — Globally, excess capacity as a percentage of production was sharply reduced by 22.33% in 2018 and by 5.66% in 2019.  Likewise, the Chinese excess capacity to production percentage significantly contracted by 36.19% in 2018 and by 27.30% in 2019.

These data establish that global (and especially Chinese) steel overcapacity decreased significantly both prior to and during the POR.  The evidence demonstrates that the Chinese steel industry not only targeted significant capacity reductions, but also expects this trend to continue with further declines in global overcapacity along with corresponding price increases.  These facts as well as all of the other data and information submitted by Saha Thai in its PMS Rebuttal Factual Submission completely undermine Commerce's central thesis that global and Chinese overcapacity during the POR fueled a "particular" distorted market situation in Thailand.  And therefore, because Commerce effectively ignored and did not address all of this data and documentation, Commerce's finding that a cost-based PMS existed is not supported by substantial evidence.

### 2. Commerce's conclusion that Saha Thai's HRC suppliers received countervailable subsidies from the Thai Government is completely unsupported by the evidentiary record

Commerce also claimed that HRC producers are subsidized by the Government of Thailand, and as "proof" referenced the existence of the U.S. countervailing duty (CVD) orders on HRC against Thailand. Appx 14313. Although it is true that the U.S. CVD order still is in place, the order does not provide an accurate measure of any perceived market distortion in 2019-2020.

The low subsidy rate of 2.38% that Commerce found 18 years ago was for one domestic Thai HRC producer, and Commerce determined its CVD rate based entirely on (1) "non-recurring" duty exemptions on imports of machinery, which are company-specific; (2) duty exemptions on imports of raw materials, which are company-specific and period-specific; (3) tax deductions, which are company-specific and period-specific; and (4) electricity purchases for less than adequate remuneration, which are company-specific and period-specific. *See Certain Hot-Rolled Carbon Steel Flat Products Final Affirmative Countervailing Duty Determination,* 66 Fed. Reg. 50,410 (October 3, 2001) and accompanying Issues and Decision Memo at II.A and II.B.

As argued by Saha Thai, because these subsidies were from 2001, they are outdated, and have not been shown to have any relevance to the period of review in this proceeding. Appx90991-90992. Commerce's insistence on utilizing the outdated CVD finding is directly contrary to past precedent of the court that has held that Commerce needs to prove, and not merely assume, that upstream subsidies on HRC distort downstream prices of subject merchandise. *See HiSteel Co., Ltd. v. United States*, 547 F.

Supp. 3d 1233, 1253-54 (Ct. Int'l Trade 2021) (rejecting subsidization calculated by

Commerce as evidence of distorted prices in the HRC industry for the effects of applying

a PMS calculation); *Garg Tube Exp. LLP v. United States*, No. 20-00026, 2022 Ct. Intl.

Trade LEXIS 25, at 20-21 (CIT March 11, 2022) ("the existence of trade remedies and

subsidies are not unique market phenomena").

Indeed, the Court of International Trade has rejected PMS adjustments based on

mere evidence of CVD orders in place, when Commerce has not specifically analyzed

how subsidization distorts manufacturing costs.  *Nexteel Co. v. United States*, No. 20-

03898, 2022 Ct. Intl. Trade LEXIS 36, at 14 (CIT April 19, 2022) ("Here, Commerce has

only shown that HRC subsidies were in place during the period of review and that

NEXTEEL and SeAH purchased HRC from entities receiving subsidies. On remand, if

Commerce wishes to continue relying on the provision of subsidies as a market

phenomenon contributing to a PMS in the Korean HRC market, it should explain how the

subsidies distort the price of HRC preventing an accurate reflection of the cost of

production in the ordinary course of trade and demonstrate that the effect of the subsidies

is particular to producers of the subject merchandise.").

In short, Commerce's finding that a cost-based PMS existed is not supported by

substantial evidence and otherwise not in accordance with law.

### B.     Commerce's Calculation of a PMS Adjustment Is Unsupported By Substantial Evidence And Is Otherwise Not In Accordance With Law

Commerce's I&D Memo makes clear that the PMS adjustment that Commerce

applied to Saha Thai's costs was the same as Commerce had done for its preliminary

determination.  Appx14310.  And Commerce's Preliminary Determination stated that Commerce calculated a 21.34% adjustment based on the regression analysis that Petitioner had submitted.  *See* Preliminary I&D Appx13685.  However, during the underlying AD review, Saha Thai had fully documented significant problems with Petitioner's proposed regression analysis (and the resulting estimated impact), and indeed had shown that the record evidence better supports an estimated PMS cost adjustment of well under 10 percent.  Appx98990.  Specifically, Saha Thai's PMS Rebuttal Factual Submission , dated February 19, 2021 contained an Appendix that set forth numerous methodological and calculation deficiencies in Petitioner's proposed regression methodology.  *See* Saha Thai PMS Rebuttal Appendix, Appx 90995-91018.  For purposes of this argument and any remand to Commerce, we hereby incorporate all of the deficiencies with Petitioner's proposed regression analysis identified in Saha Thai Appendix.  However, given limited argument space, we detail below just three of the most egregious deficiencies as illustrative of the magnitude of the problems.

First, Commerce has improperly calculated a PMS adjustment for this specific POR based on data from outside the POR.  Saha Thai showed how a more focused time period would yield much lower estimated adjustments.  See Saha Thai PMS Rebuttal Appendix, Appx91001.  Commerce responds that Saha Thai has not justified using different periods of time (Appx14314), but this argument ignores Commerce's own well established practice of determining cost of production for a specific period of review (POR), and using data that most closely approximates that POR.  Indeed, this is

evidenced by the fact that Commerce's AD questionnaire explicitly seeks cost data particular to the AD review period.

Yet for this cost-PMS adjustment, Commerce persisted in using data from well outside the POR for no apparent reason other than to inflate the size of the PMS adjustment. As Saha Thai amply demonstrated, an adjustment for just 2019 would be only 2.04 percent, and other narrower time periods would also yield adjustments much lower estimates than Commerce used in the preliminary determination. Appx91001. Commerce has not identified any legitimate reason to believe that the longer five-year period is more representative of this specific POR than data more narrowly tailored to match the POR itself.

Second, Commerce has improperly calculated a PMS adjustment based on incorrect and biased capacity utilization rates. Although the underlying logic was to calculate an "uneconomic capacity" variable for prior periods to avoid the acknowledged methodological bias of using an endogenous variable, the actual calculation upon which Commerce relied continued to include the methodological basis. When this correction is made, the PMS adjustment drops to only 5.08 percent. Appx91002. Commerce argues that Saha Thai has not provide an alternative calculation to avoid the methodological error, Appx13687, but this comment ignores the fact that Saha Thai has provided to Commerce a revised specific calculation yielding a 5.08 percent cost adjustment that avoids the methodological error. Appx91001. In short, rather than address the methodological flaws in the regression model upon which it relied, Commerce tries to mask the errors and then just ignores them.

- 19 -

Third, Commerce has improperly calculated a PMS adjustment on a global basis while defending it as necessary to account for local market conditions and yet ignoring local market conditions. Commerce itself argues that overcapacity is a global phenomenon, but the impact is different in specific national markets. Appx13686. Yet the regression Commerce uses makes no effort to differentiate based on different effects in different countries. The regression finds the impacts on national steel markets are exactly the same for each and every country in the analysis, whether that be India or the U.S. or any other country in the sample. The regression calculates exactly the same impact for each and every country. There is no country-specific impact; only one impact that can be applied to any country.

Commerce's own rational cannot be reconciled with what Commerce is doing. Before Commerce, Saha Thai extensively documented that the particular conditions in Thailand are different, and the price of Thai HRC cannot be reconciled with the market trends that underlie the regression model that Commerce utilized. Commerce purports to dismiss this argument by stating that it uses a global approach, but then also argues inconsistently that the effects are different in different markets. Appx13686. The record evidence shows the proposed PMS makes little sense for any market, and certainly not for the Thai market. Commerce has not provided any justification for its proposed PMS adjustment as applied to the specific conditions in the Thai market.

In sum, Commerce calculated by the PMS adjustment by applying a flawed model on a global basis, with no effort to take into account the particular circumstances of this particular POR or this particular country. Whatever justification might apply in the time

pressured context of an original investigation simply does not apply in the context of an administrative review.  The underlying premise of the U.S. retrospective system is to calculate accurate margins for particular transactions over a particular period of time. Yet Commerce's calculation of its PMS adjustment ignores this premise entirely, with a deeply flawed one size fits all approach that is wrong and should be corrected for the final determination.

The statute and regulations require specificity and contemporaneity.  In a recent case considering a similar aspect of the PMS adjustment applied in the second administrative review of the antidumping duty order on welded line pipe from Korea, the Court found fault with Commerce's determination because it relied in part on a dated subsidy finding.  Specifically, the Court found that "given the non-contemporaneity of Commerce's findings in Hot-Rolled Steel from Korea CVD, and the fact that the rate was based on AFA, such findings alone do not constitute an approximation of HRC cost distortions during the POR."  See *Husteel Co. v. United States*, 471 F. Supp. 3d 1349, 1363 (Ct. Int'l Trade 2020).

Commerce's calculation of its cost-PMS adjustment in the underlying proceeding ignored all of these principles. The PMS adjustment is not as specific as possible -- neither in time (focused on the specific POR) or in geography (focused on Thailand). And the adjustment reflects serious methodological errors that create inaccuracies and distortions.

These are not trivial errors. Saha Thai has documented to Commerce the serious distortions and their severe impact in exaggerating the PMS adjustment.  But Commerce

ignored all of this evidence.  As such, Commerce's calculation of its cost-based PMS adjustment is not supported by substantial evidence and is otherwise not in accordance with law.

### III.   COMMERCE'S DECISION TO APPLY PARTIAL FACTS AVAILABLE IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS NOT IN ACCORDANCE WITH LAW

As detailed above in the Statement of Facts, Commerce's preliminary determination calculated Saha Thai's AD margin by utilizing all of Saha Thai's submitted U.S. sales and home market sales data (essentially unadjusted) and Saha Thai's cost of production data after application of cost-based PMS adjustment.  For its final determination, however, Commerce effectively threw out Saha Thai's submitted home market invoice prices for [      ] home market customers and instead replaced the actual invoice prices with a very high sales price that Commerce calculated from other data. *See* Commerce Final Analysis Memorandum for Saha Thai, Appx99504-99506, ("we revised the home-market program to apply the second highest Saha Thai home market unaffiliated sales price of those commonly sold control numbers to both unaffiliated customers and affiliated customers to Saha Thai's sales to the potential unreported affiliated home-market customers.")  Commerce undertook this dramatic change in AD margin calculation because Commerce determined to apply partial adverse facts available (referred to as partial AFA).  There is no question that Commerce's decision to apply partial AFA was a significant increase in Saha Thai's AD margin from Commerce's

NONCONFIDENTIAL

preliminary determination.  *Compare* Preliminary AD margin of 7.23% with Final AD

margin of 36.97%.  Appx13755-13758, 14332-14334.

Commerce's decision to apply partial AFA, in turn, was based on two subsidiary

Commerce findings: (a) Saha Thai, in fact, had [      ] home market customers that re-

sold the subject merchandise in the Thai market and (b) Saha had allegedly impeded the

AD review by failing to provide the re-sale data for these [      ] home market

customers.  Appx14294-14297.  In this section we detail why Commerce's decision to

apply partial AFA is not supported by substantial evidence and is otherwise not in

accordance with law.  Specifically:

- Commerce's decision to accept, very late in the proceeding, Petitioner's new factual information that did not comply with Commerce regulations was an abuse of discretion and therefore unlawful;

- Commerce's conclusion that there were [      ] home market customers who resold the subject merchandise that were affiliated to Saha Thai is not supported by substantial evidence is otherwise not in accordance with law; and

- Commerce's conclusion that Saha Thai impeded the AD review is not supported by substantial evidence and completely violated its statutory obligations under 19 U.S.C. §1677m.

### A.  Commerce's Affiliation Conclusion Is Based On A Belated and Deficient Submission by Petitioners That Commerce Should Have Rejected

Commerce's final determination makes very clear that Commerce's subsidiary

conclusion that Saha Thai is affiliated with [      ] home market customer who re-sold

the subject merchandised during the POR is based almost entirely on factual information

that Petitioner submitted very late in the proceeding.  Appx14294-14297, 99504-99506.

Commerce's decision to accept and then rely on Petitioner's new factual information

constituted an abuse of discretion because Petitioner's new factual information failed to comply with multiple Commerce regulations.

Commerce has very specific regulations governing the submission of factual information in Commerce AD proceedings. Specifically, 19 C.F.R. §351.301 and 19 C.F.R. §351.303 set forth detailed requirements as to when new factual information in Commerce AD proceedings must be submitted, and the content of such new factual information. We detail below how Petitioner's new factual information submission failed to comply with these regulations.

On June 1, 2021, _the same day_ Commerce had issued its Preliminary Determination Memorandum, Petitioner submitted "Rebuttal Factual Information to Saha Thai's Supplemental Questionnaire Response" ("Petitioner's RFI to Saha Thai"). Appx97105-97684. Petitioner's submission was voluminous (580 pages), vague, and confusing. Of particular note was that Petitioner's submission did not comply with Commerce's regulations, which require the submitter of the rebuttal factual information to "provide a _written explanation_ identifying the information which is already on the record that the factual information seeks to rebut, clarify, or correct." 19 C.F.R. §351.301(b)(2)(emphasis added). Although Petitioner's submission identified broadly certain parts of Saha Thai's May 6, 2021 supplemental questionnaire response as the target of the rebuttal information (i.e. reference to pp. 2-3 and Exhibits 2 and 3), Petitioner failed to comply with the regulation by not explaining _how_ the submitted information rebuts, clarifies, or corrects Saha Thai's supplemental questionnaire response. _See_ Petitioner's RFI to Saha Thai, Appx97109. Petitioner's submission also

did not relate the parts of the voluminous submission rebutted to each specific answer of

Saha Thai's response. Appx97109-97110.  Under the regulations, Petitioner cannot

simply throw a bunch of documents on the record, leaving to the parties' imagination

how to interpret what specific point they are rebutting or clarifying.  Petitioner should

have included an explanation, and its two pages of narrative preceding 15 attachments

were certainly not enough.

Furthermore, Petitioner's submission was a clear attempt to confuse Commerce as

it did not restate the question directed to Saha Thai.  Commerce specifically asked Saha

Thai to report affiliates which participated in "the development, production, sale and/or

distribution of the merchandise under review." And Saha Thai provided a complete and

full response.  Appx96420-96662.  By omitting Commerce's question and proceeding to

submit voluminous documents as well as raising a novel argument on affiliation,

Petitioner generated the incorrect impression that Saha Thai omitted to report affiliated

companies when this was not the case.  Commerce's questions to Saha Thai were not

open ended and were not intended to refer to the whole universe of companies which

might be affiliated, but rather only to those companies that may be involved in the

"development, production, sale or distribution" of circular welded carbon steel pipes in

the Thai market.  And Saha Thai addressed this very question providing a complete set of

information.  Appx82825-82830.

Petitioner's puzzling strategy started from the moment it requested an extension of

two weeks to file factual rebuttal information. In this letter, Petitioner accuses Saha Thai

without any foundation of "having engaged in a scheme to manipulate Commerce's

calculations based on affiliations" that were not reported.  Petitioner's Extension Request

(May 17, 2021), Appx13623. The extension request further accused Saha Thai of a

possible "fraud." The extension request was also based on the need to provide English

translations which were never provided.  Appx13622-13623.

Indeed, a large part of Petitioner's submission was incomprehensible as many of

the documents were submitted in Thai without full or even partial translations to English.

Commerce regulations are very clear on this point, as they require that a document

submitted in a foreign language must be accompanied in all instances by an English

translation of the "entire document or of only pertinent portions, where appropriate,

unless the Secretary waives this requirement for an individual document." 19 C.F.R.

§351.303(e).  Although in its cover letter Petitioner announced its intention to "follow-up

with full translations by the end of this week" and with "a separate analysis of this new

information," Petitioner never filed such supplemental documents.  Appx97106.  On June

4, 202, Petitioner indeed placed additional translations in the record but such translations

only concerned the prior submission to rebut, clarify or correct information regarding

Blue Pipe, a completely different company (_not_ Saha Thai). Petitioner's Additional

Translations to Blue Pipe's RFI, Appx98072. In any case, the very fact that Petitioner

considered filing translations and clarifications to its rebuttal information beyond the

extension granted by Commerce, is very troublesome as it evidences that the very filing

was not clear, and did not incorporate translations. Had Petitioner filed any additional

document, this would have also been done in contravention of the regulatory deadlines

established in 19 C.F.R. §351.301(c)(1)(v).

In addition to the above, Petitioner's submission should have been rejected as it introduced a novel issue of affiliation at a very late stage in the proceeding and when it was materially impossible to have a complete investigation on the allegations. The administrative review was initiated in May 2020, and Commerce issued multiple questionnaires. Petitioner had plenty of opportunities to submit comments on affiliation at an earlier stage, yet it chose to submit its rebuttal factual information when the preliminary results were already scheduled for briefing.

It is Commerce's own practice to determine affiliation early in the proceedings, as it sets the stage for how companies need to report their data. It is also Commerce's practice to reject allegations that are made at a late stage of an administrative proceeding and therefore cannot be subject to sufficient investigation. For example, in the 2004-2006 review of the antidumping duty order on *Chlorinated Isocyanurates From Spain* Commerce stated that "{s}ince the issue of collapsing was not raised by an interested party until very late in this segment of the proceeding (i.e., in Aragonesas' rebuttal brief), the Department was unable to fully examine the appropriateness of collapsing Aragonesas with Ercros by issuing supplemental questionnaires.". *Chlorinated Isocyanurates From Spain*: Final Results of Antidumping Duty Administrative Review, 72 Fed. Reg. 64,194 (Nov. 15, 2007) and accompanying Decision Memorandum at Comment 3.

In sum, Petitioner's submission did not fulfill the regulatory requirements and should have been rejected by Commerce as it did not explain how it rebutted or clarified information submitted by Saha Thai, did not provide English translations, and was placed

in the record at a very late stage.  Commerce's decision to accept Petitioner's new factual

information that violated Commerce's own regulations constituted an abuse of discretion

and therefore is unlawful.

**B.   Commerce's Decision To Apply Adverse Facts Available Is Premised Upon Wholly Incorrect Subsidiary Conclusions That Saha Thai Had Affiliated Home Market Customers That Re-Sold Subject Merchandise In The Thai Market**

As noted above, Commerce's decision to apply partial AFA was based on two

subsidiary Commerce conclusions, one of which was that Saha Thai, in fact, had [        ]

home market customers that re-sold the subject merchandise in the Thai market that were

affiliated to Saha Thai.  This subsidiary Commerce conclusion of affiliation with [

                                ] who resold the subject merchandise in the Thai market is not

supported by substantial evidence and is not in accordance with law.

As we detail below, rather than a rational process of gathering information, vetting

that information through arguments by the parties, and considering all the evidence – in

other words instead of following the questionnaire framework of making threshold

decisions like affiliation early -- Commerce rushed to a woefully deficient and defective

finding of "affiliation" that has no support in the record.  A late-made argument for

adverse inferences cannot serve to bypass the statutory and regulatory requirements on

affiliation. And this Court should not allow Commerce to use adverse inference as a

remedy to cure the defects in its analysis.

1.    **The statute and regulations provide an express legal framework within which Commerce must evaluate claims of affiliation**

The applicable statute has a specific provision defining "affiliated person."  The

statute provides:

(33)  Affiliated persons

The following persons shall be considered to be "affiliated" or "affiliated persons":

> (A) Members of a family, including brothers and sisters (whether by the whole or half-blood), spouse, ancestors, and lineal descendants.
>
> (B) Any officer or director of an organization and such organization.
>
> (C) Partners.
>
> (D) Employer and employee.
>
> (E) Any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization.
>
> (F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.
>
> (G) Any person who controls any other person and such other person.

For purposes of this paragraph, a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person.

19 U.S.C. §1677(33).

As indicated above, there are six specific descriptions of "affiliated persons" and

then a seventh (subparagraph G) that serves as a residual definition.  Moreover, of the

seven, the first four address relationships either among individuals or an individual and

an organization.  Only the last three paragraphs (D), (E) and (F) address possible

affiliation among corporate entities.

In its regulations, Commerce has provided additional guidance on analyzing

possible affiliation among corporate entities.  Specifically Commerce's regulations

provide:

> "Affiliated persons" and "affiliated parties" have the same meaning as in
> section 771(33) of the Act.  In determining whether control over another
> person exists, within the meaning of section 771(33) of the Act, the
> Secretary will consider the following factors, among others: Corporate or
> family groupings; franchise or joint venture agreements; debt financing;
> and close supplier relationships.  The Secretary will not find that control
> exists on the basis of these factors unless the relationship has the potential
> to impact decisions concerning the production, pricing, or cost of the
> subject merchandise or foreign like product.

19 C.F.R. §351.102(b)(3)(emphasis added).

In applying the affiliation definition set forth in the statute and regulations,

Commerce's practice is to focus on the potential for the alleged relationship to indicate

control over pricing and production decisions.  And the courts have agreed.  *See Dongkuk*

*Steel Mill Co. v. United States*, 29 CIT 724, 727 (2005) ("the Chang family's leadership

positions, namely Saw Joo Chang's position as the Chairman and the CEO of DSM, Sae

Wook Chang's position as a Director of DSM, and Sang Kuhn Chang's position as the

Chairman of DKI," combined with "the fact that the Chang family owns the largest

blocks of outstanding shares in those three companies, places the Chang family in a

position to legally and/or operationally restrain or direct DSM, KISCO and DKI."); *Jinko*

*Solar Co. v. United States*, 229 F. Supp. 3d 1333, 1341 (Ct. of Int'l Trade 2017)

NONCONFIDENTIAL

("Commerce reasonably concluded based on the Li family grouping's large shareholdings and numerous senior management positions in the ReneSola and Jinko entities during the POI that the ReneSola and Jinko entities are under common control… {and} that those shareholdings and management positions create the potential to impact decisions concerning the production, pricing, or cost of subject merchandise.").

As we detail below, in the underlying AD review, Commerce completely ignored its own past practice and court precedent in undertaking its affiliation analysis.  In the case at hand, Commerce jumped into conclusions without complying with the statutory and regulatory requirements.  Commerce's application of adverse inference falls short of what is required under an affiliation determination.  Commerce is precluded from making an affiliation finding "unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product." 19 C.F.R. §351.102(b)(3). Commerce is bound by the statute and its very own regulations and cannot ignore this Court and its own practice.

> **2.** **Commerce's conclusion that Saha Thai was affiliated with [    ] home market customers who re-sold the subject merchandise is not supported substantial evidence or is in accordance with law**

In its Final Analysis Memo Commerce identified the [    ] home market customers for whom Commerce believed were affiliated to Saha Thai and who re-sold subject merchandise during the POR time period as follows:

**NONCONFIDENTIAL**

[

].

Appx99506.

In this section we examine what the evidentiary record says (or does not say) about each of the [      ] home market customers for whom Commerce concluded were affiliated to Saha Thai.  As detailed below, each of the [      ] home market customers falls into one of these two buckets.  Either there is not sufficient evidence on the record to find that Saha Thai was, in fact, affiliated (based on the statutory definition) with the home market customer or there is not sufficient evidence to conclude that the home market customer actually re-sold the subject merchandise during the period of review.[4]

**[                    ]**

With respect to this home market customer, at the outset, we note two critical points.  First, with respect to [                    ], Commerce never identified the specific legal basis for its affiliation conclusion.  That is, Commerce never identifies which of the seven statutory provisions for affiliation applies to [                    ].  We respectfully submit that this failure to identify the legal affiliation basis alone is sufficient justification for holding that Commerce's determination is unlawful.  Under the AD law, there is no such thing as being generally affiliated; either one of the seven statutory applies or there is no affiliation.

---

[4] This second conclusion is important because, under the AD law and long-standing Commerce practice, sales data from an affiliated customer is only necessary if that affiliated home market customer re-sold the subject merchandise.  Commerce's Section B Questionnaire, Appx3163-3164.

NONCONFIDENTIAL

Second, with respect to [                              ] Commerce makes clear that its conclusion of affiliation is based on applying a double negative; namely, "we cannot determine that Saha Thai is necessarily not affiliated with [        ]." Appx99505.  Again, we respectfully submit that this approach is justification enough for concluding Commerce's determination is not supported substantial evidence.  By definition the substantial evidence standard is not satisfied by a conclusion of an absence of evidence.

Commerce's entire determination regarding affiliation with this customer is premised on a single submission of rebuttal factual information that Petitioners placed on the record on the same day Commerce issued its I&D Memo for the preliminary determination.  In this submission, Petitioners included two documents submitted to the Thai Labor  Department showing [                              ], a Saha Thai employee, as an [            ] at [        ] with the email address [                              ].  Petitioner's RFI to Blue Pipe at Exhibit 3, Appx97867-97995.  This alone does not demonstrate any of the factors discussed above for affiliation.  And Commerce does not provide explanation for its decision.  In fact, Exhibit 3 of Petitioner's RFI to Blue Pipe, Appx97886-97913, includes a number of registrations and shareholder documents naming [                                           ] as the persons in "control" of the company as majority shareholders and directors.  Accordingly, even taking the submitted documentation at face value, there is no evidence that a person in a position of control or a member of the family at Saha Thai is in anyway in a position of "control" in [        ].

Moreover, Commerce completely fails to address contradictory evidence. Specifically, in Saha Thai's original section A response and the multiple supplementals submitted by Saha Thai, [                    ] only appears as an employee, not a director, and not having any senior management position.  *See* Saha Thai's Supplemental Response (May 6, 2021), Appx96484.

Accordingly, from the evidentiary record, the only possible connection between Saha Thai and [     ] is a single employee of both companies.  What this means is that neither Commerce nor, Petitioners have been able to present evidence of actual affiliation, as defined by statute, between Saha Thai and [     ].  If Commerce wanted to pursue the link between a human resources employee at [     ] and the same person being employed by Saha Thai, then Commerce could have issued a supplemental questionnaire to Saha Thai.  But Commerce did not.

Saha Thai notes that there is a past court decision that is directly on point because it addresses very similar facts.  In *Heavy Indus. Co., Ltd. v. United States*, 393 F. Supp. 3d 1293, 1319 (Ct. Int'l Trade 2019) the court addressed a Commerce final determination in which Commerce found affiliation based solely on a single employee of one company using the email address and title of the respondent company.  *Id*.  The court ruled this alone was just not enough to establish affiliation.  In addition, the court ruled that Commerce failed to identify any evidence supporting its finding of affiliation under 19 U.S.C. §§1677(33)(D),(E),  and did not explain the basis.   The court described its rationale as follows:

- 34 -

NONCONFIDENTIAL

> Commerce determined that HHI and the "sales agent" were affiliated
> pursuant to   and , but did not specify whether it meant Individual X or
> Company Y.  {record citation omitted}  Those statutory provisions,
> respectively, provide that an "[e]mployer and employee" and "[a]ny person
> directly or indirectly owning, controlling, or holding with power to vote, 5
> percent or more of the outstanding voting stock or shares of any
> organization and such organization" "shall be considered to be affiliated." .
> The only explanation that Commerce gave to support its finding of
> affiliation is "the fact that [Individual X] uses an email address and a title
> and a division that belongs to [HHI]." {record citation omitted}  Commerce
> did not, however, explain how that "fact" fulfilled the statutory definition
> of affiliation pursuant to .  {record citation omitted}  Commerce also failed
> to identify any evidence supporting its finding of affiliation ….

*Heavy Indus.*, 393 F. Supp. 3d at 1319.  Accordingly, the court determined that

Commerce's application of adverse facts available could not be sustained:

> <u>"Commerce must explain the basis for its decisions," such that "the path of
> Commerce's decision [is] reasonably discernable to a reviewing court.</u>" .
> Because Commerce did not do so, the court will remand this matter to the
> agency to reconsider and further explain the basis for its decision that HHI
> was affiliated with a sales agent pursuant to and <u>in the absence of
> substantial evidence to support Commerce's use of facts available,
> Commerce's reliance on an adverse inference also cannot be sustained</u>.

*Id* (emphasis added).  Saha Thai respectfully submits that the same legal conclusion

applies to Commerce's determination in this case.

We also note the procedural irregularities of Commerce's approach.  Saha Thai

was not aware of this additional evidence regarding [          ] until Petitioners raised the

issue of Saha Thai and [       ] being affiliated in Petitioner's Case Brief.  Pet. Case Brief,

Appx99015-99019.   Saha Thai was not aware of Petitioner's submitted new factual

information about [       ] because (a) this information was originally submitted in

rebuttal factual information to <u>another company's</u> [          ] supplemental response and

- 35 -

NONCONFIDENTIAL

(b) Petitioner claimed that all of the information was confidential and therefore was submitted under administrative protective order (APO).  And so, given these two facts, Saha Thai's counsel was prohibited from sharing this information with Saha Thai and therefore, Saha Thai had zero opportunity to address the allegation and provide new factual information to dispute Petitioner's claim.

The regulations, under 19 C.F.R. §351.301(b)(2), requires Petitioners to identify to which interested party and the date of the submission the factual information is being submitted to rebut, clarify, or correct.  As can be seen in the evidentiary record, the additional information regarding [      ] was submitted to "to rebut, clarify, or correct information submitted in the May 6, 2021 Supplemental Questionnaire Response filed by Blue Pipe Steel Center Co., Ltd."  Appx97685.  The regulation, which permits a party to place new factual information on the record in response to rebuttal factual information, 19 C.F.R. §351.301(c)(1)(v), also states that "{w}ithin seven days of the filing of such rebuttal, clarification, or correction to a questionnaire response, the original submitter of the questionnaire response is permitted one opportunity to submit factual information to rebut, clarify, or correct factual information submitted in the interested party's rebuttal, clarification or correction." (emphasis added).  Therefore, because Saha Thai was not the original submitter, there was no opportunity for Saha Thai to respond.   As such, the first opportunity Saha Thai had to address this tenuous allegation that [      ] and Saha Thai could be affiliated was in Saha Thai's rebuttal brief, which Saha Thai did.  *See* Saha Thai's Rebuttal Brief, Appx99478-99479.  However, the period of time to place new information on the record had already closed.  Commerce should have either disregarded

NONCONFIDENTIAL

Petitioners last ditch effort to allude to affiliation between Saha Thai and [      ] or if Commerce wanted to pursue the matter, Commerce could have issued a supplemental questionnaire.

[                                    ]

This is a clear case of "mistaken identity."  In its Section B response Saha Thai provided a list of all of its home market customers.  Saha Thai Section B Response, Appx89719-89724.  And one of Saha Thai's customers was [

].  In its Final Analysis Commerce claimed [                              ] was affiliated with Saha Thai based on majority stock ownership and board membership of the [                 ] family, citing Exhibit 1 of Petitioners RFI Submission.  Appx99505.

However,  Exhibit 1 of Petitioner's RFI Submission, which includes various documents (primarily in English) entitled "Juristic Person information," only show that (a) [                         ] was part of the Board of Director of [                  ]. and (b) potentially other family members as on the board of directors of [

]  Appx97112-97114.   These business registration and shareholder documents, clearly show the names of the companies as for [

].  Such names are **not** the same name as [

].  They are different companies.

Additionally, the documentation provided by Petitioner is for a company that was liquidated over 10 years ago and therefore cannot be the basis of an affiliation finding this review.  Petitioner's RFI to Saha Thai at Exhibit 1, Appx97112-97114.  Saha Thai

NONCONFIDENTIAL

cannot comprehend how a company that had been liquidated ten years ago can be

involved in the resale of the subject merchandise during the AD review POR.

In short, the evidentiary record does not provide substantial evidence for

Commerce's conclusion that Saha Thai is affiliated with its home market customer [

].

[                                    ]

Commerce claimed that Saha Thai was affiliated with its home market customer

[                               ] based on allegedly majority stock ownership and board

membership of the [                    ] family.  Appx99505.  In support of this claim,

Commerce refers only to Exhibit 8 of Petitioner's RFI submission.  Appx99505.  Exhibit

8, in turn, has 47 pages but there is only a single page with specific reference to this

customer – [                                ].  Appx 97303. And this single page purports

to identify some of the shareholders of [                          ] and these

shareholders have the family name of [                ]  Commerce's entire basis for

affiliation is the fact that this family name [                 ] is the same family name of

some of Saha Thai's shareholders.  However, Commerce's conclusion of affiliation

ignores the fact that Saha Thai itself had already informed Commerce that Saha Thai had

shareholders with the family name of [                    ] who were connected to a  [

].  Saha Thai Rebuttal NFI, Appx98782-98783.  And so, there can be no inference of

Saha Thai attempting to hide anything concerning overlapping shareholders.

Moreover, establishing that two separate companies each have the same individual

as a shareholder does **not** make the two companies affiliated under the AD law.  Pursuant

NONCONFIDENTIAL

to 19 U.S.C. §1677(33), two companies are to be considered "affiliated" only if the relationship of the two companies satisfy the factual predicates conditions of sub-paragraphs (E), (F) or (G).  Vis-à-vis this home market customer, Commerce has not even claimed, let alone proven, any of the factual predicates of (E), (F) or (G) have been satisfied.  Again, the sole basis of Commerce's conclusion of affiliation is the existence of certain individuals that happen to individual shareholders of both companies.  This is not enough.

In addition, perhaps most importantly, Commerce completely ignored substantial evidence on the record that this home market customer does not re-sell subject merchandise CWP in the Thai market.  First, Saha Thai's Response clearly stated this fact. Appx98783.  Second, Petitioner's RFI Submission also confirmed this fact. Specifically, Exhibit 5 to Petitioner's RFI Submission itself states that this company – this home market customers  - is in the business of  [

] ." Appx 97196.

There is no conflicting information on this point.  To be clear, the only information on the evidentiary record is that this home market customer does not re-sell subject merchandise CWP in the Thai market.  And so, given this fact, there was no "necessary" information or data from this customer that was missing and therefore Commerce had not statutory justification to apply adverse AFA.

[                                    ]

Vis-à-vis this home market customer, once again, Commerce's sole basis for claiming this home market customer is that certain individual shareholders of Saha Thai

NONCONFIDENTIAL

had the same family name as certain individual shareholders of this home market

customer.  Appx99505.  As we noted above, the claimed overlap is not enough to

establish affiliation under 19 U.S.C. §1677(33).

But again, even more importantly, Commerce completely ignored the evidentiary

record that this home market customer did not sell subject merchandise CWP during the

POR.  Indeed, the very documentation that Commerce cites to as support of alleged

affiliation – Petitioners' RFI submission – itself makes clear that this home market

customer [                                              ] was engaged in the [

                                          ].  Appx97122.  And so, once again, the

only information on the evidentiary record is that this home market customer did not re-

sell subject merchandise CWP in the Thai market during the POR..  And so, once again,

given this fact, there was no "necessary" information or data from this customer that was

missing and therefore Commerce had no statutory justification to apply adverse AFA.

[                                          ], [                                          ], [
        ]

Vis-à-vis the remaining three home market customers, the story is essentially the

same.  Once again, Commerce's sole basis for claiming this home market customer is that

certain individual shareholders of Saha Thai had the same family name as certain

individual shareholders of this home market customer.  As we noted above, the claimed

overlap is not enough to establish affiliation under 19 U.S.C. §1677(33).

And, once again, even more importantly, Commerce completely ignored the

evidentiary record that these home market customers did not sell subject merchandise

NONCONFIDENTIAL

CWP during the POR.  Indeed, the very documentation that Commerce cites to as support

of alleged affiliation – Petitioners' RFI submission – itself makes clear that these home

market customers were involved in the production and sale of <u>non-subject</u> merchandise,

not CWP.  We set forth below evidentiary record support of this fact:

| Customer | In the business of | Evidentiary Record |
|---|---|---|
| [          ] | sale of [          ] | Saha Thai's NFI to Rebut Petitioner, Exhibit 2,  Appx 98795- 98803. |
| [          ] | production and sale of [          ] | Saha Thai's NFI to Rebut Petitioner, Exhibit 3,  Appx 98804 98824. |
| [          ] | [          ] | Petitioner RFI to <u>Blue Pipe,</u> <u>Appx98021</u> |

Given the above, there is no legal or evidentiary support for Commerce's

application of adverse AFA for these home market customers.

C. **Commerce's Decision To Apply Adverse Facts Otherwise Available Is Unlawful Because There Is No Evidence That Saha Thai Impeded The Investigation And Because Commerce Did Not Comply With The Statutory Obligation Set Forth in 19 U.S.C. §1677m**

1. **When Commerce does not use a respondent's own information, specific statutory provisions govern the possible application of facts otherwise available with adverse inferences**

The purpose of a Commerce AD proceeding is to use a respondent's information to calculate a dumping margin for that respondent using that party's own information.   In the context of an administrative review, Commerce calculates a new AD rate for the foreign producer-exporter for whom an AD review was requested and calculates final AD assessment for the import entries made during the review period.  Pursuant to the statute and long-standing Commerce practice, Commerce's calculation of a new AD review rate (for a mandatory respondent such as Saha Thai) is based on specific sales and cost data submitted by the producer-exporter.  This is the very reason that, in every AD review, Commerce sends to the producer-exporter an extremely detailed questionnaire seeking both general information and U.S. sales transaction data, home market sales transaction data and costs of production.  Commerce then uses all of this submitted U.S. sales transaction, home market sales transaction, and cost data to calculate a new AD rate for the producer-exporter based on that information.  *See* 19 U.S.C. §1675(a)(2)(A) (directing Commerce to calculate normal value for each entry of every known exporter and calculate a dumping margin for each of those entries).

Again, the law and long-standing Commerce practice require Commerce to use the sales and cost data submitted by the producer exporter to calculate the new AD review

- 42 -

rate.  That stated, the statute recognizes that there may be instances in which Commerce

believes that certain data needed for the AD margin calculation is not available.

Accordingly, the statute contains specific provisions governing how Commerce should

address these instances.  Such instances are referred to as Commerce using "facts

available" in the calculation of the AD margin—that is, Commerce relying on facts

otherwise available (rather than relying solely on the producer-exporter's submitted data)

to calculate the AD margin.  The use of "facts available" is governed by

19 U.S.C. §1677e and 19 U.S.C. §1677m(d).  Commerce's final AD review

determination does not comply with these statutory provisions.

      19 U.S.C. §1677e is titled "Determinations on basis of facts available" and

provides in relevant part as follows:

> (a)  In general
> If—
> (1)  necessary information is not available on the record, or
> (2)  an interested party or any other person—
>
>> (A)  withholds information that has been requested by the administering authority or the Commission under this subtitle,
>>
>> (B)  fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,
>>
>> (C)  significantly impedes a proceeding under this subtitle, or
>>
>> (D)provides such information but the information cannot be verified as provided in section 1677m(i) of this title,
>
> the administering authority and the Commission shall, <u>subject to section 1677m(d) of this title</u>, use the facts otherwise available in reaching the applicable determination under this subtitle.

19 U.S.C. §1677e (emphasis supplied).  As noted by the highlighted text, Commerce's

use of facts available is explicitly conditioned on two key elements that are relevant for

this case.

First, the information must be "necessary."  Commerce cannot apply facts

available because any information might be missing. That information must be

"necessary" and Commerce has to be able to show the information is "necessary" for the

AD review margin calculation. *Clearon Corp. v. United States*, 359 F. Supp. 3d 1344,

1357-58 (Ct. Int'l Trade 2019) ("Commerce must resort to facts available only when

'necessary information is not available on the record,' or an interested party withholds

information or significantly impedes a proceeding."). In addition, Commerce must have

the authority to apply facts available before deploying an adverse inference.

19 U.S.C. §1677e(b)(1).  *See Ghigi 1870 S.P.A. v. United States*, 547 F. Supp. 3d 1332,

1345 (Ct. Int. Trade, 2021) ("{T}he determination to use facts available is a separate

determination from the application of adverse inferences. Each determination must be

made separately, and each must be explained separately.")

Second, Commerce must provide notice.  The statute expressly conditions the use

of adverse facts available on Commerce's compliance with 19 U.S.C. §1677m(d).

19 U.S.C. §1677m(d) is titled "Deficient submissions" and provides as follows:

> If the administering authority or the Commission determines that a response
> to a request for information under this subtitle does not comply with the
> request, the administering authority or the Commission (as the case may be)
> <u>shall promptly inform the person submitting the response of the nature of</u>
> <u>the deficiency</u> and shall, to the extent practicable, <u>provide that person with</u>
> <u>an opportunity to remedy</u> or explain the deficiency in light of the time

limits established for the completion of investigations or reviews under this subtitle.

19 U.S.C. §1677m(d)(emphasis added).

The above statutory language is clear.  When conducting its AD proceedings, should Commerce believe that the data submitted by the respondent is not sufficient in some respect for Commerce's purposes, Commerce has an affirmative obligation to notify the respondent of the nature of the perceived deficiency and provide an opportunity for the respondent to remedy the perceived deficiency.

Beyond this explicit statutory language, repeated court precedent has held unlawful a Commerce AD determination applying adverse facts available when Commerce has not complied with the affirmative obligation set forth in 19 U.S.C. §1677m(d).  *See e.g Jindal Poly Films Ltd. of India v. United States*, 365 F. Supp. 3d 1379 (Ct. Int'l Trade, 2019); *Hyundai Heavy Indus. Co. v. Hyosung Corp. & Iljin Elec. Co*., 485 F. Supp. 3d 1380 (Ct. Int'l Trade 2020); *Shelter Forest Int'l Acquisition, Inc. v. United States*, 497 F. Supp. 3d 1388 (Ct. Int'l Trade 2021); *Bluescope Steel v. United States*, 548 F. Supp. 3d 1351 (Ct. Int. Trade 2021); *Hyundai Steel Co. v. United States*, 518 F. Supp. 3d 1309 (Ct. In. Trade 2021).

We respectfully submit that *Jindal Poly*, *Shelter Forest, Bluescope Steel and Hyundai* are particularly instructive.  In those cases, like here, the respondent submitted data and information to Commerce fully believing that the submitted data and information fully satisfied Commerce's requirements.  The respondents were then surprised when they learned—only in Commerce's determination—that their belief was

not correct and that Commerce apparently thought it needed something else.  On appeal the court ruled that it was Commerce who was at fault.  *See Jindal Poly, supra* and *Shelter Forest, supra*.  Indeed, the court in *Jindal Poly*, after noting Commerce's statutory obligation set forth in 19 U.S.C. §1677m, explicitly commented that "Commerce was the only party that could have been aware of the deficiency in the questionnaire response because it was the only participant in the review that knew what would satisfy its unarticulated criteria." *Jindal Poly*, 365 F. Supp. 3d at 1388.  In *Bluescope*, the Court further accused Commerce of waiting "to disregard BlueScope's U.S. sales information. . . until it was too late for BlueScope to remediate any deficiency in its reporting." *Bluescope*, 548 F. Supp. 3d at 1365.  In that case, Commerce gave no reason as to "why it would have been impracticable to ask further questions." *Id.* *Hyundai* is also of particular interest. In that case, the Court clearly stated that "broadly drawn initial or supplemental questionnaires may not sufficiently place a respondent in notice of the nature of the deficiency, and deprive it of the opportunity to remedy that deficiency." *Hyundai Steel Co.*, 518 F. Supp. 3d 1309 at 1322.  Commerce thus is required to point to the specific points and request clarifications of the deficient responses. "Vague" questions in a supplemental questionnaire without indication to identified deficiencies do not afford respondents with sufficient procedural safeguards required by the statute. *Id.* at 1326.  The Court in that case remanded the matter to Commerce identify the deficiency, explain its nature, and provide Hyundai with an "opportunity to fix it." *Id.* at 1328.

In the instant case, Commerce likewise did not comply with the statute. Commerce never told Saha Thai it needed certain information and instead shocked Saha Thai with an entirely new rationale that had no proper basis in the review at issue. Commerce's determination is therefore contrary to law.

### 2.   The evidentiary record confirms that Saha Thai responded to each Commerce questionnaire to the best of its ability

As noted above, the governing statute provides that Commerce may resort to an adverse inference only if it makes the requisite finding that an "interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. §1677e(b). As such, an adverse inference may not be withdrawn merely from a failure to respond, "but only under the circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made"). *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1383 (Fed. Cir. 2003). This limitation on Commerce's authority under 19 U.S.C. §1677e reflects the purpose of the authority—to "provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins." *F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000) *see also Mukand, Ltd. v. United States*, 767 F.3d 1300, 1307 (Fed. Cir. 2014) ("the purpose of the adverse inference provision is to encourage future cooperation and ensure that a respondent does not obtain a more favorable antidumping rate by failing to cooperate.").

The evidentiary record confirms that Saha Thai fully responded to every questionnaire issued by Commerce, just as Saha Thai has done for the past three decades.

NONCONFIDENTIAL

The Federal Circuit has found that a failure to comply with the maximum effort standard only in situations where respondents withhold information that has been specifically requested. *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012). As we demonstrate below, this did not happen in the underlying AD review.

In its AD questionnaire Commerce asked Saha Thai to identify "all suppliers, (sub)contractors, lenders, exporters, distributors, resellers, and other persons involved in the development, production, sale and/or distribution of the merchandise under review which Commerce may also consider affiliated with your company…" Commerce's Section A Questionnaire (October 13, 2021), Appx3152. Saha Thai dutifully provided its Section A response on November 10, 2020 in the same manner Saha Thai has responded for decades affirmatively noting certain affiliates and providing a list of all other customers. Saha Thai Section A QR, Appx82825-82830.

Six months later, Commerce issued a Supplemental Questionnaire requesting additional information about family members, stockholders, mangers, directors and additional affiliation related questions. Supplemental Questionnaire for Saha Thai (April 13, 2021), Appx13255-13257. Again Saha Thai fully responded to the supplemental questionnaire in a timely fashion in two parts on May 4, 2021 and May 6, 2021, providing twelve additional exhibits including, shareholder family trees, lists of employees, and board meeting minutes. Saha Thai Supplemental QR, Appx96420-96662. Nothing in this supplemental questionnaire lead Saha Thai to infer that Commerce was concerned about a possible gap in the record concerning a potential affiliation between Saha Thai with [                    ] home market customers. Appx13255-13257.

Commerce noted no deficiencies in Saha Thai's responses and proceeded to issue its Preliminary Results Issues and Decision Memo on June 1, 2021 and made no mention of deficiencies in Saha Thai's responses or intent to rely on facts available or apply an adverse inference in regard to Saha Thai's reporting of its affiliates.  Specifically, in the Preliminary Results Commerce stated that it reviewed and "collected information on the issue" and did not find that Saha Thai was affiliated with the entities alleged by Petitioner.  Preliminary Decision Memo, Appx13692.  Furthermore, Commerce stated it would review an additional submission by Wheatland and potentially issue supplemental questionnaires after the Preliminary Results.  *Id.*

Late in the proceedings right before the Preliminary Results were issued, Petitioner submitted certain registration documents, shareholder information and financial information from purported Saha Thai affiliates.  Petitioner's RFI to Saha Thai (June 1, 2021), Appx97105-97684.  Petitioner's submission, however, failed to tie the allegations to development, production, sale and/or distribution of the merchandise under review or otherwise show any deficiency in Saha Thai's reporting.

More importantly, even after Petitioner's submission, Commerce did not request any additional information from Saha Thai, therefore giving Saha Thai no indication that the new information was the basis for Commerce concluding that its responses were deficient.  The Court has recognized that the statute does not require respondents to be "mind-readers." *Sigma Corp. v. United States*, 17 CIT 1288, 1303, 841 F. Supp. 1255, 1267 (1993).

Similarly, Commerce's authority under 19 U.S.C. §1677e is not a license to employ a "predatory 'gotcha' policy," which "does not promote cooperation or accuracy or reasonable disclosure by cooperating parties intended to result in realistic dumping determinations." *Bowe-Passat v. United States*, 17 CIT 335, 343 (1993).  Saha Thai cannot be expected to provide additional information without any indication from Commerce that it is necessary for the review especially as is the case here, there is no evidence that the customers who are allegedly affiliated re-sell subject merchandise and Saha Thai was not given an opportunity to address any questions Commerce may have had on the issue.

> **3.     Commerce's decision to apply adverse facts available is unlawful because Commerce did not comply with the statutory obligation set forth in 19 U.S.C. §1677m**

As detailed above, pursuant to 19 U.S.C § 1677m(d), Commerce has a statutory obligation to inform respondents if there are any deficiencies in the data and information provided.  The statute provides that Commerce "shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits…."  19 U.S.C § 1677m(d).  If the response or explanation provided is found to be unsatisfactory, only then may Commerce disregard the information provided in favor of facts otherwise available.

The courts have determined that in order to satisfy its obligation under 19 U.S.C. § 1677m(d), Commerce must inform the respondent of a deficiency by "'specifically

NONCONFIDENTIAL

point{ing} out and request{ing} clarification of the deficient responses,' and identify the information needed to make the required showing." *Hyundai Steel Co. v. United States*, 518 F. Supp. 3d 1309, 1323 (Ct. Int'l Trade 2021) (quoting *NSK Ltd. v. United States*, 481 F.3d 1355, 1360 n.1 (Fed. Cir. 2007)).  And indeed, the Federal Circuit has found that a failure to comply with the maximum effort standard only applies in situations where respondents withhold information that has been specifically requested. *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012).

Here, Commerce completely failed to adhere to its statutory obligation pursuant to 19 U.S.C. §1677m.  The underlying administrative record shows that Commerce never informed Saha Thai that it believed that Saha Thai's prior questionnaire responses indicating that it has not sold subject merchandise to affiliated home market distributor customers were deficient in any way.  Specifically, Commerce never informed Saha Thai that it had a different conclusion concerning affiliation with the [     ] home market customers.  And, perhaps most importantly, Commerce never requested that Saha Thai provide a new home market sales database to include re-sales of subject merchandise made by the [     ] allegedly affiliated home market customers.

Given that Commerce never, ever requested Saha Thai to provide the re-sale data of the [     ] allegedly affiliated home market customers, Commerce had no authority to impose adverse facts available.  Commerce's determination, therefore, must be found unlawful and not supported by substantial evidence.

**IV.    COMMERCE MUST REVISE THE CALCULATION OF THE AD ASSESSMENT RATE IN THIS REVIEW BECAUSE IT INCLUDES OUT-OF SCOPE MERCHANDISE**

Since briefing concluded in the review on August 4, 2021, *see* Rebuttal Brief Extension, Appx14076, this Court rendered a decision regarding a crucial scope issue. *See Saha Thai Steel Pipe Pub. Co. v. United States,* 547 F. Supp. 3d 1278 (Ct. Int'l Trade 2021)*.* As a result of that remand redetermination, Commerce determined (albeit under protest) that the group of products referred to as "dual-stenciled pipe," in fact, does not fall within the scope of the order under review.  Final Results of Redetermination Pursuant to Court Remand, *Saha Thai Steel Pipe Pub. Co. v. United States,* 547 F. Supp. 3d 1278 (Ct. Int'l Trade 2021) (hereinafter "Commerce's Scope Remand Redetermination").

We recognize that Commerce's new conclusion that dual-stenciled pipe is not covered by the scope of the CWP Order is not yet final.  However, should Commerce's Scope Remand Redetermination become final before this Court renders its decision in this case, we respectfully submit that this Court must conclude that Commerce's final determination in the underlying AD review is unlawful because the calculation of Saha Thai's new AD rate is based on sales and cost data that includes non-subject merchandise dual-stenciled pipe.

Commerce performs administrative reviews pursuant to 19 U.S.C. §1675(a).  That provision states in pertinent part that Commerce "shall determine— (i) the normal value and export price . . . of <u>each entry of the subject merchandise</u>, and (ii) the dumping margin for each such entry." 19 U.S.C. §1675(a)(2)(A)(emphasis supplied).  The

statutory phrase "subject merchandise" refers to the specific merchandise that is within the scope of the AD order.  What this means is that Commerce's AD review determination should not include sales and cost data for non-subject merchandise.  And indeed, Commerce's own AD questionnaire make clear that Saha Thai was only to report sales and cost data for subject merchandise.  Appx3307.

There is no question that, during the underlying AD review, both Commerce and Saha Thai believed that the definition of "subject merchandise" included dual-stenciled pipe.  Specifically, in Saha Thai's Section B questionnaire response Saha Thai stated as follows: "Saha Thai included all of the categories that fall within the general description of circular welded pipe. Additionally, the company included all products that fall into the category of dual-stenciled pipes (i.e. API 5L and ASTM 53)."  Section B QR, Appx8202. Further, in Saha Thai's Section C questionnaire response Saha Thai stated as follows:

> Saha Thai has reported the specification and grade in this field as requested. During the POR, Saha Thai sold dual stenciled pipes (e.g. ASTM A53 Grade A/API 5L or ASTM A53 Grade B/API 5L) to the United States through a trading company. In the standard field, Saha Thai has indicated whether these products are dual-stenciled pipes and tubes.

Section C QR, Appx8321, 8324 (noting that dual stenciled pipe is covered by codes 10 and 15).

These elements of Saha Thai's responses demonstrate two key things.  First, Saha Thai did report those sales based on the then prevailing interpretation of the scope; and second, those sales will be easy for Commerce to remove from its margin program. Saha Thai is also able to easily generate new databases in order to remove the sales at issue.

And so, should Commerce's Scope Remand Redetermination become final, it will mean that Commerce's calculation of Saha Thai's AD rate is not specific to subject merchandise and therefore is unlawful. This Court has the power to correct this issue. While trade remedy proceedings generally proceed *sui generis* there are some issues that cut across reviews because they are foundational and bear on what the law allows in related proceedings. *Sonoco Steel Tube Div. Ferrum, Inc. v. United States*, 12 CIT 990, 991 (1988) ("{i}t is impossible to totally separate the effects of an original determination from subsequent events, as defendant would wish. An annual review does not have independent existence, it requires a valid underlying order."). In addition, the Federal Circuit has found that the agencies involved in these proceedings are under an obligation to ensure that their determinations reflect changes in fact that bear on their conclusions. *Borlem S.A.-Empreedimentos Industriais v. United States*, 913 F.2d 933, 939 (Fed. Cir. 1990) ("we have an incorrect fact determination, corrected by the governmental agency that issued it, while the appeal was pending, which determination when properly considered, may lead to a different result."). That is the situation that we have here.

Commerce's determination in this review was based on the conclusion that sales of dual-stenciled pipe were within the scope of the order. Saha Thai reported its sales databases on that basis, which were accepted by Commerce. Commerce then calculated a margin based, with certain exceptions, on those reported sales. Now this Court and Commerce, though under protest, have concluded that that determination regarding the scope was wrong. The results of this review must be amended to reflect that fact. Failing to cure this defect would render the final results contrary to law.

## CONCLUSION

For all of the foregoing reasons, Saha Thai respectfully requests that the Court holds unlawful Commerce's final determination rendered in the underlying administrative review and remand with instructions for Commerce to reissue its AD review determination consistent with the Court's decision.

Respectfully submitted,

/s/  Daniel L. Porter

Daniel L. Porter
James P. Durling
James C. Beaty
Ana Amador

**Curtis, Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, NW
Washington, DC, 20006

*Counsel for Plaintiff Saha Thai Steel Pipe Public Company Limited*

May 9, 2022

## Word Count Certificate of Compliance

This brief has been prepared utilizing Microsoft Word 2010 using a proportionally spaced typeface 13 point Times New Roman font.

In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth in the Chambers Procedures.  Specifically, excluding those exempted portions of the brief as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains 13,731 words.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/  Daniel L. Porter

Daniel L. Porter

**Curtis, Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, NW
Washington, DC, 20006

*Counsel for Plaintiff Saha Thai Steel Pipe
Public Company Limited*