## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| SAHA THAI STEEL PIPE PUBLIC COMPANY LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>WHEATLAND TUBE COMPANY and NUCOR TUBULAR PRODUCTS INC.,<br><br>Defendant-Intervenors. | Court No. 21-00627 |

## <u>ORDER</u>

Upon consideration of plaintiff's Rule 56.2 Motion for Judgement on the Agency Record, defendant's opposition, and other pertinent papers, it is hereby

ORDERED that plaintiff's motion for judgment concerning the Department of Commerce's (Commerce) decision to apply partial facts available with adverse inferences is denied, and it is further

ORDERED that defendant's request for a partial remand is granted to permit Commerce to recalculate the weighted-average dumping margin without making a cost-based particular market situation adjustment, and it is further

ORDERED that the challenged determination is sustained in all other respects.

_____
JUDGE

Dated: _____
     New York, NY

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | | |
|---|---|---|
| SAHA THAI STEEL PIPE PUBLIC COMPANY LIMITED, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Consol. Ct. No. 21-00627 |
| UNITED STATES, | ) ) | PUBLIC VERSION |
| Defendant, | ) ) | Business Proprietary Information Removed from Pages 4-5, 15-17 20-29, and 32 |
| and | ) ) | |
| WHEATLAND TUBE COMPANY and, NUCOR TUBULAR PRODUCTS, INC., | ) ) ) | |
| Defendant-Intervenors. | ) ) | |

---

## DEFENDANT'S RESPONSE TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

---

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL:

JONZACHARY FORBES
Attorney
Office of the Chief Counsel
For Trade Enforcement and Compliance
U.S. Department of Commerce
Washington, D.C.

ELIZABETH A. SPECK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel:  (202) 616-0477

July 15, 2022

Attorneys for Defendant

## <u>TABLE OF CONTENTS</u>

STATEMENT PURSUANT TO RULE 56.2 ....................................................................2

    I.    Administrative Determination Under Review ..........................................2

    II.    Issues Presented for Review ....................................................................2

STATEMENT OF FACTS ........................................................................................2

SUMMARY OF THE ARGUMENT .........................................................................8

ARGUMENT ............................................................................................................9

    I.    Standard Of Review ................................................................................9

    II.    Commerce's Decision To Apply Partial Facts Available With Adverse Inferences Is Supported By Substantial Evidence And Is Otherwise In Accordance With Law .10

        A.    Legal Framework For The Use of Facts Available With Adverse Inferences ..........................................................................11

        B.    Commerce's Decision To Apply Facts Otherwise Available Is Supported By Substantial Evidence And Is Otherwise In Accordance With Law ....................13

            1.    Saha Thai Failed To Supply Necessary Information That Was Requested In Commerce's Initial And Supplemental Questionnaires .............................13

            2.    Saha Thai Withheld Information That Commerce Had Requested, Failed Adequately To Respond To Commerce's Requests For Information, And Significantly Impeded The Investigation ......................................................19

        C.    Commerce's Decision To Apply An Adverse Inference Is Supported By Substantial Evidence And Is Otherwise In Accordance With Law ....................20

        D.    Saha Thai's Incomplete And Inadequate Responses Precluded Commerce From Conducting Its Typical Affiliation Analysis ........................................................21

        E.    Wheatland's Factual Submission Was Timely And Complied With Commerce's Regulations Regarding The Submission Of New Factual Information ...............29

        F.    Commerce Complied With 19 U.S.C. § 1677m(d) ................................................31

    III.    Commerce's Determination That A Particular Market Situation Existed In Thailand During The Period Of Review Is Supported By Substantial Evidence ....................35

A.  Legal Framework For Determining That A Particular Market Situation Exists ... 36

B.  Commerce's Particular Market Situation Analysis ................................................. 37

IV.  The Court Should Grant The Government's Request For A Voluntary Remand So That Commerce May Reconsider Its Particular Market Situation Adjustment .......... 41

V.  Saha Thai Failed To Exhaust Its Argument Regarding The Inclusion Of Dual-Stenciled Pipe In Its Administrative Case Brief ........................................................ 41

CONCLUSION ..................................................................................................................... 43

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*ABB Inc. v. United States,*
   355 F. Supp. 3d 1206 (Ct. Int'l Trade 2018) ............................................................ 33, 34

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
   802 F.3d 1339 (Fed. Cir. 2015) ................................................................................... 12

*Algoma Steel Corp. v. United States,*
   865 F.2d 240 (Fed. Cir. 1989) ..................................................................................... 37

*Boomerang Tube LLC  v. United States,*
   856 F.3d 908 (Fed. Cir. 2017) ..................................................................................... 42

*Clearon Corp. v. United States,*
   800 F. Supp. 2d 1355 (Ct. Int'l Trade 2011) .............................................................. 42

*Consol. Edison Co. v. NLRB,*
   305 U.S. 197 (1938) ......................................................................................... 9, 21, 27

*Consolo v. Fed. Mar. Comm'n,*
   383 U.S. 607 (1966) .................................................................................................. 9, 24

*Corus Staal B.V. v. United States,*
   502 F.3d 1370 (Fed. Cir. 2007) ................................................................................... 41

*Deacero S.A.P.I. de C.V. v. United States,*
   996 F.3d 1283 (Fed. Cir. 2021) ................................................................................... 10

*Essar Steel, Ltd. v. United States,*
   678 F.3d 1268 (Fed. Cir. 2012) ................................................................................... 12

*F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States,*
   216 F.3d 1027 (Fed. Cir. 2000) ................................................................................... 12

*Hitachi Energy USA Inc. v. United States,*
   34 F.4th 1375 (Fed. Cir. 2022) ................................................................................... 16

*Hung Vuong Corp. v. United States,*
   483 F. Supp. 3d 1321 (Ct. Int'l Trade 2020) .............................................................. 11

*Hyundai Elec. & Energy Sys. Co. v. United States,*
   15 F.4th 1078 (Fed. Cir. 2021) ................................................................................... 32

*Hyundai Heavy Indus. Co. v. United States*,
    485 F. Supp. 3d 1380 (Ct. Int'l Trade 2020)..........................................................34

*Hyundai Steel Co. v. United States*,
    19 F.4th 1346 (Fed. Cir. 2021)...................................................................9, 40

*INS v. Elias-Zacarias*,
    502 U.S. 478 (1992) ........................................................................................9

*Itochu Bldg. Prods., Co. v. United States*,
    208 F. Supp. 3d 1377 (Ct. Int'l Trade 2017)..........................................................23

*Jinko Solar Co. v. United States*,
    229 F. Supp. 3d 1333 (Ct. Int'l Trade 2017)..........................................................25

*Linyi Chengen Imp. & Exp. Co. v. United States*,
    391 F. Supp. 3d 1283 (Ct. Int'l Trade 2019)..........................................................31

*Marmen Inc. v. United States*,
    545 F. Supp. 3d 1305 (Ct. Int'l Trade 2021)..........................................................29

*Maverick Tube Corp. v. United States*,
    857 F.3d 1353 (Fed. Cir. 2017)...................................................................32

*Mukand, Ltd. v. United States*,
    767 F.3d 1300 (Fed. Cir. 2014)...................................................................19

*N.M. Garlic Growers Coal. & El Bosque Farm v. United States*,
    352 F. Supp. 3d 1281 (Ct. Int'l Trade 2018)..........................................................28

*Nat'l Nail Corp. v. United States*,
    390 F. Supp. 3d 1356 (Ct. Int'l Trade 2019)..........................................................16

*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003)...........................................................12, 20, 21

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006)...................................................................9, 21

*Papierfabrik Aug. Koehler SE v. United States*,
    843 F.3d 1373 (Fed. Cir. 2016)...................................................................10, 32

*Papierfabrik August Koehler AG v. United States*,
    180 F. Supp. 3d 1211 (Fed. Cir. 2016)...................................................................12

*Saha Thai Steel Pipe Pub. Co. v. United States,*
    547 F. Supp. 3d 1278 (Ct. Int'l Trade 2021) ................................................. 40, 41

*Shandong Dongfang Bayley Wood Co. v. United States,*
    375 F. Supp. 3d 1339 (Ct. Int'l Trade 2019) ................................................. 32

*Sigma Corp. v. United States,*
    841 F. Supp. 1255 (Ct. Int'l Trade1993) ................................................. 30

*SKF USA Inc. v. United States,*
    254 F.3d 1022 (Fed. Cir. 2001) ................................................. 40

*T. T. Int'l Co. v. United States,*
    439 F. Supp. 3d 1370 (Ct. Int'l Trade 2020) ................................................. 29

*Timken Co. v. United States,*
    240 F. Supp. 2d 1228 (Ct. Int'l Trade 2002) ................................................. 18

*Torrington Co. v. United States,*
    68 F.3d 1347 (Fed. Cir. 1995) ................................................. 35

*Zhaoqing New Zhongya Aluminum Co. v. United States,*
    70 F. Supp. 3d 1298 (Ct. Int'l Trade 2015) ................................................. 17

**Statutes**

19 U.S.C. § 1516a(b) ................................................. 9

19 U.S.C. § 1675(a) ................................................. 35

19 U.S.C. § 1677(15) ................................................. 36

19 U.S.C. § 1677(33) ................................................. 17, 22

19 U.S.C. § 1677(33)(A) ................................................. 25

19 U.S.C. § 1677(33)(F) ................................................. 25

19 U.S.C. § 1677a(a) ................................................. 35

19 U.S.C. § 1677b(a) ................................................. 17, 35

19 U.S.C. § 1677b(b) ................................................. 40

19 U.S.C. § 1677b(e) ................................................. 35

19 U.S.C. § 1677e(a) ................................................................. *passim*

19 U.S.C. § 1677e(b) ................................................................. *passim*

19 U.S.C. § 1677m(c) ....................................................................... 11

19 U.S.C. § 1677m(d) ................................................................ *passim*

19 U.S.C. § 1677m(e) ....................................................................... 11

19 U.S.C. § 1677m(i) ........................................................................ 11

19 U.S.C. § 16773(b) ........................................................................ 16

**Regulations**

19 C.F.R. § 351.102(b) ..................................................................... 14

19 C.F.R. § 351.225(k) ..................................................................... 41

19 C.F.R. § 351.301(b) ............................................................... 29, 30

19 C.F.R. § 351.301(c) ..................................................................... 29

19 C.F.R. § 351.308 ......................................................................... 11

19 C.F.R. § 351.308(c) ..................................................................... 12

19 C.F.R. § 351.309(c) ..................................................................... 42

19 C.F.R. § 351.401(f) ...................................................................... 17

19 C.F.R. § 351.403(c) ...................................................................... 17

19 C.F.R. § 351.403(d) ....................................................................... 7

**Rules**

U.S. Ct. Int'l Trade R. 56.2 ............................................................ 1, 41

**Federal Register**

*Antidumping Duty Order; Circular Welded Carbon Steel Pipes and Tubes from Thailand,*
51 Fed. Reg. 8,341 (Mar. 11, 1986) ............................................... 3, 41

*Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review,*
85 Fed. Reg. 12,267 (Mar. 2, 2020) ...................................................................... 2

*Certain Hot Rolled Carbon Steel Flat Products from Thailand: Final Results of the Third Expedited Five Year(Sunset) Review of the Countervailing Duty Order,*
84 Fed. Reg. 27,085 (Dep't Commerce June 11, 2019) .......................................... 37

*Circular Welded Carbon Steel Pipes and Tubes from Thailand: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2019-2020,*
86 Fed. Reg. 30,405 (June 8, 2021) ...................................................................... 6

*Common Alloy Aluminum Sheet from the Sultanate of Oman: Final Affirmative Determination of Sales at Less Than Fair Value and Negative Determination of Critical Circumstances,*
86 Fed. Reg. 13,328 (Dep't of Commerce Mar. 8, 2021) ...................................... 36

*Corrosion-Resistant Steel Products From the Republic of Korea: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017– 2018,*
85 Fed. Reg. 15,114 (Dep't of Commerce Mar. 17, 2020) ...................................... 38

*Final Affirmative Countervailing Duty Determination:  Certain Hot-Rolled Carbon Steel Flat Products from Thailand,*
66 Fed. Reg. 50,410 (Dep't Commerce Oct. 3, 2001) ............................................ 37

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
85 Fed. Reg. 26,931 (Dep't of Commerce May 6, 2020) ........................................ 3

*Welded Carbon Steel Pipes and Tubes from Thailand:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019–2020,*
86 Fed. Reg. 69,620 (Dec. 8, 2021). ..................................................................... 2, 8

**Legislative History**

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act (SAA),
H.R. Rep. No. 103-316, vol. 1 (1994)……………………………………………12, 13, 37

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

|  |  |
|---|---|
| SAHA THAI STEEL PIPE PUBLIC COMPANY LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>WHEATLAND TUBE COMPANY and NUCOR TUBULAR PRODUCTS INC.,<br><br>Defendant-Intervenors. | Court No. 21-00627<br><br>**PUBLIC VERSION**<br><br>**Business Proprietary Information Removed from Pages 4-5, 15-17, 20-29, and 32** |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully submits this response in opposition to the motion of plaintiff, Saha Thai Steel Pipe Public Company, Limited (Saha Thai), for judgment upon the agency record.  As demonstrated below, with the exception of one issue for which the Government respectfully requests a voluntary remand, the Court should deny Saha Thai's motion for judgment on the agency record and sustain the Department of Commerce's (Commerce) determination as supported by substantial evidence and otherwise in accordance with law.

**STATEMENT PURSUANT TO RULE 56.2**

**I.     Administrative Determination Under Review**

The determination under review is the final results of the 2019-2020 administrative
review of the antidumping duty (AD) order on certain welded carbon steel pipes and tubes from
Thailand.  *See Welded Carbon Steel Pipes and Tubes from Thailand:  Final Results of
Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019–
2020*, 86 Fed. Reg. 69,620 (Dec. 8, 2021*)* (Final Results), Appx14332-14334, and accompanying
Issues and Decision Memorandum (IDM), Appx14288-14319.  The period of review is March 1,
2019, through February 29, 2020.  Final Results, 86 Fed. Reg. at 69,260, Appx14332.

**II.    Issues Presented for Review**

1.   Whether Commerce's decision to apply partial facts available with an adverse inference
based upon a finding that Saha Thai failed to cooperate by not acting to the best of its ability is
supported by substantial evidence and is otherwise in accordance with the law.

2.   Whether Commerce's determination that a particular market situation exists in Thailand
based on record information is supported by substantial evidence.

3.   Whether the Court should grant the Government's request for a voluntary remand so that
Commerce may recalculate the weighted-average dumping margin without making a cost-based
particular market situation adjustment.

4.   Whether Saha Thai failed to exhaust its argument regarding Commerce's inclusion of
dual-stenciled pipe sales and cost data in its final margin calculations.

**STATEMENT OF FACTS**

On March 2, 2020, Commerce published in the *Federal Register* a notice of opportunity
to request an administrative review of an antidumping duty order on circular welded carbon steel

*PUBLIC VERSION*

pipes and tubes from Thailand for the period covering March 1, 2019 to February 29, 2020.  *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review*, 85 Fed. Reg. 12,267 (Dep't of Commerce Mar. 2, 2020), Appx1000-1002.

The subject merchandise covered by the scope of the *Order* is pipe and tube that has an outside diameter of 0.375 inches or more, but not exceeding 16 inches, of any wall thickness, and is referred to as "standard pipe" or "structural tubing."  *See Antidumping Duty Order; Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 51 Fed. Reg. 8,341 (Dep't of Commerce Mar. 11, 1986) (*Order*); IDM at 3, Appx14290.

On March 30, 2020, Saha Thai requested an administrative review of itself.  *See* Saha Thai's Request for Administrative Review:  Circular Welded Carbon Steel Pipe and Tubes from Thailand (Mar. 30, 2020), Appx1003-1007.  Also, Wheatland Tube Company (Wheatland), a domestic producer, requested a review of multiple Thai producers and/or exporters on March 31, 2020, including Saha Thai.  *See* Wheatland's Request for Administrative Review (Mar. 31, 2019), Appx1011-1013.  Commerce initiated the 2019-2020 administrative review of the *Order* on May 6, 2020.  *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 26,931 (Dep't of Commerce May 6, 2020) (Initiation Notice), Appx1048-1055.

On October 13, 2020, Commerce selected Saha Thai and Blue Pipe Steel Center (Blue Pipe) as mandatory respondents.  *See* Circular Welded Carbon Steel Pipes and Tubes from Thailand:  Respondent Selection (Oct. 13, 2020), Appx3121-3128, Appx82221-82229.  Commerce also issued Saha Thai an initial questionnaire, which was divided into Sections A-E.  *See* Antidumping Duty Questionnaire (Oct. 13, 2020) (Initial Questionnaire), Appx3130-3449.

On November 10, 2020, Saha Thai responded to Commerce's initial Section A

questionnaire.  *See* Saha Thai Section A Questionnaire Response (Nov. 10, 2020) (Saha Thai

AQR), Appx3954-4553, Appx82810-84267.  In Section A of the questionnaire, Commerce

specifically requested information regarding any potential affiliation relationship between Saha

Thai and its customers by asking:  "If you sold to affiliated customers, also report separately the

quantity and value such sales represent as a percentage of all home market sales and of sales in

each of the largest third country markets, respectively."  Section A Questionnaire (Oct. 13, 2020)

at A-2, Appx3308.  Also, in Section B of the questionnaire under a section titled "Sales to

Affiliated Customers in the Comparison Market," Commerce requested that:

> If you had sales to an affiliated party that consumed all or some of
> the merchandise (*i.e.*, used it in the production of merchandise that
> does not fall within the description provided in Appendix III), then
> report all of your sales to that affiliate, *whether the merchandise
> was consumed or resold by the affiliate.*

Section B Questionnaire (Oct. 13, 2020) at B-3 (emphasis added), Appx3324.

In its response Saha Thai stated that it was reporting three categories of home market

sales:  "(1) sales to unaffiliated customers, (2) sales to *potentially affiliated* entities for

consumption, and (3) sales to affiliated resellers."  Saha Thai AQR at 3 (emphasis added),

Appx3963, Appx82819.  But Saha Thai identified only the following home market customers:

███████████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████].  *Id*. at 3-4, Appx82819-

82820.  Saha Thai also listed [███] individuals who held directorship positions at Saha Thai

during the POR:  [██████████████████████████████████████

4

*PUBLIC VERSION*

███████████████████████████████████████████████

███████.  *Id.* at 9, Appx82825.

On January 27, 2021, defendant-intervenor Wheatland submitted an allegation that a particular market situation (PMS) existed in Thailand during the period of review that distorted costs of hot-rolled coil, an input into the subject merchandise.  *See* Wheatland's Particular Market Situation Allegation – Qualitative Submission (Jan. 27, 2021), Appx8938-9172, Appx90698-90931.  Saha Thai subsequently responded to the particular market situation allegations.  *See* Saha Thai's Rebuttal Factual Information and Comments Concerning Petitioner's PMS Allegation (Feb. 19, 2021) (Saha Thai Rebuttal PMS RFI), Appx10027-11346, Appx90950-92268.

On April 13, 2021, Commerce issued Saha Thai a third supplemental questionnaire.  *See* Commerce's Third Supplemental Questionnaire for Saha Thai (Apr. 13, 2021) (Supplemental Questionnaire), Appx13253-13257, Appx96233-96237.  Specifically, Commerce asked Saha Thai to "provide a complete family tree for ██████████████████ for Saha Thai…{and to} identify any member of these families that has any role in any company involved in the development, production, sale and/or distribution of the merchandise under review."  *Id.* at 1, Appx96235.  Also, Commerce clarified that Saha Thai was to "state whether Saha Thai's or any of Saha Thai's affiliates' employees, stockholders, managers, directors, officers, or department heads has an equity or a debt position in any other company involved in the development, production, sale and/or distribution of the merchandise under review."  *Id.*

On May 4 and May 6, 2021, Saha Thai submitted its response to Commerce's third supplemental questionnaire in two parts.  *See* Saha Thai Third Supplemental Questionnaire Response Part 1 (May 4, 2021), Appx13303-13341, Appx96420-96458; Saha Thai Third

Supplemental Questionnaire Response Part 2 (May 6, 2021) (Saha Thai SQR), Appx13342-13416, Appx96459-96662.

On June 2, 2021, Wheatland submitted its rebuttal to Saha Thai's supplemental questionnaire responses by further identifying alleged discrepancies in Saha Thai's affiliation reporting. *See* Wheatland Rebuttal Factual Information to Saha Thai Supplemental Questionnaire Response (June 2, 2021) (Wheatland Rebuttal to Saha Thai), Appx13630-13666, Appx97105-97684. In its rebuttal, Wheatland alleged that the information "sheds light on the owners and directors which impacts Saha Thai's claims of affiliation." *Id.* at 1, Appx97109. The same day, Wheatland separately submitted its rebuttal to Blue Pipe's supplemental questionnaire responses identifying that it was seeking to rebut claims regarding affiliation. *See* Wheatland Rebuttal Factual Information to Blue Pipe Supplemental Questionnaire Response (June 2, 2021) (Wheatland Rebuttal to Blue Pipe), Appx13704-13721, Appx97685-98071.

Shortly thereafter, on June 8, 2021, Commerce published the preliminary results of the administrative review. *See Circular Welded Carbon Steel Pipes and Tubes from Thailand: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2019-2020*, 86 Fed. Reg. 30,405 (June 8, 2021) (Preliminary Results), Appx13667-13676, and accompanying Preliminary Decision Memorandum (PDM), Appx13677-13698. In its Preliminary Results, Commerce reasonably found that a particular market situation existed in Thailand and issued Saha Thai a weighted-average dumping margin of 7.23%. *Id.*, Appx13670.

On December 8, 2021, Commerce published its Final Results, in which it determined that Saha Thai had failed to report its affiliations with home-market customers. IDM at 9, Appx14296. As a result, and in accordance with 19 U.S.C. § 1677e(a)(1), Commerce concluded

6

that necessary information—specifically complete details on the ties between Saha Thai and its customers—was missing from the record.  *See* IDM at 9, Appx14296; *see also* Circular Welded Carbon Steel Pipe and Tubes from Thailand:  Final Analysis Memorandum for Saha Thai Steel Pipe Public Co., Ltd. (December 2, 2021) (Final Analysis Memo) at 1-3, Appx13729-13737, Appx99504-99506.

Further, in accordance with 19 U.S.C. § 1677e(a)(2)(A)-(C), Commerce determined that by not reporting its ties with these home-market customers, Saha Thai withheld information that was requested by Commerce, failed to provide such information in a timely manner or in the form or manner requested, and significantly impeded the review.  IDM at 9, Appx14296. Because Saha Thai withheld information, Commerce determined that Saha Thai failed to cooperate by not acting to the best of its ability within the meaning of 19 U.S.C. § 1677e(b).  *Id.* (citing Saha Thai's New Factual Information to Rebut, Clarify or Correct information in Wheatland's June 1, 2021 Submission (June 21, 2021) (Saha Thai RFI), Appx13782-13803, Appx98778-98796).  Thus, Commerce concluded that it was appropriate to apply facts available with adverse inferences.  IDM at 9-10, Appx14296-14297.

As partial facts available with adverse inferences, Commerce determined that the customers in question were all affiliated with Saha Thai.  *Id.*  Also, Commerce determined as partial facts available with an adverse inference that all of Saha Thai's sales to these customers were ultimately re-sold by those customers as-is in Thailand.  IDM at 10, Appx14297. Commerce found that Saha Thai's sales to these customers were not made at arm's length.  IDM at 9, Appx14296 (citing Final Analysis Memo at "Test Results for Affiliated Customers," Appx99616).  Because Saha Thai's sales to its affiliated customers exceeded five percent of its total home-market sales by quantity, Commerce required Saha Thai to report these customers'

7

downstream sales to unaffiliated parties in accordance with 19 C.F.R. § 351.403(d).  IDM at 9, Appx14296 (citing Final Analysis Memo at "Summary of Customer Affiliation & LOT," Appx99608).  Because, despite having been given the opportunity by Commerce on multiple occasions, Saha Thai failed to report information regarding its home market affiliates and because Wheatland submitted the contravening information very near the publication of the Preliminary Results, Commerce did not have the opportunity to request that specific downstream sales information.  IDM at 9-10, Appx14296-14297.  Thus, as partial facts available with adverse inferences, Commerce calculated the net home market sales price for Saha Thai's sales to the home-market customers in question using the second-highest reported net home market sale price by Saha Thai to unaffiliated customers for the common product control numbers.  IDM at 10, Appx14297 (citing Final Analysis Memo at section 4-B-iii, Appx99554-99555 and Saha Thai RFI at 2-5, 7, and Exhibits 2 and 3, Appx98780-98783, 98785 and 98795-98824).  Commerce assigned Saha Thai a weighted-average dumping margin of 36.97%.  Final Results, 86 Fed. Reg. at 69,621, Appx14333.

## SUMMARY OF THE ARGUMENT

With the exception of one issue for which we request a voluntary remand, Commerce's final results are supported by substantial record evidence and are otherwise in accordance with law.  The record demonstrates that Saha Thai failed to disclose multiple home market customers that may in fact be affiliated, thus, (1) necessary information is not available on the record for purposes of calculating normal value and further inquiring into whether such affiliates are resellers of subject merchandise; and (2) Saha Thai withheld information that Commerce specifically had requested in its questionnaires, did not timely submit such information or in the form and manner requested, and significantly impeded the proceeding.  Therefore, the statutory

criteria permitting Commerce to apply partial facts otherwise available to determine Saha Thai's margin was met.

Further, because of these failings, and because Saha Thai failed to disclose this information despite having been given multiple opportunities to do so, thus failing to cooperate by not acting to the best of its ability, Commerce determined to apply partial facts otherwise available with adverse inferences.  Commerce's determination is supported by substantial evidence and consistent with the statute.

Commerce's conclusion that a particular market situation existed in Thailand during the period of review concerning the cost of hot-rolled coil used in the production of circular welded carbon and steel pipes is supported by substantial evidence.  In determining that a particular marked situation existed, Commerce relied on record evidence demonstrating significant global overcapacity as well as other record evidence. We recognize, however, that the United States Court of Appeals for the Federal Circuit recently held, in *Hyundai Steel Co. v. United States*, 19 F.4th 1346 (Fed. Cir. 2021), that Commerce cannot apply a particular market situation adjustment to calculation of costs of production under the sales-below-cost test.  Thus, we respectfully request that the Court remand the issue to Commerce to recalculate the weighted-average dumping margin without making a cost-based particular market situation adjustment. Accordingly, with the exception of this issue, the Court should sustain Commerce's final results.

## ARGUMENT

## I.   Standard Of Review

This Court sustains any determination of Commerce unless it is unsupported by substantial evidence or otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229

(1938).  The possibility of drawing inconsistent conclusions from the record does not prevent

Commerce's finding from being supported by substantial evidence.  *See Consolo v. Fed. Mar.*

*Comm'n*, 383 U.S. 607, 620 (1966). When an issue is inherently fact-intensive, the Court will set

aside Commerce's finding only if the evidence is "so compelling that no reasonable factfinder"

could reach the same conclusion.  *See INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992).

Thus, the substantial evidence standard is a "high barrier to reversal." *Nippon Steel Corp. v.*

*United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted) (*Nippon Steel 2006*).

Commerce's determination to apply facts available with adverse inferences is a matter that

implicates the substantial evidence standard.  *See Deacero S.A.P.I. de C.V. v. United States*, 996

F.3d 1283, 1296 (Fed. Cir. 2021) (reviewing application of facts available with an adverse

inference under substantial evidence standard); *Papierfabrik Aug. Koehler SE v. United States*,

843 F.3d 1373, 1379 (Fed. Cir. 2016) (reviewing application of 19 U.S.C. §§ 1677e(a)-(b)).

## II.   Commerce's Decision To Apply Partial Facts Available With Adverse Inferences Is Supported By Substantial Evidence And Is Otherwise In Accordance With Law

Commerce properly applied partial facts available with adverse inferences to remedy the

gaps in the evidentiary record left by Saha Thai's failure to report certain ties with its home

market customers.  Because Saha Thai failed to report its connection to certain of its home-

market customers, Commerce reasonably concluded that necessary information was missing

from the record pursuant to 19 U.S.C. § 1677e(a)(1).  *See* IDM at 9, Appx14296.  Further, in

failing to report its ties with certain home-market customers as requested by Commerce, Saha

Thai withheld information requested by Commerce, failed to provide such information in a

timely manner or in the form or manner requested, and significantly impeded this review pursuant to 19 U.S.C. § 1677e(a)(2)(A)-(C).  IDM at 9, Appx14296.

Also, pursuant to 19 U.S.C. § 1677e(b), Commerce reasonably determined that, because Saha Thai had failed to report such information despite having had multiple opportunities to do so and had represented to Commerce that it had reported information on even its potentially affiliated home market customers, Saha Thai failed to cooperate by not acting to the best of its abilities when responding to Commerce's requests for information.  Thus, Commerce was justified in applying partial facts available with adverse inferences.  IDM at 9, Appx14296.

### A.       Legal Framework For The Use of Facts Available With Adverse Inferences

Consistent with the statute, Commerce "shall" use facts otherwise available to make its determination if "necessary information is not available on the record," 19 U.S.C. § 1677e(a)(1), or if an interested party:

> (A) withholds information that has been requested by the {Department}; (B) fails to provide such information by the deadlines for submission of the information or in the form or manner requested subject to {19 U.S.C. § 1677m(c)(1) and (e)}; and (C) significantly impedes a proceeding under {the antidumping statute}; or (D) provides such information but the information cannot be verified as provided in {1677m(i)}.

19 U.S.C. § 1677e(a)(2)(A)-(D); *accord* 19 C.F.R. § 351.308.  Although 19 U.S.C. § 1677e(a)(1) asks whether "necessary information is not available on the record," 19 U.S.C. § 1677e(a)(2) omits the word "necessary" and focuses on an interested party's conduct.  *See Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1337 (Ct. Int'l Trade 2020).  In either situation, Commerce must use facts otherwise available.  19 U.S.C. §§ 1677e(a)(1)-(2) (providing that Commerce "*shall* . . . use the facts otherwise available in reaching the applicable determination") (emphasis added).

11

Selection from among the facts otherwise available is subject to the requirements of 19 U.S.C. § 1677m(d).  If Commerce determines that a party's response does not comply with the request for information in an antidumping duty review, it shall "promptly inform the person submitting the response of the nature of the deficiency" and shall, to the extent practicable, "provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews."  *Id.*

If Commerce finds that a respondent fails to cooperate by not acting "to the best of its ability" in response to Commerce's requests for information, Commerce may proceed in its application of facts available with adverse inferences.  19 U.S.C. § 1677e(b)(1).  A respondent is deemed to have failed the "best of its ability" standard if Commerce finds that a respondent has failed to exercise its "*maximum effort* to provide Commerce with full and complete answers to all inquiries in an investigation."  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003) (emphasis added) (*Nippon Steel 2003*).

Because Commerce lacks subpoena power, its statutorily granted authority to apply facts available with adverse inferences is an essential tool to incentivize cooperation with investigations and administrative reviews.  *See Essar Steel, Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012) (citing *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)); *see also* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act (SAA), H.R. Rep. No. 103-316, vol. 1, at 868 (1994) (noting that, because Commerce has no subpoena power, using an adverse inference is an "essential investigative tool" to induce cooperation from interested parties in antidumping proceedings).  Thus, the purpose of section 1677e(b) is to provide Commerce with the authority to deter parties from future non-compliance.  *See Papierfabrik August Koehler AG v. United*

*States*, 180 F. Supp. 3d 1211, 1230-31 (Ct. Int'l Trade 2016).  Consequently, the use of facts otherwise available with adverse inferences ensures that "'an uncooperative party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully.'"  *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1341 (Fed. Cir. 2015) (quoting SAA, H.R. Rep. No. 103-316, vol. 1, at 870).

 Once the uncooperative nature of the respondent has been established, Commerce may subsequently rely on any information obtained during any stage of the proceeding, including the petition, a final determination in the investigation, any previous review, or, most importantly in this case, even at the very last stages of an administrative proceedings, so long as the information is placed on the record.  *See* 19 U.S.C. § 1677e(b); *accord* 19 C.F.R. § 351.308(c).

### B.  Commerce's Decision To Apply Facts Otherwise Available Is Supported By Substantial Evidence And Is Otherwise In Accordance With Law

Commerce found two separate bases for the application of facts otherwise available: (1) necessary information was missing from the record pursuant to 19 U.S.C. § 1677e(a)(1), and (2) Saha Thai had withheld requested information, failed to submit information in the time or manner requested, and significantly impeded the review pursuant to 19 U.S.C. § 1677e(a)(2)(A)-(C).  *See* IDM at 9, Appx14296.  We address each of these findings below.

#### 1.  Saha Thai Failed To Provide Necessary Information That Was Requested In Commerce's Initial And Supplemental Questionnaires

Commerce reasonably determined that certain necessary information was missing from the record regarding Saha Thai's potential affiliation with certain home-market customers.  *Id.* (citing Initial Questionnaire at A-6, Appx3152 and B-14, Appx3175 and Supplemental Questionnaire at 1, Appx13255; *see also* Final Analysis Memo at 1-2, Appx99504-99505 (citing Saha Thai Section A QR at Exhibits. A-3 (Appx82857-83067) and A-5 (Appx83667-83669);

13

Wheatland Rebuttal to Saha Thai at Exhibits 1-2 (Appx97111-97134), 8 (Appx97300-97347), 10 (Appx97403-97477), 14 (Appx97591-97669); Wheatland Rebuttal Factual Information to Blue Pipe's Supplemental Questionnaire Response at Exhibit 3 (Appx97867-97995) and Exhibit 5 (Appx98013-98042); Saha Thai's SQR at Exhibit 2, page 1 Appx96484).  Specifically, that "some of Saha Thai's home-market customers may, in fact, be affiliated with Saha Thai and that Saha Thai did not report them as affiliated customers."  Final Analysis Memo at 1-2, Appx99504-99505.

As a part of the initial questionnaire, Commerce requires that a mandatory respondent disclose all potential affiliations with its customers.  In this review, Commerce issued its initial questionnaire with questions requesting information regarding all of Saha Thai's potential affiliations with customers.  *See, e.g.*, Initial Questionnaire at A-2, A-6, Appx3148, Appx3152.  Commerce requested that Saha Thai identify:

> If you sold to affiliated customers, also report separately the quantity and value such sales represent as a percentage of all home market sales and of sales in each of the largest third country markets, respectively.

And to identify:

> {A}ll suppliers, (sub)contractors, lenders, exporters, distributors, resellers, and other persons involved in the development, production, sale and/or distribution of the merchandise under review which Commerce may also consider affiliated with your company, in accordance with section 771(33) of the Act and {19 C.F.R. §§ 351.102(b) and 351.401(f)}. Some factors which you should consider include, for example … and other relationships between your company and the other person (*e.g.*, director/manager relationships).

*Id.*  Further Commerce asked:

> If you had sales to an affiliated party that consumed all or some of the merchandise (*i.e.*, used it in the production of

> merchandise that does not fall within the description {of
> subject merchandise}), then report all of your sales to that
> affiliate, *whether the merchandise was consumed or resold
> by the affiliate.*

Initial Questionnaire at B-3 (emphasis added), Appx3164.

Thus, Commerce put Saha Thai on notice that Saha Thai was to provide any and all

relevant information pertaining to any potential affiliation relationships with its home-market

customers.  Saha Thai reported in its initial questionnaire response sales to three categories of

home-market customers: "(1) sales to unaffiliated customers, (2) sales to *potentially affiliated*

entities for consumption, and (3) sales to affiliated resellers."  Saha Thai Initial Questionnaire

Response (IQR) at 3, Appx82819 (emphasis added).  This demonstrates that Saha Thai was

aware of Commerce's request and its affirmative duty as a mandatory respondent to provide

sales data on all affiliated customers, even those deemed to be "potentially affiliated."  Yet Saha

Thai identified only the following entities as affiliated: [██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████].  *Id.* at 3-4, Appx82819-82820.  Further, Commerce asked Saha

Thai to report "the code designating whether the customer is affiliated" in its initial questionnaire

when reporting its home-market sales.  *See* IDM at 8, Appx14295; *see also* Commerce's Initial

Questionnaire at B-14, Appx3175.  With only two code designations available, (1) representing

unaffiliated customers and (2) representing affiliated customers, there was no ambiguity as to

Commerce's request.

In a supplemental questionnaire, Commerce requested further detail as to the exact nature

of Saha Thai's relationship with its customers to determine whether an affiliation analysis was

required.  *See* Supplemental Questionnaire at 1, Appx96235.  Specifically, Commerce asked

Saha Thai to furnish a complete family tree of Saha Thai's owners and to:

> {I}dentify any member of these families that has any role
> in any company involved in the development, production,
> sale and/or distribution of the merchandise under
> review...{as well as to} state whether Saha Thai's or any of
> Saha Thai's affiliates' employees, stockholders, managers,
> directors, officers, or department heads has an equity or a
> debt position in any other company involved in the
> development, production, sale and/or distribution of the
> merchandise under review.

*Id.*  In its supplemental questionnaire response, Saha Thai explained that it had no further

affiliation details to share with Commerce, and in submitting its supplemental questionnaire

response fulfilled its responsibilities.  *See* Saha Thai SQR at 2-3, Appx96467-96468.

Commerce's review of the record, including Wheatland's rebuttal factual information,

demonstrated that Saha Thai could be affiliated with other entities but that Saha Thai "did not

report them as affiliated customers, nor did it report certain family members that had a role with

respect to those customers."  IDM at 8-9, Appx14295-14296; Final Analysis Memo at 1-2,

Appx99504-99505.  Specifically, that Saha Thai home market customers are affiliated through

majority stock ownership and board membership of the [████████] family: [████

████████████████████████████████████████████

████████████████].  Final Analysis Memo at 2, Appx99505.  Also, that members

of the [██████] family are shareholders of ██████████████  *Id.*  And that one of

the directors of [████████████ is [████████████] who is also a director of Saha

Thai.  *Id.*  Finally, that Saha Thai's [████████] is also [█████████████████████

Because Saha Thai did not report this information in its questionnaires, however, Commerce

could not investigate these ties during its review.  IDM at 8-9, Appx14295-14296.

16

When necessary information is not available on the evidentiary record, Commerce is authorized to consider whatever other facts are available and to "use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available" when the party has "'failed to cooperate by not acting to the best of its ability to comply with a request for information.'" *Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375 (Fed. Cir. 2022) (quoting 19 U.S.C. § 1677e(b)(1)); *see also Nat'l Nail Corp. v. United States*, 390 F. Supp. 3d 1356, 1373 (Ct. Int'l Trade 2019) ("{T}he use of facts otherwise available, to fill in gaps, applies when necessary information is lacking, regardless of the reason for its absence.") (cleaned up).

Although nothing in the statute defines what constitutes "necessary" information, this Court's precedent demonstrates that Commerce must possess certain information to analyze affiliation relationships between respondents and customers under 19 U.S.C § 1677(33). *See Zhaoqing New Zhongya Aluminum Co. v. United States*, 70 F. Supp. 3d 1298, 1308 (Ct. Int'l Trade 2015) (holding that information supporting Commerce's affiliation finding was necessary to determine that a singular family grouping maintained control over three companies).

Saha Thai erroneously contends that information regarding these certain home market customers' downstream sales was not necessary because the customers purportedly did not resell subject merchandise. Saha Thai Br. at 32. But this avoids that the predicate necessary information missing from the record was Saha Thai's ties to these home-market customers. Without this necessary information Commerce could not make an affiliation finding or collect and evaluate information to probe whether the customers in question were resellers of subject merchandise. *See* IDM at 9-10, Appx14296-14297. We also note that Saha Thai in its SQR appears to categorize certain of these home market customers as ▮▮▮▮▮▮ as opposed to ▮▮▮▮. *See* Saha Thai SQR at Exhibit 3, Appx96499-96509.

17

Also, Saha Thai's failure to file complete responses to Commerce's questionnaires prevented Commerce from determining whether those sales to those customers should be subject to the "arm's length" test.  Normal value is "the price at which the foreign like product is first sold . . . for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade." 19 U.S.C. § 1677b(a)(1)(B)(i).  Commerce may use sales data to calculate normal value only if it is "satisfied that the price is comparable to the price at which the exporter or producer sold the foreign like product to a person who is not affiliated with the seller," or only include those sales that have been made at arm's length, *i.e.*, in the ordinary course of trade.  19 C.F.R. § 351.403(c).  In accordance with the statute and regulation, Commerce applies an "arm's-length test" in which Commerce compares, on a model-specific basis, the weighted average prices of home market sales of subject merchandise to affiliated customers with the weighted average prices of home market sales of the same control number (or CONNUM) to unaffiliated customers.  *See Timken Co. v. United States*, 240 F. Supp. 2d 1228, 1236-37 (Ct. Int'l Trade 2002).  In determining whether affiliated party transactions are made at arm's-length prices, Commerce generally compares a respondent's reported prices to affiliated parties with the respondent's prices to unaffiliated parties at the same level of trade.  *See* Initial Questionnaire at Appendix VI, Appx3287.  In making such a comparison, Commerce has established a ratio in which sales by the exporter or producer to an affiliate be included in the normal value calculation.  *Id.*  For affiliated party sales to be considered in the normal value calculation, prices to an affiliate must be between 98% and 102%, inclusive, of prices to unaffiliated customers.  *Id.*  If affiliated party prices are, on average, less than 98% or more than 102% of unaffiliated party prices, then Commerce rejects them as outside the ordinary course of trade.  *Id.*  Thus, Commerce must know which home market customers are affiliated with a

respondent foreign company in order to calculate normal value and implement the "arm's length

test." Without this information Commerce lacks "necessary information" and must apply facts

available under 19 U.S.C. § 1677e(a)(1), as it did here.

> **2.** **Saha Thai Withheld Information That Commerce Had Requested, Failed Adequately To Respond To Commerce's Requests For Information, And Significantly Impeded The Investigation**

Commerce was also separately obligated to use facts available pursuant to 19 U.S.C.

§ 1677e(a)(2)(A)-(C).  Under 19 U.S.C. § 1677e(a)(2)(A), Saha Thai withheld information

requested by Commerce.  As explained in the preceding section, in its initial and supplemental

questionnaires, Commerce requested that Saha Thai identify and explain in detail its

relationships with all affiliated home-market customers.  *See* IDM at 8-9, Appx14295-14296;

s*ee also* Initial Questionnaire at A-2, Appx3148; Supplemental Questionnaire at 1, Appx96235.

But as Commerce explained, Saha Thai failed to report relevant information regarding Saha

Thai's "ties" with certain home-market customers.  IDM at 9, Appx14296; Final Analysis Memo

at 1-2, Appx99504-99505.  Because Saha Thai withheld this information despite Commerce's

multiple requests, the statute requires Commerce to use facts available.

Pursuant to 19 U.S.C. § 1677e(a)(2)(B), Commerce also determined that Saha Thai failed

adequately to respond to Commerce's request for details regarding its ties with certain home-

market customers in both its initial questionnaire response and supplemental questionnaire

response, thus failing to provide the requested information in the time and manner it was

requested.  *See* IDM at 8-9, Appx14295-14296.  Saha Thai's failure to provide the information to

Commerce in a timely manner or in the form or manner the agency requested further justified

Commerce's application of facts available.

Finally, Commerce determined that, pursuant to 19 U.S.C. § 1677e(a)(2)(C), by withholding information and failing to report its ties with certain home-market customers, Saha Thai significantly impeded Commerce's ability to investigate the extent to which the affiliation relationships between Saha Thai and its home-market customers affected the pricing of the subject merchandise. *See* IDM at 9, Appx14296.

### C. Commerce's Decision To Apply An Adverse Inference Is Supported By Substantial Evidence And Is Otherwise In Accordance With Law

Commerce also appropriately applied adverse inferences. Throughout Commerce's review, Saha Thai maintained an obligation to put forth its maximum effort to populate the evidentiary record with all necessary information, including all information pertaining to potential affiliations with home-market customers. *See Mukand, Ltd. v. United States*, 767 F.3d 1300, 1306 (Fed. Cir. 2014) ("{T}o avoid the risk of an adverse inference, respondents must take reasonable steps to maintain full and complete records and put forth maximum effort to investigate and obtain all requested information.") (citing *Nippon Steel 2003*, 337 F.3d at 1382). Saha Thai, however, failed to comply with its obligations. Saha Thai Br. at 47-49.

Saha Thai incorrectly maintains that Commerce never requested information pertaining to its affiliation with its ███ ] home-market customers. Saha Thai Br. at 25. But as discussed above, Commerce specifically requested all affiliation details between Saha Thai and its home-market customers in its initial and supplemental questionnaires. Saha Thai demonstrated that it understood the extent of Commerce's question when it stated that it was reporting data pertaining even to potentially affiliated entities *for consumption*. *See* Saha Thai IQR at 3, Appx82819. When Commerce reminded Saha Thai that it was requesting information relating to any potential affiliation with home-market customers (that are engaged in the sale of subject merchandise as the customer) in the supplemental questionnaire, Saha Thai reiterated that it had provided all

relevant information in its initial questionnaire response with nothing further to add. *See* Saha

Thai SQR at 2-3, Appx96467-96468.

Commerce's review of the rebuttal information provided by Wheatland indicates that

Saha Thai failed to provide that information, despite the information being at its disposal. *See*

IDM at 8-9, Appx14295-14296; Wheatland Rebuttal to Saha Thai, Appx97105-97684. This

publicly available information reported by Wheatland, which Saha Thai failed to submit or

adequately rebut, demonstrates that the following Saha Thai home-market customers are likely

affiliated through familial connections, majority stock ownerships and board memberships

shared between family members representing both Saha Thai and an affiliated home-market

customer, as well as through shared managerial employment between the entities: ███████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████ *See* Final Analysis Memo at 2, Appx99505. Thus, substantial evidence supports

Commerce's conclusion that Saha Thai failed cooperate by not acting to the "best of its ability"

and thus failed to "do the maximum that it is able to do." *Nippon Steel 2003*, 337 F.3d at 1382;

*Consol. Edison*, 305 U.S. at 229 ("Substantial evidence" means "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."). Accordingly, Commerce

properly applied the adverse inference that is permitted under 19 U.S.C. § 1677e(b). *See* IDM at

9, Appx14296; *Nippon Steel 2006*, 458 F.3d at 1352.

### D.  Saha Thai's Incomplete And Inadequate Responses Precluded Commerce From Conducting Its Typical Affiliation Analysis

Saha Thai raises several challenges to Commerce's finding—based upon an application

of partial facts available with adverse inferences—that certain companies were affiliated with

certain home market customers and faults Commerce for not "following the questionnaire

framework of making threshold decisions like affiliation early." *See* Saha Thai Br. at 28. These arguments are flawed for several reasons.

Significantly, Saha Thai omits that if it had cooperated to the best of its ability by disclosing these likely home market affiliates as directed in Commerce's initial questionnaire, then Commerce would have possessed the information necessary and the time to evaluate any claims that Saha Thai might have made concerning whether those customers may not have been affiliated or that they may not have resold subject merchandise. Saha Thai's failure to cooperate precluded Commerce from carrying out the normal evaluative process to which Saha Thai now claims that it is entitled. Indeed, Saha Thai's omission became apparent only when Wheatland submitted information to Commerce.

Because the necessary information regarding Saha Thai's connection to these potential home market affiliates was missing from the record, Commerce could not undertake its formal affiliation analysis. *See* IDM at 9, Appx14296. As a result, based on the record evidence highly indicative of affiliation as described further below, and because of Saha Thai's failure to cooperate to the best of its ability in responding to Commerce's multiple requests for accurate affiliation information, Commerce determined to find affiliation through the use of partial facts available with adverse inferences. Consequently, Commerce did not and was not required to make an independent affiliation finding. To require otherwise would avoid the meaning of facts available.

Saha Thai maintains that Commerce's potential affiliation finding amongst ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and [▮▮▮▮▮▮▮▮▮▮▮▮▮ is flawed because: (1) it was based on certain individual shareholders of Saha Thai and certain individual shareholders of these home-market customers sharing the same family name; and (2) these home market customers did not

sell subject merchandise during the period of review. *See* Saha Thai's Br. at 40-41; Final

Analysis Memo at 2, Appx99505 (citing Wheatland Rebuttal to Saha Thai at Exhibits 10 and 14,

Appx97403-97444, Appx97591-97669 and Saha Thai AQR at 9 and Exhibits A-3 and A-5,

Appx82825, Appx82857-83067, Appx83667-83669). These arguments ignore that Saha Thai

provided incomplete or sparse information with respond to Commerce's questionnaires. Thus,

Commerce was unable to complete its affiliation analysis under 19 U.S.C. §1677(33), which

resulted in Commerce applying facts available with adverse inferences to determine that these

Saha Thai home-market customers are affiliated through total or near total stock ownership and

board membership of the [          ] family. *See* IDM at 9, Appx14296; Final Analysis

Memo at 2, Appx99505; *see also* Wheatland's Administrative Case Br. (July 27, 2021), at 11-12,

Appx14028-14029, Appx99020-99021.[1]

Notably, Saha Thai made clear in its initial questionnaire response that it reported the

following three categories of home-market sales: "(1) sales to unaffiliated customers, (2) sales to

potentially affiliated entities for consumption, and (3) sales to affiliated resellers." *See* Saha

Thai's IQR at 3, Appx82819. Although Saha Thai claims that [                    ]

] and [                    ] were not reported as affiliates because they did not resell

subject merchandise during the period of review, Saha Thai still committed to providing all sales

---

[1]   Wheatland's Rebuttal to Saha Thai at Exhibit 10 names the company as [          ] with a Registration Number of [          ]. Wheatland Rebuttal to Saha Thai at Exhibit 10 at 10, Appx97414-97415. Wheatland's case brief, however, referred to the company as [          ] with a Registration Number of [          ]. Wheatland's Administrative Case Brief at 11, Appx99020. In the Final Analysis Memo, Commerce used the name [          ], Appx99505, and treated it as the same company based upon the consistent Registration Numbers. Also, we note that the name [          ] is also linked to the Registration Number by Saha Thai in Saha Thai's Supplemental Questionnaire Response at Exhibit 3, Appx96503, in which there is a line item listing [          ] as an "unaffiliated distributor" with the same Registration Number.

to "potentially affiliated entities for *consumption*" whether subject merchandise was sold to an affiliated customer for resale or consumption as an end-user.  *See* Saha Thai's IQR at 3, Appx82819 (emphasis added).  Importantly, Wheatland's submission demonstrated that [███████ ████████] was the listed director of [██████████████████ *see* Wheatland Rebuttal to Saha Thai at Exhibit 10 at 10, Appx97414-97415, and that [███████████████] was the listed director of [████████████████  *See* Wheatland Rebuttal to Saha Thai at Exhibit 14 at 10, Appx97600.  Both [████████████] and [█████████████] are directors of Saha Thai.  *See* Saha Thai AQR at 9, Appx82825.  *See Itochu Bldg. Prods., Co. v. United States*, 208 F. Supp. 3d 1377, 1384 (Ct. Int'l Trade 2017) (holding that shared directors between two entities who maintain the "potential to impact {a respondent and their customer's} decisions concerning the production, pricing, or cost of subject merchandise" demonstrate affiliation).  By not disclosing these home market affiliations, Saha Thai precluded Commerce from inquiring further into the status of whether these companies were resellers of subject merchandise.  IDM at 10, Appx14297.

Similarly, as a result of the facts available with adverse inferences drawn against Saha Thai, its home-market customers [███████████████] and [████████████████] were also found to be affiliated through stock ownership and shared board members from the [███████████████████] family.  *See* Final Analysis Memo at 2, Appx99505 (citing Saha Thai AQR at Exhibit A-5, Appx83667-83669, Wheatland Rebuttal to Blue Pipe at Exhibit 5, Appx98013-98402, and Wheatland Rebuttal to Saha Thai at Exhibit 2, Appx97115-97134).  Also, one of [████████████████ directors, [███████████████] was also a listed director of Saha Thai.  *Id.*; Saha Thai AQR at 9, Appx82825.  Saha Thai's consistent argument that neither [████████████] nor [███████████████] resold any subject merchandise during

24

the period of review merely avoids Saha Thai's responsibility to disclose the sales to affiliated customers for both resale and consumption as an end-user so that Commerce could conduct its investigative process.  *See* IDM at 9, Appx14296.  Thus, Commerce's use of facts available with adverse inferences drawn against Saha Thai to determine that [ ████████████ and [ ██ ████████████ ] were affiliated was lawful and based on substantial evidence.  *Consolo*, 383 U.S. at 620 (the possibility of drawing inconsistent conclusions from the evidence does not preclude Commerce's determination from being supported by substantial evidence).

     Also flawed is Saha Thai's contention that any alleged affiliation with [ █████████ ████ ] is a result of "mistaken identity."  *See* Saha Thai's Br. at 37.  Saha Thai claims that the confusion arises out of mixing the home-market affiliated customer [ █████████████ ████ ] with different companies identified as [ █████████████████████ ██ ] as in Exhibit 1 of Wheatland's Rebuttal to Saha Thai.  *Id.*; *see also* Wheatland Rebuttal to Saha Thai at Exhibit 1, Appx97111-97114.  Although Commerce inadvertently referenced Exhibit 1 in footnote 4 of its Final Analysis Memo, Appx99505, Exhibit 4 of Wheatland's Rebuttal to Blue Pipe was the exhibit Commerce meant to cite, as this was the exhibit specific to [ ████████████████ ] and contains the relevant information, which Exhibit 1 does not.  *See* Commerce's Final Analysis Memo at 2, n.4, Appx99505; *see also* Wheatland's Rebuttal to Blue Pipe at Exhibit 4, Appx97997-98011.  Exhibit 4 demonstrates that Saha Thai is affiliated through total or near total stock ownership and board membership of the [ ██████████ ] family.  *See* Wheatland's Rebuttal to Blue Pipe at Exhibit 4, Appx97997-98011.  Also, Exhibit 4 lists members serving as directors:  [ █████████████████████████████ ████████████████████████████ ]  *See* Wheatland's Rebuttal to Blue Pipe at Exhibit 4, Appx97997-97998.  Of those directors, [ ██ ] appear to share a familial connection with

[█████████████████], a director of Saha Thai. *See* Saha Thai's SQR at Exhibit 1, Appx96475-96482. This familial connection evidences an affiliation between Saha Thai and its home-market customer [████████████████ *See Jinko Solar Co., Ltd. v. United States*, 229 F. Supp. 3d 1333, 1337 (Ct. Int'l Trade 2017) ("The affiliation statute is sufficiently broad that Commerce can consider a family grouping's collective indicia of control, including the collective board memberships and managerial positions held by a family grouping, {as set forth} in 19 U.S.C. § 1677(33)(A), (F)").

Saha Thai's affiliation with [██████████████████ as a home-market customer also stems from majority stock ownership and board membership of the [██████████ family. *See* Wheatland's Rebuttal to Saha Thai at Exhibit 8, Appx97300-97347. Saha Thai argues that Exhibit 8, upon which Commerce based its facts available with an adverse inference determination with respect to [████████████████ mentions this entity only once. *See* Saha Thai Br. at 38; *see also* Wheatland Rebuttal to Saha Thai at Exhibit 8, Appx97300-97347. Although the possibility exists that translation discrepancies may have resulted in different name variations, such as listing out the company names [██████████████ ████████████████████████], throughout the exhibit each name unmistakably refers to the same home-market affiliate as evidenced by the same Registration Number, [██████████], regardless of whether the document is in English or Thai. *See* Wheatland Rebuttal to Saha Thai at Exhibit 8, Appx97300-App97347. Since each iteration of [█████████████████ shares the same Registration Number, Commerce reasonably treated each instance as the same company.

Nor is there merit to Saha Thai's assertion that it reported information regarding [███████ ████ to Commerce. Saha Thai Br. at 38. Saha Thai did initially report [████████████████

████████████████ ] as an affiliated customer.  Saha Thai RFI at 3-5, Appx98781-98783.

Contrary to Saha Thai's assertions, however, there is no mention of a company with the name

"[ ███████████ *Id.*  Saha Thai notes in its rebuttal to Wheatland's new factual information that

the registration number of [ ████████████████████ ], the affiliate it had reported

to Commerce was [ ███████████ ].  Appx98782.  [ ████████████████████ is a

different entity than [ ████████████████████ ] as noted by the different

registration numbers [ ███████████ ], Appx98782, versus ████████████ ], Appx97301.

Therefore, Saha Thai did not previously report any potential affiliation with [ ███████████

███████████ ].

Saha Thai also reasons that the mere repetition of the [ ███████████ ] family name

amongst [ ████████████████████ shareholders is insufficient to claim that the entity is

affiliated with Saha Thai.  *See* Saha Thai's Br. at 38.  But Saha Thai does not contest that one of

its [ ██ ] directors, [ ████████████████ ] is also the [ ████████████████████

███████████ and also appears to be its [ ████████████████ ].  *See* Saha Thai's IQR at 9,

Appx82825.  Based on this information, it appears very likely that Saha Thai violated its duty to

report such a relationship in both its initial and supplemental questionnaire responses.  Thus,

Commerce properly relied on facts available with adverse inferences to determine that this entity

is indeed affiliated with Saha Thai as a result of the lack of any rebuttal information presented to

the contrary.  *See* IDM at 9, Appx14296.

Nor is there merit to Saha Thai's argument that [ ████████████████████ did not

resell subject merchandise in the Thai market during the period of review.  Saha Thai Br. at 39.

As noted above, during and after the submission of its initial questionnaire Saha Thai was

obligated to report all sales to "potentially affiliated entities for consumption" whether subject

merchandise was sold to an affiliated customer for resale or consumption as an end-user.  *See*

Saha Thai's IQR at 3, Appx82819.  Saha Thai failed to satisfy those obligations when reporting

on sales data from [█████████████████████████].  *Id.*  Thus, Commerce's affiliation

finding based upon Wheatland's rebuttal factual information is based in substantial evidence.

*Consol. Edison*, 305 U.S. at 229 ("Substantial evidence" means "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.").  Further, because Saha

Thai failed to report these affiliated home-market customers, Commerce was precluded from

further analyzing whether they may or may not be resellers of subject merchandise.  Therefore,

Commerce's further application of adverse facts available that the parties are resellers was

supported by substantial evidence.  *Id.*

As a result of Wheatland's submission of information contained within publicly available

records, Commerce also found that [████] is a potential affiliate of Saha Thai and should have

been reported as such by Saha Thai during the review in response to the multiple opportunities

afforded by Commerce.  *See* Final Analysis Memo at 2, Appx99505 (citing Wheatland Rebuttal

to Blue Pipe at Exhibit 3, Appx97868-97995).  Saha Thai reported that [████████

████████████] is its [████████████], who also serves as [████████████████████].

*See* Saha Thai's SQR at Exhibit 2, page 1 Appx96484.  Although Saha Thai contends that this

position is not one that exerts control over either company to the extent of creating an affiliation,

Commerce specifically requested in a supplemental questionnaire that Saha Thai "state whether

Saha Thai's or any of Saha Thai affiliates' employees, stockholders, managers, directors,

officers, or department heads has an equity or a debt position in any other company involved in

the development, production, sale and/or distribution of the merchandise under review."  *See*

Supplemental Questionnaire at 1, Appx96235.  Since Commerce was made aware of this

information only as a result of Wheatland's submission, Appx97983, 97990, 97992-97994, Commerce could not assume that this was the only tie between Saha Thai and ██ ].  This supports Commerce's use of partial facts available with adverse inferences to find Saha Thai is affiliated with [██ ].  *See* Final Analysis Memo at 2, Appx99505.  Despite Saha Thai's argument that Wheatland's submission of information regarding the affiliation between ██ ] and Saha Thai was presented in APO protected materials for Blue Pipe, Saha Thai still maintained an affirmative obligation to present Commerce with sales data from all affiliated home-market customers in its Section A response or any of the supplementals issued relating to that request, whether or not their affiliation with Saha Thai was alleged in another party's brief.

Similar to this case, in *N.M. Garlic Growers Coal. & El Bosque Farm v. United States*, 352 F. Supp. 3d 1281, 1295 (Ct. Int'l Trade 2018), this Court held that if Commerce's questionnaires request information for *all* companies affiliated with a respondent and the respondent fails to provide such information after being provided with even only two opportunities to do so, "Commerce was not required to provide additional supplemental questionnaires seeking the same information."  In that case, Commerce also made use of publicly available information to identify discrepancies in the respondent's initial questionnaire response relating to inadequate affiliation information.  *Id.* at 1291-92.  Thus, with sufficient specificity in its questions requesting information regarding any potential affiliations, Commerce may lawfully resort to facts available with adverse inferences to fill in the gaps left behind by respondents.  *Id.*

### E.  Wheatland's Factual Submission Was Timely And Complied With Commerce's Regulations Regarding The Submission Of New Factual Information

Contrary to Saha Thai's assertions, Saha Thai Br. at 27, Wheatland's submission was both timely and sufficiently detailed as to what new material was being introduced and the

information it sought to rebut, clarify, or correct regarding Saha Thai's claim that it had no further affiliations to report to Commerce.

Section 351.301(c)(1)(v) of Commerce's regulations establishes the time limits "for factual information submitted to correct or clarify questionnaire responses by an 'interested party other than the original submitter.'"  *Marmen Inc. v. United States*, 545 F. Supp. 3d 1305, 1310 (Ct. Int'l Trade 2021) (quoting 19 C.F.R. § 351.301(c)(1)(v).  The regulation provides that factual information submitted to rebut, clarify, or correct, questionnaire responses must be submitted within 14 days after an initial questionnaire response and within 10 days after a supplemental questionnaire response has been filed with Commerce.  19 C.F.R. § 351.301(c)(1)(v).  Here, Wheatland requested an extension to the 10-day deadline set forth in Commerce's regulations because it required additional time to collect relevant information, and Commerce lawfully extended the deadline for Wheatland's rebuttal factual information submission to June 1, 2021.  *See* Wheatland's Request for RFI Extension (May 17, 2021), Appx13622-13623; *see also T. T. Int'l Co. v. United States*, 439 F. Supp. 3d 1370, 1383 n.15 (Ct. Int'l Trade 2020) ("Commerce may extend deadlines for good cause if those requests are submitted prior to the original deadlines.").  Wheatland submitted its rebuttal factual information in response to Saha Thai's supplemental questionnaire response on June 1, 2021, within Commerce's deadline.  *See* Commerce's RFI Extension Request Response (May 17, 2021), Apppx13625.  Consequently, Wheatland's submission was timely.

Citing 19 C.F.R. § 351.301(b)(2), Saha Thai asserts that Wheatland failed to provide a written explanation of how the information with which it was supplementing the record was to rebut, clarify, or correct any factual misinformation presented by Saha Thai.  *See* Saha Thai Br. at 24.  Saha Thai's argument rests upon the faulty assumption that the regulation required

Wheatland to explain *how* the newly submitted factual information rebuts, clarifies, or corrects Saha Thai's supplemental questionnaire response.  *Id.*  The regulation states:  "If the factual information is being submitted to rebut, clarify, or correct factual information on the record, the submitter must provide a written explanation *identifying* the information which is already on the record that the factual information seeks to rebut, clarify, or correct . . . ."  *Id.*  (emphasis added).  Thus, the controlling verb of the sentence within 19 C.F.R. § 351.301(b)(2) requires only that the submitting party *identify* the information being rebutted, clarified, or corrected.  Here, Wheatland identified itself as the interested party, clarified that the newly submitted information was intended to rebut Saha Thai's affiliated home-market customer information, and listed the date on which the information was submitted.  Commerce, therefore, lawfully accepted the information.  *See* Wheatland's RFI to Saha Thai's SQR (Jun. 1, 2021), Appx97105-97684.

Relying on this Court's holding in *Sigma Corporation v. United States*, 841 F. Supp. 1255, 1267 (Ct. Int'l Trade 1993), Saha Thai contends that respondents are not required to be "mind-readers" when considering what information Commerce requires for its calculations.  Saha Thai Br. at 49.  But in *Sigma Corporation*, this Court asked only for Commerce to ensure it was specific enough in its questionnaire instructions.  *Id.*  ("Commerce should have … provided respondents with supplemental questionnaires requesting additional proof regarding their independence.")  Conversely, here Commerce clearly requested Saha Thai's affiliation information with all home-market customers in both its initial and supplemental questionnaires, but Saha Thai chose not to respond fully to those questionnaires.

### F.  Commerce Complied With 19 U.S.C. § 1677m(d)

Nor is there merit to Saha Thai's contention that Commerce failed to provide Saha Thai with an opportunity to rebut Commerce's affiliation determination.  Saha Thai Br. at 44-45.

Saha Thai references Commerce's duty to notify respondents of any deficiencies in the data provided to allow for the party to "remedy or explain the deficiency." Saha Thai Br. at 50; 19 U.S.C. § 1677m(d). But Saha Thai ignores that it was provided with multiple opportunities to furnish necessary information requested regarding affiliations with [███] home-market customers. *See* IDM at 8-9, Appx14295-14296.

This Court has held that Commerce fulfills its obligation to provide a respondent with an opportunity to rebut a claim with additional evidence under 19 U.S.C. § 1677m(d) so long as Commerce:

> {I}ssues a supplemental questionnaire specifically pointing out and requesting clarification of the party's deficient responses . . . Nothing in the language of the statute compels Commerce to treat intentionally incomplete data as a deficiency and then to give a party that has intentionally submitted incomplete data an opportunity to remedy as well as to explain.

*Linyi Chengen Imp. & Exp. Co. v. United States*, 391 F. Supp. 3d 1283, 1287 (Ct. Int'l Trade 2019) (holding that a respondent fails to cooperate to the best of its abilities by not disclosing the full extent of its familial affiliations as requested by Commerce's initial and supplemental questionnaires) (cleaned up).

Contrary to Saha Thai's assertions, Commerce's supplemental questionnaire inquired further as to the nature of Saha Thai's affiliation with its home-market customers within the supplemental questionnaire. *See* Supplemental Questionnaire, Appx96233-96237. Commerce asked Saha Thai to "provide a complete family tree for [███████████████] for Saha Thai…{and to} identify any member of these families that has any role in any company involved in the development, production, sale and/or distribution of the merchandise under review." *Id.* at 1, Appx96235. Also, Commerce clarified that Saha Thai was to "state whether Saha Thai's or

any of Saha Thai's affiliates' employees, stockholders, managers, directors, officers, or department heads has an equity or a debt position in any other company involved in the development, production, sale and/or distribution of the merchandise under review." *Id.*  This satisfied Commerce's statutory obligations under section 1677m(d).  *See Shandong Dongfang Bayley Wood Co. v. United States*, 375 F. Supp. 3d 1339, 1345 (Ct. Int'l Trade 2019) ("Commerce satisfies its obligations under § 1677m(d) when it issues a supplemental questionnaire specifically pointing out and requesting clarification of the party's deficient responses.") (cleaned up).

 Saha Thai's failure to provide Commerce with the necessary affiliation information despite Commerce's multiple requests substantiates Commerce's finding that Saha Thai failed to cooperate by not acting to the best of its ability.  *See Hyundai Elec. & Energy Sys. Co. v. United States*, 15 F.4th 1078, 1090 (Fed. Cir. 2021) (holding that an "adverse inference may be appropriate where an interested party has been notified of a defect in its questionnaire response yet continues to provide a defective response."); *Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1361 (Fed. Cir. 2017) ("{Appellees} had already failed to provide the information requested in Commerce's original questionnaire, and the supplemental questionnaire notified {Appellees} of that defect. § 1677m(d) does not require more.").

Saha Thai attempts to analogize its situation to several cases in which "the respondent submitted data and information to Commerce fully believing the submitted data and information fully satisfied Commerce's requirements."  Saha Thai Br. at 45.  Here, however Commerce concluded that Saha Thai failed to provide complete responses to its questionnaires and supplemental questionnaires.  IDM at 9, Appx14296.  Commerce is not obligated to notify Saha Thai of its own seemingly intentional reporting deficiencies.  As the Federal Circuit explained in

33

*Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1384 (Fed. Cir. 2016), 19

U.S.C. § 1677m(d) does not require Commerce to consider an "intentionally incomplete" report

as a "deficiency:"

> But nothing in that language compels Commerce to treat
> intentionally incomplete data as a "deficiency" and then to
> give a party that has intentionally submitted incomplete
> data an opportunity to "remedy" as well as to "explain."
> The consequence of such a reading would be to permit
> respondents to submit fraudulent data with the knowledge
> that, should their misconduct come to light, they can
> demand an opportunity to remedy their intentionally
> deficient data and avoid the otherwise authorized adverse
> inferences. The language of § 1677m(d) does not compel
> that reading. It permits Commerce not to deem such
> misconduct to be a "deficiency" or to provide only an
> opportunity to "explain" (but not "remedy") such
> misconduct.

*Id.*

But even if the Court believes that Commerce did not give Saha Thai sufficient notice of

the specific deficiency, this Court has held:

> Inherent in the requirement of § 1677m(d) is a finding that
> Commerce was or should have been aware of the
> deficiency in the questionnaire response. When a
> respondent provides seemingly complete, albeit completely
> inaccurate, information, § 1677m(d) does not require
> Commerce to issue a supplemental questionnaire seeking
> assurances that the initial response was complete and
> accurate. In other words, Commerce is not obligated to
> issue a supplemental questionnaire to the effect of, "Are
> you sure?"

*ABB Inc. v. United States*, 355 F. Supp. 3d 1206, 1222 (Ct. Int'l Trade 2018).  Here, Saha Thai

provided a seemingly complete and accurate list of its home market affiliates, and Commerce

was not obligated to reissue multiple supplemental questionnaires asking Saha Thai, "Are you

sure?"  As Saha Thai points out on page 45 its brief, this Court has declined to apply the holding

in *ABB Inc.* when for example, the party in question itself provides Commerce with the information alerting it to the deficiency and when Commerce receives such information well before the Preliminary Results.  *See Hyundai Heavy Indus. v. United States*, 485 F. Supp. 3d 1380, 1391-92 (Ct. Int'l Trade 2020) (Court held that Commerce was required to issue a supplemental questionnaire, distinguishing *ABB Inc.*).  Here, by contrast, Commerce was alerted to deficiencies in Saha Thai's reporting only through Wheatland's submission, and Wheatland's submission was received days before the publication of the Preliminary Results.  Thus, even if the Court finds that Commerce's supplemental questionnaires did not satisfy the requirements of 19 U.S.C.

§ 1677m(d), the Court should still be guided by the reasoning in *ABB Inc.*  To hold otherwise would create a large incentive for respondents to withhold information.

### III.   Commerce's Determination That A Particular Market Situation Existed In Thailand During The Period Of Review Is Supported By Substantial Evidence

Although in Section IV, below, we request a voluntary remand so that Commerce can reconsider its application of a particular market situation adjustment, substantial evidence supports Commerce's determination that a cost-based particular market situation existed in Thailand during the period of review with respect to hot rolled coil used in the production of subject merchandise.  *See* IDM at 23, Appx14310.  The basis for Commerce's determination was the reasonable evaluation of the cumulative effects of subsidization of hot rolled coil by the Government of Thailand and the distortion of hot rolled coil import prices due to overcapacity, dumping, and subsidization.  *Id.*  Saha Thai's main arguments are that the conditions on which Commerce's determination relies are not particular to Thailand and that such conditions had improved during and before the period of review.  *See* Saha Thai Br. at 13-14.  There is no merit to either claim.

A. **Legal Framework For Determining That A Particular Market Situation Exists**

The antidumping duty statute directs Commerce to determine whether subject merchandise is being, or is likely to be, sold at less than fair value in the United States by comparing the U.S price and the normal value of subject merchandise.  19 U.S.C. § 1675(a)(2)(A).  In doing so, the statute further directs that "a fair comparison shall be made between the export price or constructed export price and normal value."  19 U.S.C. § 1677b(a); *see also Torrington Co. v. United States*, 68 F.3d 1347, 1352 (Fed. Cir. 1995).

Generally, export price is the price at which subject merchandise is first sold in the United States, and normal value is the price at which the merchandise is sold in the exporting country.  *See id.* §§ 1677a(a), 1677b(a)(1).  Within this framework, normal value is generally determined by reference to sales of merchandise in the home market, sales of merchandise in a third country, or a constructed value of the merchandise consisting of the cost of manufacturing selling, general, and administrative expenses, profit, and packing expenses.  *See* 19 U.S.C. §§ 1677b(a)(1), (a)(4), (e).

When the record includes home market sales, several considerations affect whether Commerce will rely on these sales in calculating normal value.  In particular, under 19 U.S.C. § 1677b(a)(1)(C)(iii), Commerce may consider home market sales unusable when "the particular market situation in the exporting {home market} country does not permit a proper comparison with the export price or constructed export price."  *Id.*  Also, section 1677b(a)(1)(B)(ii) provides that Commerce may use sales to a third-country market, but only if Commerce does not determine that a particular market situation prevents a proper comparison with United States price.  19 U.S.C. § 1677b(a)(1)(B)(ii)(III).

36

A particular market situation prevents a proper comparison with export price as determined by Commerce, thus rendering relevant sales and transactions to be outside of the ordinary course of trade.  19 U.S.C. § 1677(15)(C).  Although the statute does not concretely define what may constitute a "particular market situation," the SAA provides a non-exhaustive list of examples of what might be considered a particular market situation.  *See* SAA, H.R. Doc. 103-316, vol. 1, at 822.  For instance, a particular market situation might exist when the home market consists of a single sale, when there is "government control over pricing to such an extent that home market prices cannot be considered to be competitively set," or when the demand patterns in the foreign market are different from those in the United States.  *Id.*

In Commerce's particular market situation analysis, Commerce first determines whether substantial evidence supports the finding of a particular market situation during the period of review.  If so, then Commerce proceeds to the evaluation of what appropriate adjustment, if any, should be applied.  *See, e.g., Common Alloy Aluminum Sheet from the Sultanate of Oman: Final Affirmative Determination of Sales at Less Than Fair Value and Negative Determination of Critical Circumstances*, 86 Fed. Reg. 13,328 (Dep't of Commerce Mar. 8, 2021) (final determ.), and accompanying IDM at cmt 1.

### B.  Commerce's Particular Market Situation Analysis

Commerce concluded that a particular market situation existed based upon its reasonable evaluation of the cumulative effects of subsidization of hot rolled coil by the Government of Thailand and the distortion of hot rolled coil import prices due to overcapacity, dumping, and subsidization.  *See* IDM at 23, Appx14310.

With respect to subsidization of hot rolled coil, Commerce has previously found that the Government of Thailand unfairly subsidizes Thai hot rolled coil exporters/producers.  *See Final*

*Affirmative Countervailing Duty Determination:  Certain Hot-Rolled Carbon Steel Flat Products from Thailand*, 66 Fed. Reg. 50,410 (Dep't of Commerce Oct. 3, 2001) (final determ.).  Thus, imports of hot rolled coil into the United States are subject to a countervailing duty rate of 2.38%.  *See* IDM at 26, Appx14313 (citing *Certain Hot Rolled Carbon Steel Flat Products from Thailand: Final Results of the Third Expedited Five Year (Sunset) Review of the Countervailing Duty Order*, 84 Fed. Reg. 27,085 (Dep't of Commerce June 11, 2019) (final results of sunset review and accompanying IDM) (*HRC From Thailand Sunset Review*).  Saha Thai contends that because the original subsidy finding was from 2001, it is outdated and irrelevant to the current review period.  Saha Thai Br. at 16.  In the most recent sunset review from 2019, however, Commerce stated: "Commerce finds that countervailable subsidies would be likely to continue or recur in the event that the {countervailing duty} Order was revoked as the subsidy programs found countervailable in this investigation continue to exist" and, further, Saha Thai has not presented any evidence that such countervailable subsidization has ceased since the last administrative review of the countervailing duty order.  IDM at 26-27, Appx14313-14314 (citing *HRC from Thailand Sunset Review*).  Thus, this countervailable subsidization describes the current situation and remains relevant to Commerce's analysis regarding whether a particular market situation exists during the period of review.

Citing recent precedent from this Court, Saha Thai also contends that the existence of a countervailing duty order is insufficient to show contribution to a particular market situation.  Saha Thai Br. at 16-17.  But this precedent is not binding on this Court.  *See Algoma Steel Corp. v. United States*, 865 F.2d 240, 243 (Fed. Cir. 1989).  A countervailable subsidy represents a distortion in the market and is appropriately considered in a particular market situation analysis.  Specifically, the Government of Thailand's subsidization of Thai steel producers would exert

downward pressures on hot rolled coil prices in Korea, in connection with transactions involving consumers of hot rolled coil.  This would result in distortions in the hot rolled coil input.  *See, e.g.*, *Corrosion-Resistant Steel Products From the Republic of Korea: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017– 2018*, 85 Fed. Reg. 15,114 (Dep't of Commerce Mar. 17, 2020) (final results) and accompanying IDM at 21.

Commerce also concluded that the distortion of hot rolled coil import prices due to overcapacity, dumping, and subsidization contributed to the existence of a particular market situation in Thailand.  Appx14313 (citing Saha Thai PMS RFI at CAP-1, Appx10755-10756, Appx91678-91679; Wheatland's Particular Market Situation Allegation – Quantitative Submission (Jan. 4, 2021) at Exhibit 5, Appx8978-9030, Appx90737-90789; PDM at 8, Appx13684).  Saha Thai argues that global steel overcapacity cannot be a basis for a particular market situation since a global problem cannot be said to be particular.  Saha Thai Br. at 13. Saha Thai continues, arguing that "{e}ven if the effects of global overcapacity manifest differently in different markets, however, that does not make the situation 'particular' to those markets."  *Id.*  But Saha Thai does not cite anything to support this separate point as there is no specific definition of what "particular" means.  Thus, it is reasonable to determine, as Commerce did, that the different manifestations of the effects of the global overcapacity issue between countries do result in market situations particular to that country.  IDM at 26, Appx14313.  For example, Saha Thai reported that it paid all duties on hot rolled coil imports subject to Thai antidumping orders at the time of entry.  *See* PDM at 9, Appx13685 (citing Saha Thai PMS RFI at 33, Appx10068, Appx90991 and Saha Thai Section C Questionnaire Response (Dec. 10, 2020) at 35-36, Appx89797-89800, Appx89796-89799).  Saha Thai also reported receiving duty

drawback on those purchases.  *Id.*  Given that any antidumping, countervailing, or safeguard duties paid by Saha Thai at the time of entry were reimbursed by the Government of Thailand, those measures, addressing price distortions and injury caused by global steel overcapacity, were not offset.  *Id.*  Consequently, the Government of Thailand's response to global steel overcapacity introduced particular market conditions within the Thai market that Commerce has discretion to address, including by determining that a particular market situation exists.  Saha Thai does not address this point from the IDM in its brief.

Saha Thai submitted specific record information, alleging that such information tended to show that global overcapacity decreased in recent years, including the period of review.  Saha Thai Br. at 15-16.  But Commerce reasonably determined that global overcapacity was still significant, accounting for over 25% of global production in 2019.  IDM at 26, Appx14313 (citing Saha Thai PMS RFI at CAP-1, Appx91678-91679).  Further, the record demonstrates that China still had over 155 million metric tons of excess capacity during the period of review, accounting for almost one third of total global excess capacity (*i.e.*, 487 metric tons).  *Id.*  In addition, despite that overcapacity has declined, the record further demonstrates that the prices of hot rolled coil imports have not changed significantly over the past five years, a period over which Commerce has previously determined that a particular market situation existed.  IDM at 26 (citing Wheatland's Particular Market Situation Allegation – Quantitative Submission at Exhibit 5, Appx90737-90789; PDM at 8, Appx13684).  Thus, based on the cumulative effects of the two factors that Commerce analyzed, Commerce's affirmative particular market situation determination was supported by substantial evidence.

**IV.    The Court Should Grant The Government's Request For A Voluntary Remand So That Commerce May Reconsider Its Particular Market Situation Adjustment**

As explained in the preceding section, although we submit that Commerce's conclusion that a particular market situation exists is supported by substantial evidence, we respectfully request a remand so that Commerce may reconsider its particular market situation adjustment. When Commerce issued its Final Results on December 8, 2021, there was no governing precedent regarding Commerce's practice of applying a particular market situation outside of the context of the use of constructed value. In the intervening time, the Federal Circuit held that Commerce is not permitted to make a particular market situation adjustment when not making comparisons based on constructed value. *See Hyundai Steel Co., Ltd. v. United States*, 19 F.4th 1346 (Fed. Cir. 2021). Here, because all of Saha Thai's U.S. export price sales matched to sales of identical or similar control numbers in its home-market sales, it was not necessary to match to constructed value under 19 U.S.C. § 1677b(b). Thus, we respectfully request that the Court remand this case to Commerce to recalculate the weighted-average dumping margin without making a cost-based particular market situation adjustment in light of *Hyundai Steel*. *See SKF USA Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001) ("When an agency action is reviewed by the courts, . . . the agency may request a remand, without confessing error, to reconsider its previous position.").

**V.    Saha Thai Failed To Exhaust Its Argument Regarding The Inclusion Of Dual-Stenciled Pipe In Its Administrative Case Brief**

Saha Thai requests that the Court hold that Commerce unlawfully included the sales and cost data for dual-stenciled pipe in its final margin calculations for the administrative review at issue. Saha Thai Br. at 52. Saha Thai, however, failed to raise this issue at any point before Commerce during the administrative review. Therefore, Saha Thai has failed to exhaust its administrative remedies and the Court should decline to address this claim. *See Corus Staal B.V.*

41

*v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007); *accord Clearon Corp. v. United States*, 800 F. Supp. 2d 1355, 1362 (Ct. Int'l Trade 2011).

Case briefs must "present all arguments that continue in the submitter's view to be relevant to {Commerce's} . . . final results, including any arguments presented before the date of publication of the . . . preliminary results." 19 C.F.R. § 351.309(c)(2). Here, Saha Thai failed to raise the issue of the inclusion of dual-stenciled pipe in Commerce's final margin calculations in its case briefs before Commerce. *See* Saha Thai Administrative Case Br. (July 21, 2021), Appx13929-13991; Saha Thai Administrative Rebuttal Br. (Aug. 16, 2021), Appx14146-14189.

Section 2637(d) provides that the court shall, where appropriate, require the exhaustion of administrative remedies. 28 U.S.C. § 2637(d). The Federal Circuit has stated that the language of section 2637(d) indicates a congressional intent that, absent a strong contrary reason, parties should exhaust their remedies before the pertinent administrative agencies. *See Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017). By not raising this issue, Commerce did not have the opportunity to address the issue. Saha Thai itself claims now before the Court that: "There is no question that, during the underlying AD review, both Commerce and Saha Thai believed that the definition of "subject merchandise" included dual-stenciled pipe." Saha Thai Br. at 53. Saha Thai did not avail itself of the opportunity to raise this issue before Commerce. Thus, it cannot raise the argument for the first time on appeal before this Court.

Saha Thai relies on two cases to support its request. Saha Thai Br. at 54. Neither case, however, involves an instance in which the failure to exhaust administrative remedy was at issue. Also, as Saha Thai correctly notes, this Court remanded Commerce's final scope ruling in a different segment of this proceeding and held that certain dual-stenciled pipe was not subject to the *Order*. On remand, under protest, Commerce revised its earlier findings and determined that

42

certain dual-stenciled pipe was not subject the *Order*. Amended Final Results of

Redetermination Pursuant to Court Remand, *Saha Thai Steel Pipe Pub. Co. v. United States*, No.

20-133, April 22, 2022, ECF No. 69. Originally, we defended Commerce's determination that

dual-stenciled pipe is within the scope of the *Order* based upon the *Order*'s language and

consideration of the sources identified in 19 C.F.R. § 351.225(k)(1). Administrative Record,

*Saha Thai Steel Pipe Pub. Co. v. United States*, No. 20-133, Aug. 26, 2020, ECF No. 17-4;

Response to Motion for Judgment on the Agency Record, *Saha Thai Steel Pipe Pub. Co. v.*

*United States*, No. 20-133, March 26, 2021, ECF No. 37.

     As of the date of submission of this brief, the Court has not issued a final ruling on

Commerce's final results of redetermination in Court No. 20-00133, and any such ruling is

subject to appeal. Ultimately, however, Saha Thai had an affirmative obligation to raise and

preserve any potential arguments it had regarding Commerce's inclusion of certain sales and cost

data in its final margin calculations, which Saha Thai failed to do.

## CONCLUSION

     For these reasons, we respectfully request that the Court deny Saha Thai's Rule 56.2

motion for judgment on the agency record and sustain the challenged determination in its

entirety, with the exception of the particular market situation calculation adjustment issue for

which we have requested a voluntary remand.

                             Respectfully submitted,

                             BRIAN M. BOYNTON
                             Principal Deputy Assistant Attorney General

                             PATRICIA M. MCCARTHY
                             Director

                                                s/ Franklin E. White, Jr.
                                                FRANKLIN E. WHITE, JR.
OF COUNSEL:                                      Assistant Director

JONZACHARY FORBES
U.S. Department of Commerce                      s/ Elizabeth Anne Speck
Office of Chief Counsel for Trade                ELIZABETH ANNE SPECK
Enforcement and                                  Senior Trial Counsel
Compliance                                       Department of Justice
1401 Constitution Avenue, NW.                    Civil Division
Washington, DC 20230-0001                        Commercial Litigation Branch
Telephone: (240) 449-5906                        P.O. Box 480
Facsimile: (202) 482-8184                        Ben Franklin Station
Email: JonZachary.Forbes@trade.gov               Washington, DC 20044
                                                 Telephone:  (202) 307-0369

July 15, 2022

                                                 Attorneys for the United States

*PUBLIC VERSION*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the Rules of this Court and the

Court's scheduling order in that it contains 12,971 words, including text, footnotes, and

headings.


/s/ Elizabeth Anne Speck