# UNITED STATES COURT OF INTERNATIONAL TRADE

*Before*: The Honorable Stephen A. Vaden, Judge

| | |
|---|---|
| SAHA THAI STEEL PIPE PUBLIC COMPANY LIMITED, <br><br> Plaintiff, <br> and <br><br> THAI PREMIUM PIPE COMPANY LTD., <br><br> Plaintiff-Intervenor, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br> and <br><br> WHEATLAND TUBE COMPANY, NUCOR TUBULAR PRODUCTS INC., <br><br> Defendant-Intervenors. | Court No. 21-00627 <br><br> **NONCONFIDENTIAL** <br><br> *Confidential information is contained in brackets on pages i, 1, 13-15, 18-24, and 26.* <br><br> *Such information has been redacted in the Public Version* |

## PLAINTIFF SAHA THAI'S REPLY BRIEF IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD

Daniel L. Porter
James P. Durling
James C. Beaty
Ana Amador

**Curtis, Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, NW
Washington, DC, 20006

**August 26, 2022**

NONCONFIDENTIAL

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................... 1

ARGUMENT .................................................................................................................. 3

I.   FEDERAL CIRCUIT PRECEDENT REQUIRES A REMAND WITH
     INSTRUCTIONS TO RECALCULATE SAHA THAI'S AD MARGIN
     WITHOUT A PMS ADJUSTMENT ........................................................................ 3

     A.   Defendant Was Correct To Seek Remand To Calculate Saha Thai's AD
          Margin Without A PMS Adjustment. ........................................................... 3

     B.   Defendant-Intervenors Arguments Opposing Remand Can Be Easily
          Dismissed ...................................................................................................... 4

     C.   The Factual Basis For Commerce's PMS Finding Is No Longer Relevant
          Here ............................................................................................................. 10

II.  COMMERCE DID NOT COMPLY WITH THE STATUTORY
     REQUIREMENTS TO APPLY ADVERSE FACTS AVAILABLE ................... 11

     A.   Saha Thai Fully Cooperated By Responding to All Requests for Additional
          Information From Commerce ...................................................................... 11

     B.   For [                    ] Home-Market Customers, Additional Information
          About Affiliation Was Not "Necessary" .................................................... 15

     C.   Commerce's Subsidiary Conclusion That Saha Thai Was Affiliated With
          [                    ] Is Not Supported Substantial Evidence And Is Not
          Otherwise In Accordance With Law .......................................................... 18

     D.   In Any Event, Commerce Never Notified Saha Thai Of Alleged
          Deficiencies Concerning Affiliated Home-Market Customers And
          Therefore Its Decision To Appy Adverse Facts Available Was Unlawful . 21

III. COMMERCE MUST REVISE THE CALCULATION OF THE AD
     ASSESSMENT RATE IN THIS REVIEW BECAUSE IT INCLUDES OUT-OF
     SCOPE MERCHANDISE ..................................................................................... 26

CONCLUSION ............................................................................................................. 33

# TABLE OF AUTHORITIES

## Cases

*ABB Inc. v. United States,*
  355 F. Supp. 3d 1206 (Ct. Int'l Trade 2018) ............................................................. 26

*Agro Dutch Indus. Ltd. v. United States,*
  508 F.3d 1024 (Fed. Cir. 2007) .................................................................................. 31

*Bendure v. United States,*
  554 F.2d 427 (Ct. Cl. 1977) ........................................................................................ 30

*Bluescope Steel v. United States,*
  548 F. Supp. 3d 1351 (Ct. Int'l Trade 2021) .............................................................. 15

*Borlem S.A.-Empreedimentos Industriais v. United States,*
  913 F.2d 933 (Fed. Cir. 1990) ............................................................................... 28, 29

*Consol. Bearings Co. v. United States,*
  348 F.3d 997 (Fed. Cir. 2003) .................................................................................... 31

*Corus Staal BV v. U.S.,*
  502 F.3d 1370 (Fed. Cir. 2007) ............................................................................. 29, 30

*Dillinger France S.A. v. United States,*
  981 F.3d 1318 (Fed. Cir. 2020) .................................................................................... 9

*Essar Steel Ltd. v. United States,*
   678 F.3d 1268 (Fed. Cir. 2012) .................................................................................. 11

*Heavy Indus. Co., Ltd. v. United States,*
  393 F. Supp. 3d 1293 (Ct. Int'l Trade 2019) .............................................................. 18

*Hung Vuong Corp. v. United States,*
  483 F. Supp. 3d 1321 (Ct. Int'l Trade 2020) .............................................................. 15

*Hyundai Elec. & Energy Sys. Co. v. United States,*
  No. 20-00108, Slip Op. 22-42 (Ct. Int'l Trade May 10, 2022) .................................... 22

*Hyundai Steel Co., Ltd. v. United States,*
  19 F.4th 1346 (Fed. Cir. 2021) ............................................................................. passim

*Itochu Bldg. Prods. v. United States,*
  733 F.3d 1140 (Fed. Cir. 2013) .................................................................................. 31

*Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States,*
  519 F. Supp. 3d 1224 (Ct. Int'l Trade 2021) .............................................................. 15

*LG Chem, Ltd. v. United States,*
  534 F. Supp. 3d 1386 (Ct. Int'l Trade 2021) ................................................................ 9

*Linyi Chengen Imp. & Exp. Co.*,
    391 F. Supp. 3d 1283 (Ct. Int'l Trade 2019) .......................................................... 22, 23

*McCarthy v. Madigan*,
    503 U.S. 140 (1992) ...................................................................................................... 30

*N.M. Garlic Growers Coal. & El Bosque Farm v. United States*,
    352 F. Supp. 3d 1281 (Ct. Int'l Trade 2018) ............................................................... 19

*Nexteel Co. v. United States*,
    Consol. Court. No. 20-03868, Slip Op. 22-69 (CIT June 16, 2022) ............................. 7

*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003) ................................................................................... 11

*Papierfabrik August Koehler SE v. United States*,
    843 F.3d 1373 (Fed. Cir. 2016) ................................................................................... 25

*Rhone Poulenc, Inc. v. United States*,
    899 F.2d 1185 (Fed. Cir. 1990) ................................................................................... 19

*Saha Thai Steel Pipe Co., Ltd. v. United States*,
    Consol. Court No. 18-00214, Slip Op. 20-181 (CIT December 21, 2020) ................ 7, 8

*Saha Thai Steel Pipe Pub. Co. v. United States*,
    547 F. Supp. 3d 1278 (Ct. Int'l Trade 2021) .......................................................... 27, 28

*Saha Thai Steel Pipe Public Company v. United States*,
    Court No. 20-133, Slip Op. 22-99 (Ct. Int'l Trade, Aug. 25, 2022) ...................... 28, 32

*Shandong Dongfang Bayley Wood Co. v. United States*,
    375 F. Supp. 3d 1339 (Ct. Int'l Trade 2019) ............................................................... 22

*Sonoco Steel Tube Div. Ferrum, Inc. v. United States*,
    12 CIT 990 (1988) ........................................................................................................ 29

*Ta Chen Stainless Steel Pipe v. United States*,
    23 CIT 804 (1999) ........................................................................................................ 22

*Thai Pineapple Pub. Co. v. United States*,
    187 F.3d 1362 (Fed. Cir. 1999) ..................................................................................... 9

*Union Steel v. United States*,
    823 F. Supp. 2d 1346 (Ct. Int'l Trade 2012) ............................................................... 16

*United States v. L. A. Tucker Truck Lines, Inc.*,
    344 U.S. 33  (1952) ...................................................................................................... 30

*Walsh v. United States*,
    151 Ct. Cl. 507 (1960) .................................................................................................. 30

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
    716 F.3d 1370 (Fed. Cir. 2013) ................................................................................... 15

**Statutes**

19 U.S.C. § 1677m(d) ........................................................................ 21, 22, 25

19 U.S.C. § 1677b ................................................................................ *passim*

19 U.S.C. § 1675(a)(2) .................................................................................. 32

19 U.S.C. § 1677(15) ..................................................................................... 6

19 U.S.C. § 1677(33) .................................................................................... 12

19 U.S.C. § 1677f ............................................................................. 16, 23, 24

28 U.S.C. § 2637(d) ..................................................................................... 29

**Regulations**

19 C.F.R. § 351.403 ..................................................................................... 16

19 C.F.R. § 351.406 ..................................................................................... 16

19 C.F.R. § 351.301 ..................................................................................... 23

19 C.F.R. § 351.309 ..................................................................................... 29

**Administrative Decisions**

*Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of
Antidumping Duty Administrative Review and Final Determination of No Shipments;
2019-2020*, 86 Fed. Reg. 69,620 (Dec. 8, 2021) ........................................... 28

*Notice of Scope Rulings*, 85 Fed. Reg. 60,762 (Sept. 28, 2020) ....................................... 27

*Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of
Antidumping Duty Administrative Review and Final Determination of No Shipments,
In Part; 2018-2019*, 86 Fed. Reg. 7,259 (Jan. 27, 2021) ............................................. 27

NONCONFIDENTIAL

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff's opening brief set forth three primary arguments demonstrating why Commerce's final AD review determination could not be sustained, rather why this case must be remanded back to Commerce. Vis-à-vis one of these arguments—addressing Commerce's decision to apply a particular market situation ("PMS") cost adjustment—Defendant now admits that the combination of Federal Circuit precedent and the facts of this case require a remand to Commerce so that Commerce can re-calculate Saha Thai's AD margin without applying the PMS cost adjustment. Although Defendant-Intervenors still attempt to justify Commerce's application of a PMS-cost adjustment, their arguments have little support in the law and are based on factual assumptions not supported by the record.

And so, given that it appears that this case will definitely be remanded back to Commerce, the only question is how this Court should address the other two aspects challenged by Plaintiff. We respectfully submit that the court should address these other two issues. Commerce's affiliation conclusions with respect to the [    ] customers, who are not resellers of subject merchandise, must fail because Commerce cannot demonstrate that the alleged missing information was "necessary" for Commerce's AD margin calculation. Likewise, concerning Commerce's decision to partially apply "facts available" with an adverse inference, neither Defendant nor Defendant-Intervenor have adequately rebutted Plaintiff's arguments that Commerce's conclusion that [      ] was affiliated with Saha Thai is legally unsound and is not supported by the evidentiary record.

Finally, in light of this Court's recent affirmation of Commerce's remand redetermination that dual-certified pipe is not subject to the order defining the scope of this review, this AD review must be remanded so that Commerce can revise its AD margin calculation to remove those improperly included sales of out-of-scope merchandise.  We note that neither Defendant nor Defendant-Intervenor undertake any attempt to address the substance of this argument.  Rather, both attempt to persuade the court to just ignore this argument.  But these attempts have no support under past court precedent and therefore fail.

# ARGUMENT

## I. FEDERAL CIRCUIT PRECEDENT REQUIRES A REMAND WITH INSTRUCTIONS TO RECALCULATE SAHA THAI'S AD MARGIN WITHOUT A PMS ADJUSTMENT

### A. Defendant Was Correct To Seek Remand To Calculate Saha Thai's AD Margin Without A PMS Adjustment.

Defendant requests leave from this Court to reconsider its application of a PMS adjustment to Saha Thai's dumping margin in this review. Def. Br. at 41.  Defendant notes that there is binding precedent holding "that Commerce is not permitted to make a particular market situation adjustment when not making comparisons based on constructed value."  Def. Br. at 41 (citing *Hyundai Steel Co., Ltd. v. United States*, 19 F.4th 1346 (Fed. Cir. 2021) Defendant acknowledges that "all of Saha Thai's U.S. export price sales matched to sales of identical or similar control numbers in its home-market sales, it was not necessary to match to constructed value under 19 U.S.C. §1677b(b)." Def. Br. at 41.  As a result, Defendant "request{s} that the Court remand this case to Commerce to recalculate the weighted-average dumping margin <u>without making a cost-based particular market situation adjustment</u> in light of *Hyundai Steel*." Def. Br. at 41 (emphasis added).

Defendant's request for a remand to redo the calculation is consistent with the ruling in *Hyundai Steel*.  The Federal Circuit found that the statute "clearly indicates that Congress intended to limit PMS adjustments to calculations pursuant to the 'constructed value' {} and not to authorize Commerce to make such adjustments pursuant to the 'cost of production.'" *Hyundai*, 19 F.4th at 1352.  Further, the court held that the statute does

not "authorize Commerce to use the existence of a PMS as a basis for adjusting a respondent's costs of production to determine whether a respondent has made home market sales below cost." *Hyundai*, 19 F. 4th at 1348.  That is, however, what Commerce did here, stating that "{w}e disagree with Saha Thai's assertion that Commerce is legally precluded from making a PMS adjustment to Saha Thai's COP in the context of the sales-below-cost test."  Final IDM at 21, Appx14310.  Further, all of Saha Thai sales during the period were analyzed on a price-to-price basis.  *See* Commerce's Output Log for Final Results, Appx 99672.

The record is clear that there were no comparisons based on constructed value.  In addition, there is no ambiguity as to how the Federal Circuit's ruling in *Hyundai* applies in this case.  This Court should, therefore, grant the remand request.

## B.     Defendant-Intervenors Arguments Opposing Remand Can Be Easily Dismissed

Defendant-Intervenor Wheatland Tube argues that "the scope of this requested remand is based on an overly broad reading of the Federal Circuit's holding in *Hyundai Steel*."  Def.-Inv. Br. at 19.  Wheatland argues that "{the Federal Circuit} was not foreclosing some type of PMS adjustment in all cases where normal value is based on home market sales, only that such an adjustment was not a proper basis for adjusting costs for the purposes of the sales-below-cost test."  *Id.* at 20.  Wheatland then offers two potential paths for applying a PMS adjustment that impacts cost when normal value is based on home-market sales, but each is without support in the law or in this record.

The first path would have Commerce find that there is some aspect of hot-rolled steel prices in Thailand that "does not permit a proper comparison with the export price or constructed export price." *Id.* at 20 (quoting *Hyundai*, 19 F. 4th at 1355). There is, no evidence in this record, however, that would support such a finding. Essentially, Wheatland is asking Commerce to find that the hot-rolled steel used by Saha Thai in the production of its export sales is different than the hot-rolled steel used by Saha Thai for its home-market sales. That is the only possible scenario where the particular market situation that Commerce found in this investigation could "prevent{} a proper comparison to the export price." *Id.* at 20 (quoting *Hyundai*, 19 F 4th at 1355 n. 10) (emphasis supplied). Wheatland's theory ignores the statute, recent adverse court decisions, and current Commerce practice.

Central to Wheatland's first approach is the conclusion that the PMS causes Saha Thai's home-market sales to occur outside of the ordinary course of trade. *Id.* at 21. The basis for Wheatland's approach is §1677b(a)(1) which states that "normal value of the subject merchandise shall be the price described in subparagraph (B), at a time reasonably corresponding to the time of the sale used to determine the export price or constructed export price." 19 U.S.C. §1677b(a)(1). Subparagraph B establishes rules for determining "price." Of particular relevance are the provisions within subparagraph B discussing "particular market situation." 19 U.S.C. §§1677b(a)(1)(B)(ii)III); (a)(1)(C)(iii). Neither provision authorizes an adjustment based on the alleged hot-rolled steel price distortions that underly the particular market situation found here. Further, each provision has the object of ensuring an accurate comparison between home-market

prices and export prices. Thus, there must be some aspect of the distortion that impacts the comparison. It is not enough for the words to exist in the statute for Commerce to invoke this authority.

The ordinary course of trade provision in §1677b(a)(1)(B)(i) states that price is "the price at which the foreign like product is first sold { } for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price." 19 U.S.C. §1677b(a)(1)(B)(i). "Ordinary course of trade" is defined as "the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind." 19 U.S.C. §1677(15). Commerce's preliminary determination reveals no difference between export and home-market sales that would implicate hot-rolled steel input prices. The only difference between export and home-market sales that Commerce identified was in level of trade. Prelim. IDM at 18-19, Appx14305-14306. The record does not indicate that there is any difference between home-market sales and export sales that would implicate the price of hot rolled steel—the basis of the particular market situation found in this case.

The definition of "ordinary course of trade" further states that Commerce may find sales outside of the ordinary course of trade in "{s}ituations in which the administering authority determines that the particular market situation prevents a <u>proper comparison</u> with the export price or constructed export price." 19 U.S.C. §1677(15)(C) (emphasis supplied). This provision shows that there must be something about the particular market

situation that causes home-market sales and export sales to occur differently.  In this case, Commerce has made no such finding, nor does the record support any such difference.

Moreover, this issue was recently litigated in *Nexteel Co. v. United States*.  In that decision, the court found that "Commerce on remand may still claim to have had, as a matter of law, 'discretion' to examine whether a particular market situation existed in Korea, but that is only relevant when normal value is based on constructed value." *Nexteel Co. v. United States*, Consol. Court. No. 20-03868, Slip Op. 22-69 at *8 (CIT June 16, 2022).  Since Commerce is not relying on constructed value in this case, taking such a position on remand would be inconsistent with recent Court of International Trade jurisprudence interpreting the very element of the *Hyundai* decision that Wheatland cites here. Fundamentally, "{t}he structure of section 1677b, as amended by the Trade Preferences Extension Act of 2015 (TPEA), clearly indicates that Congress intended to limit PMS adjustments to calculations pursuant to the 'constructed value' subsection." *Hyundai*, 19 F.4th at 1352

Finally, Commerce has already correctly rejected Wheatland's theory.  In the remand redetermination for the 2016-2017 review, Wheatland argued that "if Commerce cannot use the sales-below-cost test to determine which home market sales were made in the ordinary course of trade as a result of the Court's order, it must rely on constructed value."  Final Results of Redetermination Pursuant to CIT Order, *Saha Thai Steel Pipe Co., Ltd. v. United States*, Consol. Court No. 18-00214, Slip Op. 20-181 at *4 (CIT December 21, 2020).  Commerce, correctly, did not implement this suggestion, finding only that "we, under respectful protest, have made no adjustments to the calculation of

each respondent's weighted-average dumping margin to account for a particular market situation."  *Id.* at 6.  Wheatland's new theory has no support in the statute, the case law, or Commerce current practice.

The second path, is based on a determination that Saha Thai's records do not accurately reflect its actual costs.  Def-Inv. Br. at 21.  Wheatland's argument relies on Commerce invoking its authority under §1677(f)(1)(A) which states that "costs shall normally be calculated based on the records of the exporter . . . if such records are kept in accordance with the generally accepted accounting principles of the exporting country and reasonably reflect the costs associated with the production and sale of the merchandise."  19 U.S.C. §1677b(f)(1)(A). In interpreting this language, the Federal Circuit found that it

> authorizes Commerce to make adjustments to reported costs when accounting practices or other circumstances do not accurately reflect the actual costs incurred by the exporter. Welspun suggests that section 1677b(f)(1)(A) extends Commerce's authority to adjust an exporter's costs to cases in which a reported cost accurately reflects what the exporter has paid, but in which the cost was suppressed by a PMS or other factor.

*Hyundai*, 19 F.4th at 1356.  The Federal Circuit's observation that the invocation of this provision is generally reserved for methodological issues undermines Wheatland's argument for invoking this authority here.  Commerce made no finding that Saha Thai's underlying records are flawed in any way.  Wheatland argues that Saha Thai's "actual costs" are artificially low as a result of depressed hot-rolled steel prices.  §1677b(f)(1)(A) does not, however, provide for this type of correction.

In previous cases, the Court of International Trade has found that §1677b(f)(1)(A) "unambiguously imposes two binary yes/no conditions—either the respondent's records (1) 'are kept in accordance with the generally accepted accounting principles' and (2) 'reasonably reflect the costs associated with the production and sale of the merchandise,' or they do not." *LG Chem, Ltd. v. United States*, 534 F. Supp. 3d 1386, 1393 (Ct. Int'l Trade 2021).  Commerce has made no finding that Saha Thai's costs records are flawed so the only question is whether Saha Thai's records accurately reflect its costs.

In *LG Chem*, the Court found that it was reasonable for Commerce to conclude that the respondent's records did not reasonably reflect its costs because there was a superior accounting method available. *Id.* at 1398 ("Commerce's choice of the direct-assignment methodology is supported by substantial evidence.").  Similarly, in *Dillinger France v. United States*, the Federal Circuit upheld Commerce's adjustment to the cost allocation between prime and non-prime products under §1677b(f)(1)(A).  *Dillinger France S.A. v. United States*, 981 F.3d 1318, 1321 (Fed. Cir. 2020).  In both instances, Commerce's determination to shift <u>methodologies</u> was upheld, but there was no finding that the provision allowed Commerce to depart from the respondents reported data entirely.

In fact, the Federal Circuit has previously stated that "{a}s a general rule, an agency may either accept financial records kept according to generally accepted accounting principles in the country of exportation, or reject the records if accepting them would distort the company's true costs." *Thai Pineapple Pub. Co. v. United States*, 187 F.3d 1362, 1366 (Fed. Cir. 1999).  There is no basis for Commerce to find that Saha Thai

has not reported its true costs.  Wheatland is arguing that the statute allows Commerce to

find that Saha Thai's actual cost is distorted by exogenous forces.  Even if that is true, the

cases cited above demonstrate that no remedy lies in §1677b(f)(1)(A) without some

finding that Saha Thai's records are flawed in some way.  Saha Thai notes that Defendant

has not requested a remand that contemplates either of the approaches advanced by

Wheatland.  This Court need not tinker with the scope of Commerce's requested remand

nor rule on the validity of either of Wheatland's flawed theories.  Saha Thai urges this

Court to exercise judicial economy and simply grant Defendant's "request that the Court

remand this case to Commerce to recalculate the weighted-average dumping margin

without making a cost-based particular market situation adjustment in light of *Hyundai*

*Steel*."  Def. Br. at 41.

### C. The Factual Basis For Commerce's PMS Finding Is No Longer Relevant Here

Defendant and Defendant-Intervenors continue to argue that Commerce had a

factual basis to find a PMS in Thailand, Def. Br. at 37-40; Def-Inv. Br. at 12-19, but

these arguments are no longer relevant.  The Federal Circuit has definitively ruled that a

PMS adjustment cannot apply when Commerce makes a price-to-price comparison, and

Commerce has accepted that binding precedent as the reason for a voluntary remand so

that it can "recalculate the weighted-average dumping margin <u>without making a cost-</u>

<u>based particular market situation adjustment</u> in light of *Hyundai Steel*." Def. Br. at 41

(emphasis  added).  Although Plaintiff does not agree that a PMS adjustment was

supported by substantial evidence in this record, the Court no longer has any need to resolve that dispute in this case.

## II.    COMMERCE DID NOT COMPLY WITH THE STATUTORY REQUIREMENTS TO APPLY ADVERSE FACTS AVAILABLE

### A.    Saha Thai Fully Cooperated By Responding to All Requests for Additional Information From Commerce

Defendant and Defendant-Intervenors argue that Saha Thai did not cooperate to the best of its ability in responding to the antidumping questionnaires because Saha Thai did not report its alleged connection to certain home-market customers.  Def. Br. at 10; Def-Inv. Br. at 9. This argument is inconsistent with the record as demonstrated by Saha Thai's responses to Commerce's questionnaires.

Respondents must exert "the maximum effort possible" in ensuring those responses are complete to avoid triggering Commerce's authority to apply adverse inferences in filling gaps in the record.  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  The Federal Circuit has found that a failure to comply with the maximum effort standard applies only in situations where respondents withhold specifically requested information.  *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012); Opening Br. at 47-49.  In this case, Saha Thai responded to every question posed by Commerce.  If it needed more specific information, Commerce had an obligation to make its request clear to respondents.

Defendant argues that Saha Thai did not provide full responses to Commerce's questionnaires, claiming that the standard initial questionnaire placed Saha Thai on notice

to provide additional "necessary" information.  Commerce requested information

regarding Saha Thai's home-market customers four times and Saha Thai fully responded

to each request.  None of these questionnaires indicated that Saha Thai had provided

deficient responses regarding any of the home-market customers found to be affiliated in

the Final Determination or any other deficiency in Saha Thai's responses.

  First, Saha Thai fully responded to Commerce's initial questionnaires, which

included requests for information regarding Saha Thai's affiliation with its home market

customers.  Contrary to Defendant's assertions, the questionnaire did not require Saha

Thai to provide a list of the whole universe of "potential affiliates" to Saha Thai. Def. Br.

at 4. Commerce specifically requested that Saha Thai identify:

> {1.c} If you sold to **affiliated customers**, also report separately the
> quantity and value such sales represent as a percentage of all home market
> sales and of sales in each of the largest third country markets, respectively.

Commerce's Initial Questionnaire at A-2, Appx3308.

Saha Thai submitted its response in accordance with the statutory definition of

"affiliation,"  based on equity ownership and overlapping shareholders, directors and

close family ties.  *See* 19 U.S.C. §1677(33).  As Defendant notes, Saha Thai reported

eight companies as being affiliated in its Section A Response. Saha Thai Section A QR,

at 3-4, Appx82819-82820.  Additionally, in its Section B questionnaire, Commerce

instructed Saha Thai to code customers with either an affiliated or unaffiliated

designation.  Commerce's Section B Questionnaire at B-14, Appx3175.   In response,

Saha Thai provided a complete home-market database, which specified unaffiliated and

affiliated companies. Saha Thai Section B QR at 19, Appx89660. Saha Thai also

provided a full list of its home-market customers in Exhibit B-5. *Id.* at Ex. B-5,
Appx89719-89724. Neither Commerce nor Petitioner noted any gap in Saha Thai's
reporting of its affiliates.

Second, Commerce's first supplemental questionnaire specifically requested
additional information regarding the relationship between Saha Thai and its customers
Blue Pipe, [                                        ], and the selling functions performed by
the affiliated resellers, giving no indication of any deficiency in Saha Thai's earlier
responses. Commerce's First Supplemental Questionnaire, Appx90946-90947. Saha
Thai again fully responded to all of Commerce's questions providing further details and
supporting documentation on Saha Thai's supplier-customer relationship to the four
specified companies. *See* Saha Thai's First Supplemental QR at 2-8, Appx92361-92367.

Third, on March 11, 2021, Commerce issued another supplemental with a single
question, asking Saha Thai only for a revision to the customer coding and to add a
column to the previously submitted exhibit indicating customer affiliation. Commerce's
Second Supplemental Questionnaire, Appx96064. On March 18, 2021, Saha Thai
responded with a revised list of home-market customers and explanation of Saha Thai's
revised customer coding system. Saha Thai's Second Supplemental QR, Exhibit 1,
Appx96073-96079. Once again, Commerce did not address any potential gap in the
record on affiliation for any of the home-market customers. Commerce gave no
indication that Saha Thai's previous responses were deficient in any way.

Fourth, as has been reiterated multiple times, Commerce's third supplemental
questionnaire requested information on affiliates "involved in the development,

NONCONFIDENTIAL

production, sale and/or distribution of the merchandise under review." Commerce's

Third Supplemental Questionnaire at 1, Appx96235. Saha Thai again responded that it

had reported all affiliations of those "involved in the development, production, sale

and/or distribution of the merchandise under review." Saha Thai's Third Supplemental

QR, Part II at 3, Appx96229. Contrary to Defendant's mischaracterization of the

response, Saha Thai responded fully by submitting two more exhibits containing, (1) the

company certificate and shareholder listing for [

]; (2) a list of the managers,

directors, officers, and department heads for Saha Thai and Saha Thai's affiliates. Saha

Thai Third Supplemental QR at 1, Exs. 1-2, Appx96474-96492. Additionally, Saha Thai

responded to all other affiliation related questions and provided supporting

documentation including a complete family tree, Saha Thai employee listings, and

supporting documentation for transactions between Saha Thai and Blue Pipe.

    Saha Thai was required to report companies presenting two cumulative

characteristics: (1) having persons that are equity positions, managers, directors, officers,

and department heads of Saha Thai or family members **<u>AND</u>**; (2) being involved in the

development, production, sale and/or distribution of the merchandise under review.

Commerce's Third Supplemental Questionnaire at 1, Appx96235  Defendant is now

trying to interpret these questions broadly as follow-up questions to the initial

questionnaire such that they put Saha Thai on notice concerning certain of the home-

market customers. Def. Br. 16. But this interpretation goes well beyond the actual

language used in the Third Supplemental Questionnaire.

NONCONFIDENTIAL

Defendant and Defendant-Intervenor's argument that Saha Thai did not provide necessary information that was requested by Commerce regarding affiliation and did not act to the best of its abilities is not supported by the record. Saha Thai responded fully to the questions Commerce asked throughout the period of review and those questions did not indicate any deficiency in Saha Thai's responses or ask for additional information regarding the [      ] companies Commerce ultimately found to be affiliated.

**B.     For [                    ] Home-Market Customers, Additional Information About Affiliation Was Not "Necessary"**

The use of facts available and facts available with an adverse inference are governed by a specific set of statutory provisions. Opening Br. at 43-44. Under the statute, "{t}he first pathway for applying the "facts otherwise available" analysis— paragraph (1) of subsection 1677e(a)—focuses solely on the *absence* of necessary information, not on the reason why it is missing." *Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1337 (Ct. Int'l Trade 2020) (emphasis in original). Commerce thus must first determine that there is information missing, creating a gap in the record, and that the information missing is necessary for the determination.

Although the statute does not specifically define "necessary information," court precedent confirms the underlying purpose of the statute is to calculate antidumping margins as accurately as possible. *Bluescope Steel v. United States*, 548 F. Supp. 3d 1351, 1358 (Ct. Int'l Trade 2021) (citing *Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 519 F. Supp. 3d 1224, 1234 (Ct. Int'l Trade 2021), *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013)). Therefore, for

information to be "necessary" it must be necessary for calculating an accurate antidumping margin.  Here, for those home-market customers that did not re-sell the subject merchandise, Commerce had all of the data needed to calculate an accurate antidumping margin, regardless of whether the home-market customer was considered affiliated or unaffiliated.

This conclusion is clear from an understanding of Commerce's antidumping margin calculation methodology.  For antidumping reviews, Commerce's calculation methodology is to compare individual U.S. sales transactions to a monthly average of home-market sales transaction. 19 U.S.C. §1677f-1(d)(2); *Union Steel v. United States*, 823 F. Supp. 2d 1346, 1350 (Ct. Int'l Trade 2012).  The starting point for such monthly average home-market selling price consists of all home-market sales transactions made by the respondent.  Commerce then makes two adjustments to this starting universe of home-market sales transactions: (1) Commerce excludes individual home-market sales transactions that for which the net selling price is below the costs of production, 19 U.S.C. §1677b(b)(1), 19 C.F.R. § 351.406, and (2) Commerce excludes individual home-market sales transactions made to affiliated customers that "fail" Commerce's "arms-length test."  19 U.S.C. § 1677b(f)(2); 19 C.F.R. § 351.403(c).

Only adjustment (2) is at issue here.  Through the standard SAS code, Commerce undertakes its arms-length test for every home-market sales transaction made to an affiliated home-market customer. *See* Final Analysis Memo, Attachment C at Line 8420 of the home market sales program, Appx99522 (with the following conditional programming: %LET RUN AMRSLENGTH = YES.).  The SAS code also makes clear

that, for those home-market customers that do not re-sell the subject merchandise, vis-à-vis the antidumping margin calculation, whether sales to a home-market customer (that does not re-sell the subject merchandise) pass or fail the arms-length test is a binary conclusion:  they do (RESULTS='PASS') or do not (RESULT='FAIL').  *See* Final Analysis Memo, Attachment C at 129 of the home market sales program, Appx99568.

If the sales transactions pass the arms-length test, they are included in the antidumping margin calculation of average monthly home-market sales prices; if they do not pass the arms-length test; they are not included.  *Id.* at 130, Appx99569.

Given that there is no dispute that Commerce had all necessary sales data for all of Saha Thai's home-market sales, with respect to running the arms-length test in SAS, the only aspect that is needed is to identify whether a home-market customer is or is not affiliated.  Once this designation has been made, Commerce's SAS code methodology can run the arms-length test.

Consequently, vis-à-vis those Saha Thai home market customers that did not re-sell the subject merchandise (identified in Opening Br. at 37-41), there was no missing "necessary" information.  It was very easy for Commerce to designate any customer as either being "affiliated" or "not affiliated" and then let the SAS code run the AD margin calculation program.  Even assuming that all such home-market customers were affiliated, Commerce still had all of the data needed for Commerce to undertake its arms-length test and therefore Commerce had all "necessary" information to undertake an accurate antidumping margin calculation for Saha Thai without resorting to facts available.

NONCONFIDENTIAL

### C. Commerce's Subsidiary Conclusion That Saha Thai Was Affiliated With [                    ] Is Not Supported Substantial Evidence And Is Not Otherwise In Accordance With Law

For the one company that was a reseller and for which the information might be deemed "necessary," Defendant and Defendant-Intervenor argue that Commerce correctly found affiliation between [      ] and Saha Thai based on Petitioner's claim that [                    ] worked as a human resources manager for both [      ] and Saha Thai during the period of review. Def. Br. at 28; Def-Inv. Br. at 10.  Commerce must address all affiliation evidence for each customer found to be affiliated individually. In this case, neither Commerce nor Defendant could point to evidence that established affiliation of [      ].  See Final Analysis Memo at 2, Appx99505; Def. Br. at 28-29.

Defendant's argument and Commerce's entire affiliation determination regarding [     ] is based on this single employee connection.  And, the documents provided in Petitioners Rebuttal Factual Information submission only show that a [                    ] was working in the human resources department of [      ] in April 2020, which is not during the period of review. Petitioner's RFI to Blue Pipe at Exhibit 3, Appx97989-97992.  Petitioner presented no evidence that [      ] directors or shareholders had any commonality with Saha Thai during the relevant period. *See* Opening Br. 32-34.  And as the Court of International Trade has held, a single employee with the same email address is not enough to establish affiliation.  *See Heavy Indus. Co., Ltd. v. United States,* 393 F. Supp. 3d 1293, 1319 (Ct. Int'l Trade 2019).  Defendant does not contest this, but instead repeats Commerce's mantra "Commerce could not assume that this was the only tie between Saha Thai and [      ]." Final Analysis Memo at 2,

- 18 -

Appx99505; Def. Br. at 29. We strongly disagree. Commerce may not "assume;" it must investigate and calculate the most accurate margin dumping under its statutory obligations. *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990). Additionally, no member of the board of directors of [      ], [      

                                                    ] were associated with Saha Thai. Petitioner's NFI to Blue Pipe at Ex. 3, Appx97886-97913. Likewise, Petitioner's new factual information also shows that there were no overlapping shareholders between Saha Thai and [      ]. *Id.*

      Defendant cites a single case in support of its argument that [      ] should be considered affiliated, arguing that Commerce may resort to adverse facts available if the questions requesting information were specifically for *all companies*. Def. Br. at 29 (citing *N.M. Garlic Growers Coal. & El Bosque Farm v. United States*, 352 F. Supp. 3d 1281 (Ct. Int'l Trade 2018). However, in *N.M. Garlic Growers*, the respondent claimed absolutely no affiliations in response to Commerce's initial questionnaires and its separate rate application. *N.M. Garlic Growers*, 352 F. Supp. 3d at 1291. Immediately after the initial questionnaire, petitioners then placed on the record numerous documents demonstrating the respondent's familial ties with other entities. *Id.* And unlike in the case here, Commerce then issued supplemental questionnaires specifically asking for information regarding those familial ties and the affiliation alleged by petitioners pertaining to specific family members and entities. In its supplemental questionnaire response, the respondent denied any familial connection to the people identified. *Id.* at 1292. Commerce then applied facts available with an adverse inference. In the case

before this Court, Commerce issued no such supplemental questionnaire regarding potential affiliation with [      ] or any of the other [    ] companies despite having ample opportunity to do so before making a final determination.

Defendant and Defendant-Intervenor support Commerce's decision to apply facts available with an adverse inference based on a single question: "state whether Saha Thai's or any of Saha Thai affiliates' employees, stockholders, managers, directors, officers, or department heads has an equity or a debt position in any other company involved in the development, production, sale and/or distribution of the merchandise under review." Commerce's Third Supplemental Questionnaire at 1, Appx96235.  As reiterated by Defendant and Saha Thai, Commerce's question specifically asked for information regarding those "*involved in the development, production, sale and/or distribution of the merchandise under review*."  It is not a common business practice for human resources employees to be in any way involved in the *development, production, sale and/or distribution* of a company's merchandise and therefore Saha Thai had no reason to specifically be aware of or disclose this information in response to Commerce's very specific question regarding affiliation.[1]

Commerce's position that it was appropriate to apply facts available with an adverse inference is completely unfounded and the evidence on the record does not

---

[1] Saha Thai asks the Court to take judicial notice of the Cambridge Dictionary definition of "human resources manager." *Human Resources Manager*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/human-resources-manager (last visited Aug. 25, 2022) ("a person who in charge of the department that deals with the employment, training, support, records, etc. of a company's employees.")

establish affiliation for [      ] under the statute or regulations.  This subsidary

conclusion thus does not provide a proper factual predicate to apply facts available with

an adverse inference.

> **D.    In Any Event, Commerce Never Notified Saha Thai Of Alleged Deficiencies Concerning Affiliated Home-Market Customers And Therefore Its Decision To Appy Adverse Facts Available Was Unlawful**

As discussed above, there are a number of requirements that must be met before

Commerce can apply facts available with an adverse inference.  First, the information

must be necessary.  Second, Commerce must provide notice of the deficiency in the

respondent's reporting. Commerce has a specific statutory obligation to inform

respondents if there are deficiencies in responses to questionnaires. 19 U.S.C §1677m(d).

Defendant and Defendant-Intervenor argue that Saha Thai had sufficient notice of

deficiencies in its responses and that Commerce has no obligation to inform a respondent

of a deficiency if the respondent intentionally omitted information from the record.  Def.

Br. at 33-34; Def-Inv. Br. at 11.  Both of these arguments are legally and factually wrong.

> **1.    Commerce did not provide Saha Thai with sufficient notice of deficiency in its responses or an opportunity to respond to Petitioner's allegations of affiliation**

Saha Thai provided complete submissions and supporting documentation to every

question posed by Commerce.  All of the "necessary" information was on the record.

Defendant argues that Commerce's supplemental questionnaire inquiring further into

affiliation with home-market customers put Saha Thai on notice of a deficiency.  Def. Br.

at 14-15, 32.  This court has recently restated that "{b}roadly drawn initial or

supplemental questionnaires may not sufficiently place a respondent on notice of the

NONCONFIDENTIAL

nature of the deficiency and may thus deprive the respondent of the opportunity to remedy that deficiency." *Hyundai Elec. & Energy Sys. Co. v. United States*, No. 20-00108, Slip Op. 22-42 at *7 (Ct. Int'l Trade May 10, 2022)(citing *Ta Chen Stainless Steel Pipe v. United States*, 23 CIT 804, 820(1999)).

Defendant quotes *Linyi Chengen Imp. & Exp. Co. v. United States*, for the proposition that Commerce has fulfilled its obligation under 19 U.S.C. §1677m(d) when it has "specifically point{ed} out and request{ed} clarification of the party's deficient responses." Def. Br. at 32-33 (*citing Linyi Chengen Imp. & Exp. Co*., 391 F. Supp. 3d 1283, 1287 (Ct. Int'l Trade 2019); *also citing Shandong Dongfang Bayley Wood Co. v. United States*, 375 F. Supp. 3d 1339, 1345 (Ct. Int'l Trade 2019)). Both cited cases, however, stress the specificity of the questions asked by Commerce in its supplemental questionnaires. Throughout this review, Saha Thai responded to the specific questions as they were posed by Commerce, not Defendant and Defendant-Intervenor's misleading restatement of the questions.

In support of its argument, Defendant references Commerce's question asking Saha Thai to provide a family tree and identify members involved in the production, development, sale or distribution of merchandise under review, implying that Saha Thai did not fully respond to the specific question. Def. Br. at 32. Saha Thai provided Exhibit-3 including exactly the information requested, which did not reference the [    ] customers Petitioners alleged as potentially affiliated. Saha Thai Third Supplemental QR, Part II, Appx96493-96504. Saha Thai had no reason to include additional information regarding the [       ] alleged affiliates because the question did

- 22 -

not ask for such information.  As demonstrated repeatedly, no [      ] employee has any familial ties to Saha Thai's family tree and the remaining [    ] customers did not re-sell subject merchandise during the period of review.  *See* Saha Thai Rebuttal NFI, Appx98782-98783; Saha Thai's Rebuttal Brief, Appx99476-99483; Opening Br. at 29-41.  Therefore, Saha Thai fully complied with Commerce's specific request and was not on notice of any further deficiency in its responses.

Additionally, in *Linyi*, the petitioners placed information on the record of the respondents affiliation that was sufficient to establish affiliation.  *Linyi,* 391 F.Supp. 3d at 1298. In the case presently before this Court, the information on the [     ] alleged affiliates does not establish affiliation under the statute and therefore if Commerce had doubts on potential affiliation it could have issued a supplemental questionnaire.

Even if Saha Thai's information regarding [     ] and the other six home-market customers could have been deemed deficient, Saha Thai had no opportunity to remedy any potential gap without breaching its regulatory obligations.  The additional information placed on the record regarding [     ] was done so in Petitioner's rebuttal information directed to [        ].  Petitioner's RFI to Blue Pipe at 1, Appx97685. Under 19 C.F.R. §351.301(c)(1)(v), only the "original submitter" of the supplemental questionnaire response is permitted one opportunity to submit factual information. Therefore, only Blue Pipe was authorized to rebut Petitioner's NFI.  No other interested party could have rebutted the information—including Saha Thai.

Additionally, Petitioner submitted information on [     ] under administrative protective order ("APO"). Under 19 U.S.C. §1677f(b)(1)(A) proprietary information

NONCONFIDENTIAL

"shall not be disclosed to any person without the consent of the person submitting the information."  Under §1677f(c)(1)(A) only legal counsel admitted to the APO can have access to business proprietary information submitted by interested parties.  The regulations are particularly careful with providing information on "customers names." 19 U.S.C. §1677f(c)(1)(A). Because the identity of each of [          ] customers were covered under APO, counsel for Plaintiff could not discuss the information on shareholding and board membership with Saha Thai.  Doing so would have violated counsel's legal obligations and exposed counsel to risk of disbarment before Commerce. 19 U.S.C. §1677f(c)(1)(B).

Commerce did not "promptly" or otherwise inform Saha Thai of any deficiency in its response or provide an opportunity to remedy or explain such deficiency raised the Petitioner's submission, as is required by the statute, therefore Commerce's application of facts available with an adverse inference is not in accordance with the law or supported by substantial evidence.

### 2.      Saha Thai did not intentionally provide deficient responses

Defendant implies that Saha Thai provided intentionally incomplete responses and therefore Commerce was not obligated to notify it of a deficiency. Def. Br. at 33.  This completely mischaracterizes Saha Thai's responses.  Throughout the review, Saha Thai fully and accurately responded to each of Commerce's questionnaires.  In the response to the initial questionnaires, Saha Thai provided a list of all its known affiliates.  Saha Thai Section A QR, Appx82819-82820.  And subsequently responded to each and every

supplemental question.  Even if Saha Thai's responses are found to be deficient there is no record evidence even suggesting that the deficiencies were intentional.

Defendant cites multiple cases in support of its claim that when a respondent intentionally submits incomplete data or information, 19 U.S.C §1677m(d) does not require Commerce to report a "deficiency." Def. Br. at 34.  There is no evidence on this record, however, that Saha Thai intentionally omitted information during the administrative review.  For Commerce to avoid its obligation under 19 U.S.C §1677m(d), Defendant would have to demonstrate that Saha Thai "intentionally" submitted incomplete information.

First, Defendant cites *Papierfabrik August Koehler SE v. United States*, a case in which an affidavit was placed on the record citing the respondent for engaging in a scheme to skew the home-market sales data and an admission by the respondent to such a scheme. *Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373,1376-77 (Fed. Cir. 2016).  Commerce found the attempted remedy untimely and applied facts available with adverse inferences. *Id.* at 1378-79. The determination was upheld because §1677m(d) does not require Commerce to give the respondent an opportunity to remedy its intentional misconduct. *Id.*  The court stressed "{t}he 'deficiency' in Koehler's questionnaire responses occurred because Koehler intended to submit deficient, incomplete, and fraudulent questionnaire responses." *Id.* at 1384.  In the case before this Court, in contrast, there is no such evidence of intentional misconduct and therefore Commerce remained under its obligation to provide an opportunity for Saha Thai to respond.

NONCONFIDENTIAL

Second, Defendant references *ABB Inc. v. United States*, which case is also inapposite.  In that case, despite Commerce's request to separately report service-related revenues, the respondent "submitted no information, much less deficient information, and stated it had no such information to report." *ABB Inc. v. United States*, 355 F. Supp. 3d 1206, 1222 (Ct. Int'l Trade 2018).  Additionally, Commerce only learned of the deficiency in respondent's submission during verification.  In the case here, in contrast, Commerce never requested additional information regarding [        ] and the [    ] other customers even though there was ample opportunity to do so.  At no point did Commerce even imply an issue of potential affiliation until the Final Determination.  Even then, Commerce only states "we cannot determine that Saha Thai is necessarily not affiliated with any of these home market customers." Final Analysis Memo at 2, Appx 99505.

Therefore, since Commerce never requested additional information or the re-sale data of the [        ] allegedly affiliated customers, Commerce lacked the statutory authority to apply facts available with an adverse interest and the determination should be found unsupported by substantial evidence and unlawful.

## III.   COMMERCE MUST REVISE THE CALCULATION OF THE AD ASSESSMENT RATE IN THIS REVIEW BECAUSE IT INCLUDES OUT-OF SCOPE MERCHANDISE

In its opening brief, Saha Thai argued that in light of this Court's determination that dual-certified pipe is not subject to the order under which this review is being conducted, Commerce should revise its antidumping duty calculation to remove those sales.  Opening Br. at 52-54; Final Results of Redetermination Pursuant to Court

Remand, *Saha Thai Steel Pipe Pub. Co. v. United States*, 547 F. Supp. 3d 1278 (Ct. Int'l Trade 2021). Saha Thai also amended its complaint prior to filing the opening brief to squarely present this issue to the Court. *See* Unopposed Mot. to Amend the Compl., ECF No. 37 (Apr. 7, 2022).

Defendant argues that Saha Thai failed to exhaust its administrative remedies because it did not brief the inclusion of certain sales that have since been determined to be out-of-scope. Def. Br. at 41-43; see also Def-Inv. Br. at 22. This argument fails to address the timing of the relevant administrative decisions and fails to distinguish the legal authority cited by Saha Thai in its opening brief demonstrating Commerce's affirmative obligation to amend its determination.

The relevant facts are as follows:

- On June 30, 2020, Commerce made a final determination that dual-stenciled pipe was within the scope of the order. *See Notice of Scope Rulings*, 85 Fed. Reg. 60,762, 60,763 (Sept. 28, 2020);

- On December 10, 2020, Saha Thai submitted its Section C questionnaire response, including its sales database. Section C QR, Appx89756;

- On January 27, 2021, Commerce applied facts available with an adverse inference to Saha Thai for failing to report sales that were covered by the scope ruling. *See Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments, In Part; 2018-2019*, 86 Fed. Reg. 7,259 (Jan. 27, 2021);

- On July 21, 2021, Saha Thai submitted is case brief in this review. *See* Saha Thai Admin. Case Br., Appx 98943;

- On October 6, 2021, this Court issued its opinion ruling that Commerce's scope determination regarding dual-stenciled pipe

"unlawfully expanded the scope" of the order.  *Saha Thai*, 547 F. Supp. 3d at 1292;

- On December 8, 2021, Commerce issued the final results in this review. *Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*, 86 Fed. Reg. 69,620 (Dec. 8, 2021), Appx14280; and

- On January 4, 2022, Commerce issued its remand redetermination in the scope proceeding in which Commerce changed its scope determination, concluding that dual-certified line pipe was <u>not</u> covered by this AD order. Final Results of Redetermination Pursuant to Court Remand, *Saha Thai Steel Pipe Pub. Co. v. United States*, 547 F. Supp. 3d 1278 (Ct. Int'l Trade 2021).

- On August 25, 2022 this Court rendered its final judgment affirming Commerce's remand redetermination that dual-certified line pipe was not covered by this AD order.  *Saha Thai Steel Pipe Public Company v. United States*, Court No. 20-133, Slip Op. 22-99 (Ct. Int'l Trade, Aug. 25, 2022).

As demonstrated above, when Saha Thai submitted its case brief in this proceeding on July 21, 2021 the law was that dual-certified pipe was within the scope of the order.  Commerce's position on this issue was made clear earlier in January 2021 when Commerce applied facts available with an adverse inference to Saha Thai in the 2018-2019 review.  This issue was, therefore, not live during the administrative review that is subject to this appeal.

Saha Thai continues to believe that Commerce is under an affirmative obligation to correct the Final Results of this review to comport with the scope of this order.  *Borlem S.A.-Empreedimentos Industriais v. United States,* 913 F.2d 933, 939 (Fed. Cir. 1990) ("we have an incorrect fact determination, corrected by the governmental agency that issued it, while the appeal was pending, which determination when properly considered,

may lead to a different result."). Defendant argues that *Borlem* does not control here because it does not involve exhaustion, but Defendant's argument misses the point. *Borlem* stands for the proposition that Commerce must correct determinations that rely on incorrect facts. *Borlem*, 913 F.2d at 939.

Moreover, *Sonoco Steel Tube Div. v. United States* underlines the need for Commerce to correct issues related to scope. Specifically, Judge Restani stated that "{i}t is impossible to totally separate the effects of an original determination from subsequent events, as defendant would wish. An annual review does not have independent existence, it requires a valid underlying order." *Sonoco Steel Tube Div. Ferrum, Inc. v. United States*, 12 CIT 990, 991 (1988). Fundamentally, Commerce is without authority to impose antidumping duties on imports that are not within the scope and allowing Commerce to include such sales in calculating the antidumping assessment rate would be contrary to law.

With respect to Defendant's arguments regarding exhaustion, the timeline of events triggers two exceptions to the exhaustion requirement. Specifically, the futility exception and the pure question of law exception.

The statute governing this Court's jurisdiction states that the Court "shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. §2637(d). This requirement is mirrored in Commerce's regulations.19 C.F.R. §351.309(c)(2). The Court of International Trade and the Federal Circuit have interpreted this requirement strictly, but have recognized certain exceptions to the rule. *See, e.g.*, *Corus Staal BV v. U.S.*, 502 F.3d 1370, 1379 (Fed. Cir. 2007). These exceptions recognize that the

exhaustion requirement is not absolute and the existence of the doctrine is designed to promote administrative efficiency while ensuring that litigants receive any remedy they are due. *McCarthy v. Madigan*, 503 U.S. 140, 144-45 (1992); *United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952). Here, Saha Thai lacked a meaningful opportunity to seek an administrative remedy to the scope issue, in the context of this review, at the time case briefs were due and thus it is appropriate for Saha Thai to present the issue to this Court now.

The Federal Circuit has explained that "{t}he futility exception to the exhaustion requirement has been applied in situations in which enforcing the exhaustion requirement would mean that parties 'would be 'required to go through obviously useless motions in order to preserve their rights.'" *Corus Staal*, 502 F.3d at 1379 (quoting *Bendure v. United States*, 554 F.2d 427, 431 (Ct. Cl. 1977) (quoting *Walsh v. United States*, 151 Ct. Cl. 507, 511 (1960))). It would have been futile for Saha Thai to raise this issue in the context of 2019-2020 review because Commerce had explicitly and unambiguously stated its position regarding the inclusion of dual-certified pipe sales that were subject to the scope proceeding in the 2018-2019 review. This action by Commerce demonstrated to Saha Thai that there was no meaningful opportunity to address the issue in the context of the 2019-2020 review that is now subject to this appeal. Including the issue would have been an "obviously useless motion," which the Federal Circuit has recognized is not required.

In *Itochu Building Products v. United States*, the Federal Circuit considered a situation that is highly analogous to the one now before this Court. In that case, the court

examined the interaction of a changed circumstances review, that altered the scope of the case, with an argument about the effective date of the change in scope. *Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1142 (Fed. Cir. 2013). Commerce rejected the respondents argument in its preliminary determination but later argued in court that the respondent had waived its effective date argument because it was not included in the administrative case brief. *Id.* The court found that the futility exception was appropriate because, *inter alia*, Commerce's position on the issue was based on a legal position that it was actively defending in court. *Id.* at 1146. Similarly, at the time that Saha Thai submitted its case brief, Commerce was actively litigating its position regarding the scope of this case. And Commerce had confirmed that it was iterating this position in administrative reviews by applying facts available with and adverse inference to Saha Thai. As a result, raising the issue in the underlying administrative proceeding would have been futile.

The pure question of law exception is also relevant here. The pure question of law exception may be properly invoked where the case presents a pure legal issue, requires only the examination of a controlling statute, and does not require the development of the factual record. *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1003 (Fed. Cir. 2003); *see also Itochu*, 733 F.3d at 1146 ("Requiring exhaustion may also be inappropriate where the issue for the court is a 'pure question of law' that can be addressed without further factual development or further agency exercise of discretion"); *Agro Dutch Indus. Ltd. v. United States*, 508 F.3d 1024, 1029 (Fed. Cir. 2007) (upholding

the lower Court's determination that an argument that implicates a pure question of law may be addressed on appeal despite a failure to exhaust).

Saha Thai's arguments regarding the inclusion of out-of-scope merchandise in the antidumping duty calculation in this review is a pure question of law under that framework.  Commerce performed this review pursuant to its authority under §1675(a)(2) which states that Commerce shall determine the "normal value and export price . . . of each entry of the subject merchandise."  19 U.S.C. §1675(a)(2)(i).  At the beginning of this review the law was that dual-certified pipe was within the scope of the order.  Now, the law is that dual-certified pipe is not within the scope of the order.  As this Court found in its recent opinion, "the scope of the Thailand Order cannot now be read to include dual-stenciled line pipe."  *Saha Thai*, Ct. No. 20-133, Slip Op. 22-99 at 9.  No discretion, expertise, or additional facts are required to implement this change.  Saha Thai's sales of dual-certified pipe are separately identified and Commerce can easily adjust its calculations.  The question is whether Commerce has the authority to maintain its current calculation at all.  This Court can rule on that question alone and the proper result will be reached even if the scope determination is later overturned on appeal.

For these reasons, this Court has the authority to consider its arguments regarding the inclusion of sales of dual-certified pipe in the antidumping duty calculation and that the appropriate outcome is that they be removed.  In fact, the removal of non-scope sales from the antidumping duty calculation in this review is the only possible legal outcome on these facts.

**CONCLUSION**

For all of the foregoing reasons, Saha Thai respectfully requests that the Court holds unlawful Commerce's final determination rendered in the underlying administrative review and remand with instructions for Commerce to reissue its AD review determination consistent with the Court's decision.

Respectfully submitted,

/s/  Daniel L. Porter

Daniel L. Porter
James P. Durling
James C. Beaty
Ana Amador

**Curtis, Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, NW
Washington, DC, 20006

*Counsel for Plaintiff Saha Thai Steel Pipe
Public Company Limited*

August 26, 2022

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2010 using a proportionally spaced typeface 13 point Times New Roman font.

In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth in the Chambers Procedures. Specifically, excluding those exempted portions of the brief as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains 8,359 words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/  Daniel L. Porter

Daniel L. Porter

**Curtis, Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, NW
Washington, DC, 20006

*Counsel for Plaintiff Saha Thai Steel Pipe Public Company Limited*